## STOCK PURCHASE AGREEMENT

This Agreement is made as of the 17th day of December, 2014 by and between Fred Rebarber-Ocasio, of legal age, married under a separate property regime, executive and resident of Carolina, Puerto Rico (the "Seller"), and Luis Feliciano Muñoz, of legal age, married, executive and resident of San Juan, Puerto Rico (the "Purchaser").

### WITNESSETH

WHEREAS, Seller owns 50 shares of the common stock Air America, Inc. (the "Corporation"), which constitute all of the issued and outstanding shares of common stock of the Corporation;

WHEREAS, Purchaser desires to acquire from Seller, and Seller desires to sell to Purchaser eighty percent (80%) of the shares of common stock owned by Seller or 40 shares of the common stock of the Corporation (the "Shares"), Seller retaining the remaining ten (10) shares of common stock of the Corporation currently outstanding (the "Minority Interest");

NOW, THEREFORE, in consideration of the premises and of the mutual covenants contained herein, the parties agree as follows:

### ARTICLE I
### SALE AND PURCHASE OF SHARES

A.    Purchase and Sale. On the terms and subject to the conditions set forth in this Agreement, for an aggregate purchase price of one million three hundred thousand dollars ($1,300,000.00) (the "Purchase Price"), Seller hereby sells, assigns, transfers and delivers to Purchaser, and Purchaser hereby purchases and accepts from Seller, the Shares.

B.    Payment. The Purchase Price is paid by Purchase to Seller as follows:

(i) the amount of one hundred thousand dollars ($100,000) paid by Purchaser to Seller on November 12, 2014 upon Seller's acceptance of Purchaser's offer to purchase the Shares set forth in a letter agreement of even date therewith (the "Letter Agreement"), receipt of which sum the Seller hereby acknowledges;



(ii) the amount of nine hundred fifty thousand dollars ($950,000) paid by Purchaser to Seller simultaneously with the execution of this Agreement, receipt of which sum Seller hereby acknowledges; and

(iii) the balance of two hundred and fifty thousand dollars ($250,000) in a single payment twelve (12) months after the date hereof, without interest, which amount shall be evidenced by a non-negotiable promissory note for the same amount (the "Note") substantially in the form of Exhibit A hereof. The Note shall be secured with a lien on the Beechcraft King Air E-90 aircraft, serial number SB LW-173, registration N707TL, owned by the Corporation, pursuant to an Aircraft Security Agreement of even date herewith.

C.     Other Deliveries. As set forth in the Letter Agreement, simultaneously with the execution of this Agreement:

(i) Seller delivers to Purchaser the certificate no. 1 representing the Shares acquired, duly endorsed in favor of Purchaser.

(ii) The Corporation and/or Seller have satisfied 100% of any known accrued expenses and debt of the Corporation. Any unrecorded or undisclosed expenses and liabilities related with the operations of the Corporation prior to this date (the "Unrecorded Expenses") found by the Purchaser after the date hereof, shall be paid by Seller to the Corporation upon claim thereof by Purchaser or the Corporation supported by adequate evidence. If Seller fails to reimburse the Corporation, in addition to any rights available at law to collect the Unrecorded Expenses, Purchaser shall have the right to deduct or set-off the Unrecorded Expenses from face value of the Note. All expenses incurred by the Corporation prior to the date hereof shall run on the account of the Seller; and all expenses incurred by the Corporation after the date hereof will run on the account of the Corporation. In addition, any expenses incurred by the Corporation after the date hereof that should have been incurred by the Corporation prior to this date, will be on the account of the Seller and shall be considered Unrecorded Expenses.

(iii) On the date hereof Seller has caused the Corporation to draw from the Corporation's Bank account at Banco Popular de Puerto Rico (the "Popular Bank Account") a certified or bank manager's check in the amount of $170,197.21 (the "Transfer Check"), corresponding to the aggregate balance of deposits held or contracted by the Corporation for



2

services hired on or prior to the date hereof but to be rendered subsequently, net of a 5% fee and a proration of prepaid aircraft insurance. The breakdown of the Transfer Check amount is set forth in Exhibit B attached hereto. The Transfer Check shall be deposited by Purchaser into a new bank account that Purchaser shall cause to be opened by the Corporation. Seller is authorized to draw after the date hereof  from the Popular Bank Account the funds therein after the issuance of the Transfer Check in the form of a dividend distribution to the Seller and the Popular Bank Account shall be closed no later than January 10, 2015.

