# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| LUIS FELICIANO MUNOZ AND AIR AMERICA, INC, <br><br> **PLAINTIFFS** <br> VS. <br><br> **FRED REBARBER OCASIO** <br><br> DEFENDANT | **CIVIL NO. 16-02719 (MEL)** <br><br> **Breach of Contract** |
|---|---|

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE COURT:**

**COMES NOW** Defendant **Fred Rebarber Ocasio,** through the undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56(b) respectfully submits this memorandum of law in support of the motion for summary judgment.

## I. PROCEDURAL BACKGROUND

On April 27, 2017, Luis Feliciano Muñoz ("Mr. Feliciano" or "Purchaser") and Air America, Inc. ("Air America" or "the Corporation"), collectively referred as "the plaintiffs", filed a First Amended Complaint against Fred Rebarber Ocasio ("Mr. Rebarber" or Seller"), alleging breach of contract.

Plaintiffs alleged the jurisdiction of the Court pursuant to 28 U.S.C. § 1332(a) (1) for being a dispute between citizens of different states given that Plaintiff Luis Feliciano Muñoz is a citizen of Puerto Rico; Air America, Inc., is a corporation organized pursuant to the General Corporations Act of Puerto Rico

1

14 L.P.R.A. § 3501. ("GCA of PR") and Defendant Rebarber is a resident of the stare of Florida, U.S.A. The events that allegedly entitle the plaintiffs to a cause of action occurred in Puerto Rico and the claim exceeds seventy-five thousand dollars ($75,000.00)

Pursuant to the deadlines ordered by this Honorable Court on August 29, 2017 [Docket No. 38], defendant hereby submits a Motion for Summary Judgment. Defendant sustains that Plaintiffs' allegations do not establish a claim that justifies the granting of a remedy and that *that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.* Moreover, Defendant alleges that the case is frivolous, lacking any merits and with the only purpose of avoiding Plaintiffs' own contractual responsibilities towards Defendant. Additionally, Defendant alleges that the Court does not have jurisdiction over this matter given that Plaintiffs did not exhaust intra-corporative solution to the dispute prior to seeking a judicial remedy as required by the General Corporations Act of Puerto Rico.

## II. FACTUAL BACKGROUND

Defendant hereby respectfully submits for the consideration of this Honorable Court, the facts and events that demonstrate that the cause of action for alleged breach of contract in the instant complaint should be dismissed with prejudice.

Air America, Inc., is a corporation organized pursuant to General Corporations Act of Puerto Rico 14 L.P.R.A. § 3501.  From the moment of its incorporation on August 30, 2000, the purpose of the corporation has been to engage in air the airline business as an Federal Aviation Regulations' (FAR) 135

air carrier. (Defendant's UMF 1) The only shareholder from its creation up until December 17, 2014, was Defendant, Mr. Fred Rebarber Ocasio. Besides the ownership of the 100% of the shares, Mr. Rebarber's duties in Air America's airline company were working the reservations, running the daily operations, running the administrative duties, and flying as a pilot. **(Defendant's UMF 28 P. 296, L 6-24)**

The company's operations were of flying passengers throughout the Caribbean, as approved by the Federal Aviation Administration (FAA), in the Operations Specification certification. **(Defendant's UMF 1)** In its uninterrupted history since August 2000, the FAA never issued a violation to any airman, mechanic or to the company itself.

On September 2014, Mr. Rebarber Ocasio was contacted by representatives of the Plaintiff Luis Feliciano, with a proposal to buy the company. From that moment, both parties engaged in oral and written communications to culminate the selling agreement.

Within the communications, there were at least three letters of intent (LOI)issued by Mr. Feliciano **(Defendant's UMF 3, 11 and 12)** and finally, a Stock Purchase Agreement (SPA) was executed on December 17, 2014.