(iv)  The Corporation has entered into a Consulting Agreement with Seller in the form of Exhibit C hereof.

D.     Corporate   Control;   Amendments   to   Articles   of   Incorporation. Simultaneously with the execution of this Agreement:

(i) Seller is resigning as officer of the Corporation;

(ii) Seller and Purchaser, as the sole stockholders of the Corporation, are agreeing to amend and restate the certificate of incorporation of the Corporation to, among other things, (1) convert the Corporation to a close corporation, (2) expand the corporate purposes; (3) change the resident agent, (4) establish restrictions on the transfer of the shares of common stock of the Corporation (including the shares that Seller retains) and (5) provide that the business of the Corporation shall be managed by the stockholders, acting as directors of the Corporation, but with a vote in meetings and consent for decisions equivalent to the respective percentage of the shares of common stock outstanding that each hold.

The amendment and restated certificate of incorporation shall be substantially in the form of Exhibit D.



## ARTICLE II
## SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants the matters set forth in this Article II, as follows:

A.     Capitalization.   The authorized capital of the Corporation consists of 10,000 shares of common stock with a par value of $100 each, of which 50

3

shares are outstanding. The Shares have been duly and validly issued and are fully paid and non-assessable. There are no authorized or outstanding options, warrants, or other rights to acquire the Shares, and there are no voting trusts or other agreements with respect to the voting of the Shares. No legend or other reference to any purported lien or encumbrance appears upon any certificate representing equity securities of the Corporation. There are no contracts relating to the issuance, sale, or transfer of any equity securities or other securities of the Corporation. The Shares were not issued in violation of the Securities Act of 1933, as amended, or any other federal, state or municipal law governing the issuance or transfer of securities, or any other legal requirement.

B.  Title to the Shares. Seller is the record and beneficial owner and holder of, and has good title to, the Shares, free and clear of all claims, liens, adverse interests and encumbrances. No person other than the Purchaser has any written or oral agreement or option or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement or option for the purchase from the Seller of the common stock of the Corporation, including the Shares.

C.  Conduct of Business and Liabilities; Agreement Not a Breach. The Corporation is not in default under, and no condition exists that with notice or lapse of time would constitute a default of the Corporation under (i) any mortgage, loan agreement, evidence of indebtedness or other instrument evidencing borrowed money to which the Corporation is a party or by which the Corporation or the properties of the Corporation are bound, or (ii) any judgment, order or injunction of any court, arbitrator or governmental agency that would reasonably be expected to affect materially and adversely the business, financial condition or results of operations of the Corporation taken as a whole. The execution and delivery of this Agreement by Seller, and the consummation by Seller of the transactions contemplated herein, do not and will not violate, conflict with or be prohibited by any provision of, or result in the acceleration of any obligation under any mortgage, lien, material agreement or instrument, arbitration award, judgment, order, writ, injunction, permit or decree by which the Seller or the Corporation are bound, and do not and will not violate or be in conflict with the Certificate of Incorporation or Bylaws of the Corporation or with any federal, Commonwealth of Puerto Rico or local law, statute, regulation or ordinance or any other restriction, agreement of any kind or character by which the Seller or the Corporation are bound.

4

D.   Operating Rights, Licenses and Permits.  The Corporation has all operating authority, licenses, franchises, permits, certificates, consents, rights and privileges (collectively "Licenses") as are necessary or appropriate to the operation of its business as now conducted and as proposed to be conducted and which the failure to possess would have a material adverse effect on the assets, operations or financial condition of the Corporation. Such Licenses are in full force and effect, no violations have been or are expected to have been recorded in respect of any such Licenses, and no proceeding is pending that could result in the revocation or limitation of any such Licenses.  The Corporation has conducted its business so as to comply in all material respects with all such Licenses.

E.   Enforceability. This Agreement constitutes a legal, valid and binding obligation of the Seller, enforceable against Seller in accordance with its terms.