The terms and conditions of the SPA agreement were basically that defendant Rebarber will sell 80% of the shares, maintaining 20% for himself. The selling price was agreed in $1,300,000. The payment schedule was as follows: $100,000 were previously paid on November 12, 2014, as a deposit upon acceptance of the offer; $950,000 was paid at the signing of the agreement on December 17, 2014, and a

final payment of $250,000 twelve (12) months after signing of the agreement. **(Defendant's UMF 133, 15)** A promissory note to secure the final payment was guaranteed by a lien to one of the aircrafts owned by the corporation, a Beechcraft King Air E-90**. (Defendant's UMF 15)** Neither in final letter of intent (November 14, 2014), nor in the SPA, was there a reference to any guarantee on the condition of the aircrafts, to continuance of the employees or to the fitness of the operation.

With the purpose of exercising the due diligence to evaluate the object of the sale, Plaintiff Feliciano retained at least three different professionals, Miguel Nicolás Moreda (of Porto Capital, CPA, Restructuring Startup, Tax Planning and CFO Services); Diego Perdomo (Perdomo Ferrer CPA's and Consultants); and a California based specialist in aviation and aircraft appraisals and acquisitions, Verlyn Wolfe (Wolfe Aviation, Aircraft Acquisition Sales and Service).

Also, as part of the evaluation process, Mr. Feliciano personally took photographs and physically evaluate the aircrafts. **(Defendant's UMF 19)** In addition, Plaintiff Feliciano personally met Defendant Rebarber at least in two occasions to receive an overall training of reservation and administrative duties from Mr. Rebarber himself. **(Defendant's UMF 28 P. 291, 292);**

At the time of the sale, the airline was fully operational, owning six aircrafts. Four were actively flying, one was on a routine maintenance inspection (went back to service on December 24, 2014) **(Defendant's UMF 36)** and another one, a Cessna aircraft, even though had recently flown during 2014, at the moment of the buying process, was grounded and not operational due to lack of business to use it. The condition of the aircrafts was well known by the buyer, including the inoperative condition of the Cessna aircraft. It is noticeable that in at least two of the photographs that Mr. Feliciano took of the

aircrafts, the "grounded" condition of the Cessna aircraft was noticeable, showing the absence of avionics equipment, the opening of an inspection plate in the main cabin and lacking the passenger seats. **(Defendant's UMF 20)**

The taking over by Mr. Feliciano of the operations was on December 17, 2014. As part of the SPA, all debts and expenditures prior to that day were responsibility of the Seller and all debts and expenditures after that date were the Buyer's responsibility. **(Defendant's UMF 13, P. 4 Par 22)**

> *"The Corporation and/or Seller [the Defendant] have satisfied 100% of any known accrued expenses and debt of the Corporation. Any unrecorded or undisclosed expenses and liabilities related with the operations of the Corporation prior to this date (the "Unrecorded Expenses") found by the Purchaser after the date hereof, shall be paid by Seller to the Corporation upon claim thereof by Purchaser or the Corporation supported by adequate evidence. If Seller fails to reimburse the Corporation, in addition to any rights available at law to collect the Unrecorded Expenses from face value of the Note. All expenses incurred by the Corporation prior to the date hereof shall run on the account of the Seller; and all expenses incurred by the Corporation after the date hereof will run on account of the Corporation. In addition, any expenses incurred by the Corporation after the date hereof that should have been incurred by the Corporation prior to this date, will be on the account of the Seller and shall be considered Unrecorded Expenses"*

Also, as part of the LOI of November 12th, 2014, Mr. Rebarber Ocasio remained available to be consulted by the hour. Nevertheless, his services were only requested from the end of December 2014, when Mr. Feliciano went out of Puerto Rico on vacations, up until March 2015 From that date on, he was never called again for providing his services. **(Defendant's UMF 23)**

According to the SPA and subsequent Amendment to the Certificate of Incorporation filed with the Department of State, Mr. Rebarber had to resigned as an officer of the corporation and Mr. Feliciano became the director in charge of all the operations, as president. **(Defendant's UMF 25)** From December 17, 2014, the operations continued with Mr. Feliciano as president, overlooking the

operations and the administrative duties. The mechanical duties were in charge of an FAA authorized mechanic and the flight operations, were in charge of an authorized and FAA approved pilot.