F.   Organizational Authority. The Corporation: is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Puerto Rico; has all requisite organizational power to own its property and conduct its business as now conducted and as presently contemplated; and is duly qualified and in good standing and is duly authorized to do business in each jurisdiction where the nature of its properties or business requires such qualification.

G.   Title to Corporate Assets; No Undisclosed Liabilities. The Corporation owns in fee simple all the assets listed in Exhibit E, free and clear of any and all liens and encumbrances. Except for liabilities or obligations described in Exhibit E (collectively, "Liabilities"), neither the Company nor any of the property of the Corporation, is subject to any liability, indebtedness or obligation. The Corporation has not incurred in financial debt, other than expenses incurred and not paid under the ordinary course of business. Except as provided in Exhibit E, the assets of the Company are not subject to any security interest, pledge or other encumbrance and the Corporation has not guaranteed the indebtedness or obligations of any other person or entity.

H.   Taxes. The Corporation has filed all federal, state, Commonwealth of Puerto Rico, municipal and other tax returns required to be filed, and all taxes, assessments and other governmental charges due from the Corporation have been fully paid. The Corporation has all the necessary

5

records to support the deductions taken in its income tax returns filed for the years 2013, 2012, 2011, 2010 and 2009. The Corporation has paid the Puerto Rico sales and use tax on parts and equipment introduced to Puerto Rico forming part of its inventory.

I.     No material unrecorded debt, contingencies or accrued expenses. The Corporation has no material unrecorded or unreported liabilities or contingencies.

J.     No penalties, pending balances or violations. Nether the Seller nor the Corporation have received any notices of violation, corrective action letters or similar correspondence or documents from governmental entities related to the operations of the Corporation that have not been completely and satisfactorily resolved with the corresponding governmental entities.

K.     Litigation.  There is no litigation, arbitration, proceeding or investigation pending, or, to the knowledge of the Seller, threatened, against the Seller or the Corporation that, if adversely determined, could result in a material judgment against the Corporation not fully covered by insurance, could result in a forfeiture of all or any substantial part of the property of the Corporation, or could otherwise have a material adverse effect on the assets, business or prospects of the Corporation. These include any and all proceedings or investigations related to aviation, employment, trade and suppliers, stockholders or any governmental bodies.

L.     Disclosure.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of the Seller in connection with the transactions contemplated hereby contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect.

M.     Books and Records. The books of account of the Corporation, all of which have been made available to Purchaser, are complete and correct and have been maintained in accordance with sound business practices and all of such books of accounts are in the possession of the Corporation.

N.     Labor Arrangements, Personnel and Benefit Plans. The books and records of the Corporation with respect to its employees is complete and correct, containing the names and addresses of all its employees, showing the

compensation payable to each and all accrued vacation time, sick leave and holiday time and information of all employment contracts to which the Corporation is a party or by which it is bound, and all bonus, medical expense, dental expense, hospitalization, life insurance or other death benefit, severance and other benefit plans, agreements, arrangements or other programs providing remuneration or benefits for its employees. The Corporation is not party to, or bound by or obligated to contribute to, any collective bargaining agreement or other similar contract with any labor organization, as a result of which it is bound as to the terms and conditions of employment or its hiring or termination policies with respect to any of its employees. The Corporation has experienced no, and there is no known pending or threatened labor dispute, strike, work stoppage, slowdown or labor disturbance affecting or threatening its business operations, nor has there been any labor union organizing activity within the last three years. There is no known unfair labor practice or other charge or complaint pending or threatened against the Corporation before any court or governmental agency. The Corporation does not maintain or sponsor and has not maintained or sponsored any employee benefit plan or other plan maintained for the employees of the Corporation and covered by Title IV of the Employee Retirement Income Security Act of 1974 (ERISA).

O.   Health, Safety and Environmental. The Corporation has obtained all material permits and licenses required under applicable law to operate its business as it is currently conducted, and has complied in all material respects with and is in compliance with all such permits and licenses and laws and orders relating to, the public health and safety, worker health and safety and pollution or protection of the environment.

P.   Power of Attorney.   No material power of attorney or similar authorizations given by the Corporation are presently in effect.