It is noticeable that on February 10, 2016, Mr. Feliciano held a press conference in which he announced that since his acquisition of the airline on December 2014, the airline had an increase of 23% of the operations. **(Defendant's UMF 63, 64)**

As stated before, as part of the SPA, Mr. Feliciano had to pay $250,000 to Mr. Rebarber by December 17, 2015, nevertheless, right before paying said amount, on November 16, 2015, Mr. Feliciano sent a letter to Mr. Rebarber requesting $250,000 alleging a breach of contract and for that reason having to incur in expenditures because supposedly, due to the condition of the aircrafts, these were not being able to fly. **(Defendant's UMF 26)** Obviously, Mr. Feliciano's expressions in the press conference, to the effect that the airline had significant improvements and increase of business since his taking over, contradicted his reason for claiming losses three months before on his letter to Rebarber.

In response to Feliciano's request, defendant Rebarber replied with a letter stating that Mr. Feliciano had to pay the money he owed and reiterated his full compliance with the Federal Administration Regulations (FAR's) and compliance with the Agreement. Rebarber also stated in his letter that Plaintiff's letter had the purpose of delaying the owed payment. **(Defendant's UMF 27)**

Even though Mr. Rebarber had been a minority shareholder since the acquisition of the Corporation by Mr. Feliciano and remained available to offer his consultation services, after March 2015, he was not contacted again to render any service. It is also important to emphasize that according to terms of the

Amended Certificate of Incorporation filed with the State Department, he was also a member of the board of directors with the power to manage the corporation's operations, for being a shareholder. **(Exhibit 15 Par. FIFTH)**

Nevertheless, on September 26, 2016, Mr. Feliciano, without exhausting intra-corporative remedies, nor obtaining permission from the other shareholder, in his personal name and Air America's, filed suit against Fred Rebarber Ocasio, for alleged damages due to false representations regarding the Corporation's compliance with the FAA regulations. He claimed $300,000 for those alleged damages. On April 27, 2017, plaintiffs filed a First Amended Complaint raising the request for remedies to $520,673.16

After several procedural incidents and after conducting a discovery process between the parties, the Court set different deadlines, including that all dispositive motion and Daubert motions had to be filed on or before January 16, 2018, which Defendant hereby submits in compliance.

### III. SUMMARY JUDGMENT STANDARD

"A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil *Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.* R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Rodríguez-Machado v. VA, 845 F. Supp. 2d 429, 437-438 (D.P.R. 2012) (citing Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir.

7

2008)(citing Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (stating that an issue is genuine if it can be resolved in favor of either party). In order for a disputed fact to be considered "material", it must have the potential "to affect the outcome of the suit under governing law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-661 (citing Liberty Lobby, Inc., 477 U.S. at 247-248); Prescott, supra, at 40 (citing Maymí v. P.R. Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008).

The principle of the summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citing Fed.R.Civ.P. 56(e) advisory committee note to the 1963 Amendment).

The moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact on the record. Shalala, 124 F.3d at 306. Upon a showing by the moving party of an absence of a genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate that a trier of fact could reasonably find in his favor. Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The non-movant may not rely upon mere allegations to defeat a properly supported motion for summary judgment; must present definite and competent evidence. Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994). The non-movant's burden requires a showing of "at least one fact issue which is both 'genuine' and 'material.'" See Suárez v. Pueblo Int'l., 229 F.3d 49, 53 (1st Cir. 2000) and

Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990).

Local Rule 56(c) states that a party opposing a motion for summary judgment shall support each denial or qualification by record citation as required by the rule. Local Rule 56(e) states that the facts contained in a supporting statement of material facts, if supported by record citations as required by the rule, shall be deemed admitted unless properly controverted.

When considering a motion for summary judgment, the Court must examine the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor in order to conclude whether or not there is sufficient evidence in favor of the non-movant for a jury to return a verdict in its favor. Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). The Court must review the record as a whole and refrain from engaging in an assessment of credibility or weigh the evidence presented. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). The burden placed upon the non-movant is one of production rather than persuasion. In other words, in weighing a non-movant's opposition to summary judgment the Court should not engage in jury-like functions related to the determination of credibility. However, the nonmoving party must not rest solely upon "conclusory allegations, improbable inferences and unsupported speculation." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996) and Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## IV. ARGUMENT

Defendant hereby respectfully submits for the consideration of this Honorable Court, the facts and

events that demonstrate that the cause of action for alleged breach of contract in the instant complaint should be dismissed with prejudice. At least there are three different fundamentals which would justify the requested dismissal.