Q.   Transactions with Affiliates.   Neither the Seller nor any entity owned or controlled by the Seller is a party to any agreements, understandings or proposed transactions with the Corporation, except as contemplated hereunder.   The Corporation has not guaranteed or assumed any obligations of the Seller or any members of his family.



7

## ARTICLE III
## PURCHASER'S REPRESENTATIONS AND WARRANTIES

Purchaser represents and warrants the matters set forth in this Article II, as follows:

<u>Authority, Approval and Enforceability</u>.  This Agreement has been duly executed and delivered by Purchaser, and Purchaser has all requisite authority and the legal capacity to execute and deliver this Agreement, consummate the transactions contemplated hereby and fully perform its obligations hereunder.  Upon execution and delivery, this Agreement constitutes a legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms.

## ARTICLE IV
## SELLER'S INDEMNITY

A.  <u>Indemnity Obligation</u>. Seller agrees to indemnify and save and hold harmless the Purchaser from and against all losses, claims, causes of action, obligations, suits, costs, damages, expenses (including, without limitation, reasonable attorney's fees and disbursements) and liabilities which the Purchaser and/or any of its directors, officers, employees and agents may suffer or incur or be compelled to or be subject to and which are caused by or arise directly or indirectly by reason of the breach of any representations and warranties of the Seller contained herein.



B.  <u>Set-off.</u> Upon notice to Seller specifying in reasonable detail the basis of a claim of indemnity hereunder, Buyer may set-off any amount to which it is entitled under this Article IV against amounts otherwise payable under the Note and the exercise of such right shall not constitute a default under the Note or under any instrument securing the payment of the Note. If the amount of the indemnity claim to which Purchaser would be entitled under this Article is not definitively established but the loss is reasonably probable given the circumstances, Purchaser may deduct from the payment due under the Note a reasonable estimate of the amount of the loss, provided that Purchaser deposits the deducted amount in escrow with a mutually agreed escrow agent, who shall hold such funds in escrow until the amount of the claim is finally settled. If the possible indemnity claim arises due to the failure of the Corporation of having all the

8

necessary records to support the deductions taken in its income tax returns filed for the fiscal years 2013, 2012, 2011, 2010 and 2009, as set forth in Section H of Article II hereof, Purchaser shall also be entitled to deduct from the payment due under the Note the amount of the estimated tax deficiency (assuming that the unsupported deduction will be disallowed in a tax investigation), provided that Purchaser deposits such estimated deficiency amount with a mutually agreed escrow agent, who shall hold such funds in escrow, releasing them to the extent that the Seller provides the missing support or evidence of the deduction, or as the statute of limitations of the tax return in which the deficiency would have arisen has elapsed.

C.   <u>Indemnity Limitation on Certain Representations and Warranties</u>. Notwithstanding in this Article IV to the contrary, Seller's indemnity obligations hereunder shall be limited as follows: (i) Purchaser shall not be entitled to assert any right to indemnification for any false or incorrect representations under Sections H. and I of Article II hereof until the aggregate amount of all claims of Purchaser under those provisions exceeds ten thousand dollars ($10,000) (the "Deductible Amount"), and then only to the extent such claims in the aggregate exceed the Deductible Amount; and (ii) Purchase liability under the above cited provisions shall be limited in the aggregate to eighty thousand dollars ($80,000).

ARTICLE V
SURVIVAL OF REPRESENTATIONS AND WARRANTIES

All representations, warranties and agreements made by either party in this Agreement shall survive the execution of this Agreement.

ARTICLE VI
CONFIDENTIALITY

A.   <u>Confidential Information Defined</u>. "Confidential Information" means the particular terms and conditions of this Agreement and any and all infor-mation (oral or written) relating to the Purchaser or the Corporation or any of their past, present or future activities or matters, including, but not limited to, information relating to: financial and administrative information; suppliers; customers or patients; advertising, promotion and marketing; except such information which can be shown by Seller to be generally known in the industry or in the public domain.

9

B.    <u>Nondisclosure of Confidential Information</u>.   Seller will not, at any time (other than as may be required or appropriate in connection with Seller's performance hereunder or to fulfill his/her legal obligations) directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever (except to Seller's advisors or as may be required under legal process by subpoena or other court or administrative order; provided, that, Seller will take reasonable steps to give the Corporation and Purchaser sufficient prior written notice in order to contest such requirement or order). Notwithstanding the above, the parties may inform the employees of the Corporation and any regulatory agency requiring disclosure of change of control that the Seller has sold a majority interest of the Corporation to Purchaser.