### A.   Facts v. Allegations

The magnitude of the lack of merits of this claim is conversely proportional to the amount of false or erroneous allegations of the complaint. When opposing the facts to each and every relevant and substantial allegation, it is obvious that the claim lacks merits and should be dismissed.

In essence, the complaint is based in the allegation that *Defendant is therefore liable for the damages caused to Plaintiff as a result of his breach of contract arising from his false representations and warranties regarding the Corporation's compliance with applicable FAA regulations.*

Said allegation is erroneous and does not have any base on reality as admitted by Plaintiff Feliciano himself both on his responses to request for admissions and to his testimony on his deposition.

Plaintiff alleges that he executed the buying relaying on Defendant's representations and warranties regarding the Corporation's compliance with the FAA regulations.

First of all, it is important to state that Plaintiff Feliciano did not buy airplanes, he bought the majority of the shares of Air America, Inc. As part of Air America's assets, there were six airplanes operating under an FAR 135 airline business. **(Exhibit 10 P. 7)** In order to make his decision, Mr. Feliciano had the information provided to him by Defendant, but assessed, inspected and evaluated by three different

professionals retained by him. Miguel Nicolás Moreda (of Porto Capital, CPA, Restructuring Startup, Tax Planning and CFO Services) **(Defendant's UMF 3).;** Diego Perdomo (Perdomo Ferrer CPA's and Consultants) **(Defendant's UMF 5);** and a California based specialist in aviation and aircraft appraisals and acquisitions, Verlyn Wolfe (Wolfe Aviation, Aircraft Acquisition Sales and Service) **(Defendant's UMF 7).**

Those three Feliciano's representatives participated actively in the process of evaluating all aspects needed by them on behalf of their client, Mr. Feliciano, and to advise him.

As part of that process, all financial data was provided to them at their request; all information requested by them regarding the company and the airplanes was provided, photographs were made available and each and every document, record or information requested by them, was provided by Mr. Rebarber. **(Defendant's UMF 53, 54); As** a matter of fact, Mr. Feliciano himself, who as admitted in his deposition, had previous experience of buying aircrafts **(Defendant's UMF 51);** for another of his business, went to Air America's facilities together with Mr. Moreda, inspected the aircrafts and took photographs of them from the outside and inside **(Defendant's UMF 20, 59).**

Obviously, Feliciano's assertion that he relied on Rebarber's representation that the company was in good standing, was operational, had all permissions and certificates and had never been subject to a violation a revocation of its certificates or any interruption of its operations is incomplete, because he had his representatives to provide the information for him to rely and make his business decision. A mere allegation by Plaintiff Feliciano is not sustained by any evidence.

Furthermore, Feliciano knew that he was buying an "as is" operations, **(Defendant's UMF 10);** without any reservations or conditions. Feliciano issued two different letters of intent which were not accepted by the seller, until a third one, dated November 12, 2014, which was signed by both Feliciano and Rebarber, because it finally contained the satisfactory agreements for both parties. **(Defendant's UMF 12);** Subsequent to said Letter of Intent (LOI), a Stock Purchase Agreement (SPA) containing all the covenants, terms and conditions was subscribed on December 17, 2014. **(Defendant's UMF 13);** It is absolutely clear in those documents that there is no reference whatsoever to guarantee or condition of the airplanes or to the fitness or continuation of the operation after December 14, 2014. **(Defendant's UMF 56, 57 and 58);** On the contrary, it was well clear, as customary, that the responsibilities of the Seller will cease after the taking over by the Buyer.

The documents evidence that contrary to Plaintiffs' assertion, Rebarber represented a truthful fact when guaranteed that the company was in compliance with the Federal Aviation Regulations and that the certificates were in full effect. As a matter of fact, during his deposition, Plaintiff Feliciano admitted that to his knowledge Air America's certificate had never been revoked. **(Exhibit 4 P 90, L 23-25 Defendant's UMF 48, 49);** Plaintiff does not have any evidence on the contrary, making his allegation a futile and false one.