C.    <u>Injunctive Relief</u>.  Seller acknowledges and agrees that (a) Purchaser will be irreparably injured in the event of a breach by Seller of any of his obligations under this Article VI; (b) monetary damages will not be an adequate remedy for any such breach; (c) Purchaser will be entitled to injunctive relief, in addition to any other remedy which it may have, in the event of any such breach.

ARTICLE VII
OTHER COVENANTS

A.    <u>Non-Competition</u>. (i) Seller agrees that so long as it retains the Minority Interest and for a period of three (3) years following the date in which he sells the Minority either to the Corporation or to Purchaser (pursuant to the right of first refusal imposed to the shares of common stock of the Corporation by the Amended and Restated Certificate of Incorporation or otherwise), he shall not, either by himself or through any other person or entity controlled by him, engage, directly or indirectly, in any Competing Business, whether as an individual, or as a principal, agent, officer, director, employer, employee, consultant, independent contractor, partner, member or shareholder of any firm, corporation or other business entity or group or otherwise. For purposes of this Agreement, the term "Competing Business" shall mean any person or entity or group of persons or entities which offers or attempts to offer air transportation services for passengers or cargo, on charter or scheduled basis, to and from San Juan, Puerto Rico to and from destinations in the Caribbean. Notwithstanding the foregoing, nothing herein shall preclude or prohibit Seller from (a) maintaining a passive investment in publicly held entities

10

provided that Seller does not have more than a five percent (5%) beneficial ownership in any such entity; or (b) being employed by any company as a pilot.

(ii) <u>Damages</u>. Because of the difficulty of measuring economic losses to Purchaser as a result of any breach by Seller of the covenants in clause, and because of the immediate and irreparable damage that could be caused to Purchaser for which it would have no other adequate remedy, Seller agrees that Purchaser may enforce the provisions of this clause by injunctions and restraining orders against Seller without the posting of a bond or other security, if Seller breaches any of those provisions.

(iii) <u>Reasonable Restraint</u>. The Parties agree that the provisions of clause A.(i) of this Article VII, impose a reasonable restraint on Seller in light of the activities and business of Seller and Buyer on the date hereof.

(iv) <u>Independent Covenant</u>. All the covenants in this clause A of this Article VII are intended by each Party to, and shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of Seller against Purchaser, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Purchaser of any covenant thereunder. Seller hereby agrees that clause A of this Article VII is a material and substantial part of the transactions contemplated by this Agreement.

## ARTICLE VIII
### MISCELLANEOUS

A.   <u>No Brokers</u>. Seller and Purchaser each represent and warrant to the other that they have not dealt with any broker or finder in connection with the sale and purchase of the Shares and each agrees to defend, indemnify and hold harmless the other with respect to any claims, suits or liabilities for a finder's fees, brokerage commission, or similar charge based in services which, if rendered, constitute a breach of the indemnitor's representation and warranty under this Section.

B.   <u>Successors Bound</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

11

C.     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico.

D.     Severability.   Any provision of this Agreement which is prohibited or unenforceable shall not invalidate the remaining provisions hereof.

E.     Multiple Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

F.     Binding Effect and Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, notwithstanding which, neither this Agreement, nor any of the rights, benefits or obligations hereunder, may be assigned by any party without the prior written consent of the other party.

G.     Headings.  The headings in this Agreement are for convenience and identification purposes only, are not an integral part of this Agreement, and are not to be considered in the interpretation of any part hereof.

H.     Entire Agreement; Amendments.  This Agreement, together with all exhibits attached hereto, constitutes the entire agreement of the parties concerning the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties with respect thereto, and there are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth specifically herein.  No amendment of or supplement to this Agreement shall be binding unless executed in writing by a duly authorized representative of the party to be bound thereby.



12

IN WITNESS WHEREOF, the parties have caused this Agreement to be
subscribed by its duly authorized representative as of the date first above written.

By: _____
    Fred Rebarber Ocasio

By: _____
    Luis Feliciano Muñoz

13