Another false allegation of Plaintiff Feliciano on his complaint is that upon taking over of the company, he had to ground all aircrafts in order to repair them and operate legally. Such allegation is also false and is contrary to his testimony on deposition and to his answers to requests for admissions. **(Defendant's UMF 60);**

First of all, contrary to his allegations, after December 17, 2014, the company kept operating and at least four airplanes were operational. **(Defendant's UMF 39-47);** It is false that the airplanes were grounded by Feliciano or by anyone else. A fifth aircraft was undergoing a routine inspection and started flying again on December 24, 2014, and only the sixth airplane was grounded for not having any business for it. As stated previously, the condition of this aircraft was well known to Feliciano, since he inspected it with Mr. Moreda and took photos of the interior of it, showing absence of avionic equipment, lacking the passenger seats and having an inspection plate in the main cabin open. **(Defendant's UMF 20);**

In summary, as it is incorrect that Mr. Feliciano grounded all aircrafts upon taking over the operation, **(Defendant's UMF 48, 49);** since four were operating, a fifth one within a week, it is also incorrect that the company was operating without complying with the Federal Aviation Regulations. The airline went thru two different FAA base inspections in 2014 prior to the acquisition and they did not make any significant findings, but rather minor discrepancies that were timely corrected and no certificate action was ever commenced. **(Exhibit 25 P 2 Par. Fifth);** The airline has never been violated or grounded by the FAA. **(Defendant's UMF 48, 49);** The airline was flying with the required equipment to comply with the regulations, making the allegations in the complaint for damages not only speculative but frivolous and knowingly false.

Defendant Rebarber retained two different experts with extensive experience as FAA Aviation Safety Inspectors, (Mr. Rafael Gilestra and Mr. Ismael Ortiz, which concluded and confirm that by December 17, 2014, the airline had the aircrafts flying legally and were never subject to a grounding as alleged by Defendant. These two experts with decades of experience as Aviation Safety Inspectors with the FAA, **(Exhibit 22 and Exhibit 23)** also conclude that all expenditures in the aircrafts subsequent to December

17, 2014, were routine maintenance, normal unexpected repairs or voluntary adding of non-regulatory equipment. **(Exhibit 24);**

Also, as stated by expert witness Mr. Ismael Ortiz, it is obvious that any interruption of the operations of the airline was due to the shortage of pilots to fly the all flights booked, because the airline, even though needed at least two additional pilots, for over 7 months was operating with only one full time pilot and another two-part timer. **(Exhibit 25 P 4 Par. One);** As Ortiz conclude in his expert report, he states that it is impossible to handle over of 400 flights for that period with only one full time pilot. *For the months of December 2014 until July, the only available full time Pilot with Air America, Inc. was Mr. José Rafael Fernández. He was qualified to fly all 3 models of aircraft operated. Mr. Yan Stephanie Cor acted as a part time pilot and only qualified to fly one model of aircraft, information provided by the carrier. Accordingly, only 2 pilots were available to fly 5 aircraft from the Air America, Inc. fleet. We found Mr. Fernández flying at least 2 different aircraft models on the same day.* **(Exhibit 25 P 2 Par One);**

For good or bad, the fitness of Air America, from December 17, 2014, on, can only be attributed to the new management and not to any act or omission of Defendant Rebarber. On December 17, 2014, Plaintiff Feliciano took over an operation with four airplanes in conditions to fly, and a fifth one was flying within a week. Also, the condition of the only airplane undergoing maintenance was well known by Mr. Feliciano. He also knew the human resources working at that time and the need to hire more pilots. Mr. Feliciano's admissions corroborate the fact that he had the airplanes available, nevertheless, he did not hire the pilots to fly the commitments engaged, reason for having to use the services of other airlines. Being obvious that there was not any breach of contract by Defendant, and on the contrary, that

the fitness of the airline after December 17, 2014 was entirely the consequence of Plaintiff's business decisions, the complaint should be dismissed.

### B. Lack of jurisdiction for not exhausting intra-corporate remedies

The present case is before this District Court upon diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). **Therefore, the substantive law of Puerto Rico controls.** *Erie R.R. v. Tompkins,* 304 U.S. at 78, 58 S. Ct. at 822; *Rolon-Alvarado v. Municipality of San Juan,* 1 F.3d at 77. (Our emphasis)

Additionally, the SPA states: *Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico.* **(Exhibit 11 P 12 C)**

Air America, Inc is a for profit corporation organized pursuant to the General Corporations Act of Puerto Rico 14 L.P.R.A. § 3501. ("GCA of PR") Its corporate existence began on August 30, 2000. **(Exhibit 1)** As such, the businesses of the corporation must be conducted according to the provisions of said Law. Initially, the purpose of the corporation was to engage in the airline charter business. On December 17, 2014, the purpose was modified *to provide air transportation services for passengers and cargo, on chárter or scheduled basis, to and fron San Juan, Puerto Ricoto and from destinations in the Caribbean, and any other comercial lawful business purpose or purposes that a corporation organized under the laws of the Commonwealth of Puerto Rico may be permitted to undertake.* **(Exhibit 15 P 1 Par THIRD)**

Article 4.01 (A) of the GCA of PR, establishes that all business and affairs of a corporation organized according to said law, must be directed by the board of directors, unless the law or the certificate of

incorporation establishes something different. If the certificate of incorporation establishes something different, the faculties and obligations of the board of directors will be carried out by the person or persons designated in the certificate of incorporation.

Air America's Amended and Restated Certificate of Incorporation specifies that: *The business of the Corporation shall be managed by the shareholders of the Corporation, rather than a Board of Directors, but such shareholders shall be deemed* directors *for purposes of applying the provisions of the General Corporations Act.* **(Exhibit 15 P 4 Par FIFTH)**

Given that the only shareholders are Plaintiff Feliciano and Defendant Rebarber, both were by virtue of the Certificate of Incorporation, the directors to supposedly take the decisions for the benefit of the Corporation, Nevertheless, Rebarber was not consulted nor a corporate resolution was issued to authorize Feliciano to file suit on behalf of the Corporation. **(Exhibit 18 P 13 Request of admission 65)**

Article 12.06 of the GCA of PR states that any legal action initiated by any shareholder for the benefit of the corporation must allege that the plaintiff was a stockholder at the moment the impeached business was conducted, or that the shares were a queried later by virtue of law. This is known as a derivative action.

The derivative action is an equity remedy to vindicate the rights of the corporation when the persons that are obligated to do it, do not do it. J.F.Gierbolini Bonilla, *La acción derivativa como mecanismo de control y monitoreo en Puerto Rico*, 1 U.P.R. Bus. L.J. 812010), page 82. Equally, it has been known to be the action initiated by a stockholder to avoid or repair a damage, or a loss or a breach to the corporation, not to him

personally. *Randolfo Rivera Sanfeliz v. Junta de Directores de Firstbank*, 2015 TSPR 61; 193 DPR _____ (2015).

Traditionally, the courts have established a series of requirements in order to authorize the derivative action. These requirements are: 1) the corporation must be included as a party in the suit; 2) the person initiating the action must have been stockholder or member of the corporation at the moment of the occurrence of los or damage and during the whole procedure; 3) **before claiming in the court, the stockholder or member must request to the administrators of the corporation to take a remediative action to avoid the particular situation.;** 4) for being an action in equity, the stockholder or member is subject to the traditional equity defenses such as clean hands, statute of limitations, voluntary release, stopple, within others; y 5) the suit should not be settled without the courts authorization[1].

In the stance case, it is important to emphasize on the requirement "to the corporation or to the directors prior to file claim in the court". **This requirement to claim is a rule that binds the shareholder or member of the corporation to exhaust the existing remedies inside the corporate structure before seeking a judicial remedy. This, with the purpose of giving the directors and administrators of the corporation the opportunity to manage the affairs and claims in name of the corporation.** This fundamental corporate doctrine rests in the principle that the corporate affairs rests in the hands of the directors and not in the shareholders or members of the corporation. This rule contributes to the economy of justice, given that *if* the affair is solved in the corporate level, it will not be necessary to waste the resources and time of the judicial system.."[2]

---

[1] Diza Olivo, Carlos, *Corporaciones*, Publicaciones Puertorriqueñas, Ed. 1999, p. 279.
[2] *Ibid*, pág. 281

To satisfy the requirement to claim in the name of the corporation the stockholder must present to the consideration of the board of directors all the arguments and theories related that justify the requested action *"If the stockholder does not do the presentation, will give up the possibility of present the claims before the courts. Once his claims are presented to the board of directors, the stockholder should wait a reasonable time befor he can claim in court. By not following this process, the action must be dismissed for not being mature"*.[3]

In the stance case, plaintiff Feliciano did not consulted nor obtained an authorization, not even obtained a corporate resolution, from Air America's Board of Directors before filing suit before this Court.

Answering Defendant's requests for admissions, Mr. Feliciano admitted that he had not called a meeting of the shareholders since his taking over on December 17, 2014; that Air America did not obtained a resolution authorizing to file the suit against Rebarber and that Fred Rebarber is still the agent for service for the corporation. **(Exhibit 18 P 13 Request of admission 65 y 66)**

Additionally, Fred Rebarber has been agent for service and/or shareholder of Air America, Inc., since December 17th, 2014 up until now and has never been requested to attend a meeting of the corporation, nor consulted of the corporation's affairs and certainly, not to file this suit.

**Request for Admission 65.**

**Prior to filing the case at caption, Air America, Inc. did not obtain a resolution authorizing it to file the said matter.**

Response:
Admitted.

---

[3]     *Ibid*, pág. 282

**Request for Admission 66.**

**Fred Rebarber Ocasio is the Registered Agent of Air America, Inc.**

Response:
*Admitted.*

To continue with the case at caption will be premature, given that the Plaintiffs never excersized the corresponding procedure pursuant to the applicable dispositions of the GCA of PR of exhausting the procedure with the Board of Directors and obtaining their authorization via corporate resolution, prior to file suit.

The Supreme Court of Puerto Rico has argued that the exercise of the reviewing function of the courts is governed by certain <u>self-restraint or self-limitation</u> doctrines based on considerations of judicial prudence and constitutional requirements. Crespo Rivera v. Cintron Rivera, 159 D.P.R. 290 (2003). The principle of fairness consists of one of those doctrines of judicial self-limitation. This doctrine requires the existence of a real case or controversy for the valid exercise of the judiciary. See, Ortiz v. Panel F.E.I., 155 D.P.R. 219 (2001). Thus, the doctrine of justiciability is focused on the nature of the controversy raised, that is, whether there is a case that warrants the intervention of the Court to resolve opposing interests of the parties involved, so that, what in its day is resolved by the Court affects the legal relations of the parties. See, Smyth v. Oriental Bank, 170 D.P.R. 73 (2007).

Henceforth, the courts must determine, before examining the merits of a case, whether the matters before their consideration are "judicial", i.e.: (1) Do not include aspects related to public policy guided by the executive branch; (2) that the parties have legal capacity or standing to promote litigation; (3) that the dispute is not academic or consultative; and (4) that the controversy is ripe. See, Rullán v. Fas Alzamora, 166 D.P.R. 742 (2006); Cross v. Administration, 164 D.P.R. 341 (2005); Acevedo Vilá v. Meléndez Ortiz, 164 D.P.R. 875 (2005). As the Supreme Court points out, "departing from this standard, firmly developed and strongly rooted in our jurisprudence, is inevitably falling into abstract, speculative, and consultative pronouncements." Sánchez v. Corporate. of justice, 157 D.P.R. 360 (2002).

As an integral corollary to the concept of fairness, it is recognized that the exercise of judicial work is contingent on the fact that, among other criteria, the issue that attends is a mature one. The Supreme Court of Puerto Rico has established that, in evaluating whether a dispute is ripe, and therefore susceptible to judicial review, it should be assessed: (1) whether the substantive validity controversy is appropriate for judicial resolution and (2) whether the Damage to the part is sufficient to require an adjudication. Com. de la Mujer v. Secretario de Justicia, *supra.*

Considering the foregoing, it has been decided that a premature resource, like a late one, suffers from a defect of lack of jurisdiction. Rodríguez v. Segarra, 150 D.P.R. 649 (2000).  The submission of a premature legal recourse is not effective and does not produce any legal effect, since at the time of its submission there is no judicial authority to entertain it.

Given that it is obvious that the case is not ripe, there is no other recourse as to dismiss it as a matter of law.

Ripeness doctrine involves both constitutional and prudential limitations.5 The Second Circuit explained the distinction as follows:

Constitutional ripeness is a doctrine that, like standing, is a limitation on the power of the judiciary. It prevents courts from declaring the meaning of the law in a vacuum and from constructing generalized legal rules unless the resolution of an actual dispute requires it. But when a court declares that a case is not prudentially ripe, it means that the case will be *better* decided later and that the parties will not have constitutional rights undermined by the delay. It does not mean that the case is not a real or concrete dispute affecting cognizable current concerns of the parties within the meaning of Article III. . . . But that, and its degree, is just one - albeit important - factor the court must consider. Prudential ripeness is, then, a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial.6
*Simmonds v. Immigration and Naturalization Service*, 326 F.3d 351, 357 (2d Cir. 2003).

## C.  Accord and satisfaction

As previously referred, as part of the SPA signed on December 17, 2014, there was a remaining balance of $250,000 owed to defendant Rebarber to be paid by December 17, 2015. As also part of said document, to secure the promissory note containing the debt, a lien was granted on aircraft BE-90 N707TL. **(Exhibit 11 P 2 iii)**

Plaintiff Feliciano, unilaterally, without consulting shareholder Rebarber, had practically sold that aircraft. Obviously, in order to complete the business, he had to clear the lien. Knowing that the only

way defendant Rebarber would remove the lien was by obtaining the $250,000 payment, Plaintiff Feliciano sent a letter to Rebarber claiming a breach of contract and requested $250,000 as indemnity. **(Exhibit 16)** In response to said letter, defendant Rebarber reiterated his entitlement to the payment and reiterated his full compliance with the FAR's and compliance with the agreement between the parties. **(Exhibit 17)**

Subsequent to Defendant's communication, Plaintiff Feliciano paid entirely the $250,000 **(Exhibit 21)** and Defendant cleared the lien of the aircraft **(Exhibit 20)** and Plaintiff Feliciano sold the aircraft.

It is obvious that the parties were satisfied with their respective obligations, concluding the buy/sell agreement. It is also obvious that if Feliciano had thought that Rebarber owed any amount of money, instead of paying, would rather had retained the $250,000 or as permitted by the law, deposit in consignment said amount in court. Once the amount was paid in full **without making any reserve of rights** or disclaimer, the controversies between the parties were resolved by accord and satisfaction, making the complaint a frivolous one.

## VI. CONCLUSION

In conclusion, the genuine material facts presented by Defendant for the consideration of this Honorable Court evidence that Plaintiffs' claim should be dismissed with prejudice given *that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.* The amount of admissions that impeach the allegations of the complaint and the questions of law afore discussed clearly demonstrate that the case filed by the Plaintiffs is a frivolous one without any merit, nevertheless

it has caused nuisance and substantial economic losses to Defendant. Given the lack of good faith litigation on behalf of Plaintiffs, the stance case it should be dismissed with prejudice and payment of costs and attorney's fees should be imposed.

**RESPECTFULLY SUBMITTED.**

In Caguas, Puerto Rico, this 16th day of January 2018.

**WHEREFORE,** Defendants respectfully request from this Honorable Court to enter Judgment granting Defendants' Motion for Summary Judgment dismissing with prejudice Plaintiffs' claim and costs and reasonable attorney's fees should be granted to Defendant.

**CERTIFY:** that on this date, we electronically filed the foregoing motion with the Clerk of the Court using the CM/ECF system that will send notification of such filing to all attorneys of record registered in the use of the CM/ECF system.

**MERCADO-RIVERA LAW OFFICES**
P.O. BOX 8086
CAGUAS, PR 00726-8086
Tel: 787-745-0628
Fax: 787-961-9883
Email: camercado@mercadoriveralw.com
*S/Carlos A. Mercado Rivera*
CARLOS A. MERCADO RIVERA
USDC-PR NO. 211904