**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| LUIS A. FELICIANO-MUNOZ, et al., | CIVIL NO.  16-2719 (MEL) |
| Plaintiffs | CIVIL ACTION |
| v. | PLAINTIFFS DEMAND TRIAL BY JURY |
| FRED REBARBER-OCASIO. | |
| Defendant. | |

**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**TO THE HONORABLE COURT**:

      **COME NOW Plaintiffs** through the undersigned attorneys and very respectfully **STATE**, **ALLEGE** and **PRAY** as follows:

## I.     INTRODUCTION

      1.  On 17 December 2014, Plaintiff Luis Feliciano (Feliciano) and Defendant Fred Rebarber (Rebarber) entered into a Stock Purchase Agreement (SPA).  As part of it, Plaintiff Feliciano purchased 80% of the shares of Plaintiff Air America, Inc. (AA), which is a small commercial air carrier that operates from Puerto Rico, from Defendant Rebarber, thereby assuming control of the operations of the company and its Board of Directors, as President. Defendant Rebarber kept 20% of the shares of AA.  Plaintiff's Statement of Material Facts # 1.

      2.  Before the purchase, Defendant Rebarber did not allow Feliciano to conduct an inspection of the airplanes by mechanics alleging that it would hurt the morale of his employees if they thought that he was selling AA.  Notwithstanding, Defendant Rebarber assured Plaintiff Feliciano that AA was operating in compliance with FAA regulations and that the airplanes were

in excellent condition.  Nevertheless, Feliciano made an evaluation of AA's financial records and aircraft flight and maintenance log books from which it appeared that AA was operating in compliance with regulations, and that its aircrafts were in excellent conditions.  PSMF # 2.

3.  Precisely because Plaintiff Feliciano was not allowed to inspect the mechanical equipment with mechanical experts, the SPA contains specific language to safeguard his investment.  It provides that <u>any expenses incurred by AA after the date of purchase that should have been incurred by AA prior to said date, will be on the account of Rebarber</u> and shall be considered unrecorded expenses. Article I, section C (ii).  The agreement also provides that <u>Rebarber agrees to indemnify Feliciano for all losses, claims, causes of action, obligations, suits, costs, damages, expenses and liabilities which Feliciano may suffer or incur or be compelled to or be subject to and which are caused by or arise directly or indirectly</u> by reason of the breach of any representations and warranties made by Rebarber.  Article IV, section A.  PSMF # 3.

4.  Defendant Rebarber represented to Plaintiff Feliciano, both verbally and in writing as part of the SPA, that AA "has conducted its business so as to comply in all material respects with all of its licenses which are necessary to the operation of its business as now conducted and as proposed to be conducted and which the failure to possess would have a material adverse effect on the assets, operations or financial condition" of AA. Article II, section D.  Defendant Rebarber also represented to Plaintiff Feliciano that AA "has no material unrecorded or unreported liabilities or contingencies".  Article II, section I. PSMF # 4.

5.  Notwithstanding, less than a week after the purchase, Plaintiff Feliciano found out that the aircrafts had maintenance, and repair, issues that placed the licenses and permits at risk which were not recorded on the logbooks and that should have been recorded and repaired before

2

the purchase.  For said reason, under Plaintiff Feliciano's administration, AA had to pay for repairs and to purchase new equipment to replace damaged equipment.  In addition, due to said situation, under Plaintiff Feliciano's administration, AA had to incur in other additional expenses, such as chartering flights.  PSMF # 5.

6.  For said reasons, Plaintiff Feliciano filed the present complaint against Defendant Rebarber pursuant to the above described contract provisions.

7.   On 22 January 2018, Defendant Rebarber filed a motion requesting the Honorable Court to enter summary judgment in its favor arguing that, at the time of the purchase, AA and its airplanes complied with FAA regulations, that Plaintiff Feliciano was able to inspect and evaluate the company and its airplanes before the SPA, and that the purchase of the shares was "as is".  For these reasons, Defendant Rebarber argues that Plaintiff Feliciano has no valid claim against him.

## II.      APPPLICABLE LAW

### SUMMARY JUDGMENT STANDARD

8.  The standard for summary judgment is governed by Fed. R. Civ. P. 56. The function of summary judgment is "to pierce the boilerplate of the pleadings and examine the parties' proof to determine whether a trial is actually necessary." Vega-Rodriguez v. P.R.T.C., 110 F.3d 174, 178 (1st Cir.1997). The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see* Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir.2000).

9.   The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). A contested fact is 'material' if it has the potential to alter the outcome of the case. Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir.1997). An issue is "genuine" if a reasonable jury could resolve the dispute for the nonmoving party. Cortes-Irizarry v. Corporation Insular, 111 F.3d 184, 187 (1st Cir.1997); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

10. In order to defeat a motion for summary judgment, the party opposing the motion must "present definite, competent evidence to rebut the motion." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). The non-moving party must show that a trial-worthy issue exists and must point to specific facts that demonstrate the existence of an authentic dispute. Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir.1991). "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 252, 106 S. Ct. 2505.  "If, after this canvassing of the material presented, the district court finds that some genuine factual issue remains in the case, whose resolution one way or another could affect its outcome, the court must deny the motion." Lipsett, 864 F.2d at 895.

11. There is ample evidence before this Honorable Court showing that Defendant Rebarber violated several contractual provisions for which he is liable to Plaintiffs, and that pursuant to the SPA, Defendant Rebarber must satisfy to AA the repairs, and replacement of equipment, that should have been done during his administration.

4

### III.    ANALYSIS

**Plaintiff Feliciano's testimony, which is supported by the opinion of an expert in airplane operations, contradicts Defendant Rebarber's testimony thereby creating a genuine issue regarding the conditions of the airplanes and the representations made by Defendant Rebarber at the time of the Stock Purchase Agreement.**

12. Defendant Rebarber states that, at the time of the SPA, AA and its airplanes complied with FAA regulations.  In addition, to his testimony, Defendant Rebarber attaches to his motion, the opinion of two experts in airplane operations, Rafael Gilestra and Ismael Ortiz, that support his position. Defendant Rebarber, and his experts, rely on the conditions of the airplanes at the time of the purchase, as reflected by the airplane flight and maintenance log books prepared by AA, when Defendant Rebarber was in control of the 100% of its shares and before the time of the purchase by Plaintiff Feliciano.

13. On the other hand, Plaintiff Feliciano states that less than a week after the SPA, he found out about maintenance issues on its airplanes that obviously predated the purchase date and which were not recorded on the log books.  Pursuant to the SPA, Defendant Rebarber owes Feliciano and AA the amounts invested in those repairs, as well as the expenses that AA had to incur as a consequence of the limited use of the airplanes due to said conditions. PSMF # 5 and 6.

14. In addition, after evaluating the relevant documents, Plaintiff's expert in airplane operations, Luis Irizarry (Irizarry) concluded that there were no entries in the logbooks of any discrepancies, or maintenance issues, for a long time which indicates that no entries of necessary mechanical repairs were made in the logbooks, in order to conceal that the aircrafts were not in

airworthy condition and continue operating them without investing in the necessary repairs. He also concluded that even though AA was approved to conduct flights under instrument flight conditions, as long as the auto pilot was working, because the autopilots were not working properly, the company was limited in its operations. Finally, Irizarry concluded that after the purchase, AA had to invest substantial amounts of funds to prepare the aircrafts to comply with FAA requirements and to put them in airworthy conditions when the issues that required repair predated the purchase. PSMF # 13.

15. Although, Defendant Rebarber timely announced the two experts, their reports, or statements under penalty of perjury, were not provided to Plaintiffs during the discovery period that ended on 30 November 2017. They were provided as part of the motion for summary judgment filed on 16 January 2018, almost two months after the discovery deadline. Defendant announced those expert reports after the discovery period had ended thereby precluding Plaintiff from deposing them and challenging their qualifications and opinions. When Defendant Rebarber failed to produce expert reports during the discovery period, he waived said expert testimony. The Honorable Court should preclude the testimony of any expert who did not disclose a report during the discovery period, and should not take it into consideration in deciding the present motion. Plaintiffs' expert report was provided by 8 February 2017, well within the discovery period, and Defendant Rebarber chose not to depose him.

16. It must be noted that both expert witness report's used by Defendant Rebarber are prepared in the same type font, both use the same headings "Expert Witness Report Air America Inc.", have similar formats and use similar language expressions, or similar redaction, which suggests that their author is the same person. In addition, exhibit 17 to Defendant Rebarber's statement of uncontested facts, which is a letter from Defendant Rebarber to Plaintiff Feliciano,

has a similar format and language expressions, or redaction, as the two expert reports. See Ex. 6. A reasonable juror could conclude that the three documents were prepared by the same person, Defendant Rebarber.  This is the same modus operandi exhibited by Defendant Rebarber of committing fraud in the preparation of documents.  First, Defendant Rebarber committed fraud in the preparation of the aircrafts' flight and maintenance records, and, now, he commits fraud by preparing the expert reports himself.

17. Defendant Rebarber argues that Feliciano admitted that to his knowledge, AA's certificate has never been revoked.  Rebarber also states that AA complied with FAA regulations and has never been grounded by FAA with two inspections conducted during 2014 prior to the purchase.  These statements only mean that the FAA was also misled by Defendant Rebarber's unreliable, or fraudulent flight and maintenance records.

18. Defendant Rebarber also argues that Feliciano assessed, inspected and evaluated the company with the assistance of 3 experts: Manuel Moreda, Diego Perdomo and Verlyn Wolf and therefore knew the condition of the airplanes before the SPA.  First of all, Defendant Rebarber did not allow Plaintiff Feliciano to inspect the aircraft mechanical equipment with the assistance of mechanics because it would affect the morale of the employees if they thought that he was selling AA, and assured Plaintiff Feliciano that the airplanes were in excellent conditions. Precisely, for said reason the SPA contains provisions for Plaintiff Feliciano to recover from Defendant Rebarber any expenses for repairs that Defendant Rebarber should have done before the SPA.  Nevertheless, Feliciano did hire Moreda who is a CPA and provides restructuring, startup, tax planning and CFO services to review AA's accounting books.  Feliciano also hired accountant and business consultant, Diego Perdomo, to assist him in evaluating AA's finances. And, Feliciano hired Wolf to evaluate the value of the airplanes based on the airplanes records

which, as Feliciano found out, are not true or reliable.  None of these experts inspected the aircrafts mechanical equipment. PSMF # 7.

19. Finally, Defendant Rebarber claims that the purchase was "as is" arguing that the SPA makes no reference to any guarantee, or condition, of the airplanes as to the fitness or continuation of the operation after the purchase.  First of all, as Defendant Rebarber stated in his motion for summary judgment, Plaintiff Feliciano did not purchase airplanes, but shares of AA. Second, the SPA does not mention that the purchase is "as is".  Third, there is no logic to purchasing shares "as is", as said term refers to property that can suffer occult damages. Fourth, no matter what took place during the negotiations and the various Letters of Intent, the SPA is the final contract on the matter, and Defendant Rebarber cannot deny that the SPA provides mechanisms for Plaintiff Feliciano to recover from him any expenses for repairs, or replacement of damaged equipment, that Defendant Rebarber should have done before the SPA.  PSMF # 3. Therefore, the SPA does make reference to provisions that serve as guarantees to Plaintiff Feliciano, and it is not an "as is" transaction.

20. Defendant Rebarber further argues that after the purchase on 17 December 2014, AA kept operating and, at least, four, out of its six, airplanes were operational, and a fifth was flying by 24 December 2014.  On the other hand, Feliciano states that, by 23 December 2014, he had found out about most of the mechanical irregularities which could not have arisen in less than two weeks after the purchase. PSMF # 5.

21. Although, on 23 December 2014, Feliciano sent an email communication to the chief pilot Rafael Fernandez acknowledging the need to hire two more pilots, before the purchase Rebarber verbally assured Feliciano that AA could operate with the two full time pilots, and one

part time pilot, which already worked for AA.  Nevertheless, one of those two full time pilots never showed up to work after the purchase, and during the course of business Plaintiff Feliciano realized that he needed more pilots than what Defendant Rebarber had represented to him.PSMF # 9.

22. Although Plaintiff Feliciano had previous experience buying and owning airplanes, the airplanes previously owned by him were small one passenger one engine Cub Pipers that are very different to AA's multiengine multi-passenger airplanes licensed to fly commercially. PSMF # 10.

23. Although Defendant Rebarber argues that Plaintiff Feliciano admitted in his deposition that Defendant Rebarber did not guarantee the condition of the aircrafts, the SPA contains several provisions that constitute guarantees of the fitness of the company and of the airplanes. PSMF # 3.

24. Defendant Rebarber states that Feliciano admitted in his deposition that nobody prevented him from inspecting the aircrafts while he was taking photographs, but was Feliciano admitted was that nobody prevented him from "visually" inspecting the aircrafts while he was taking photographs.  Defendant Rebarber intentionally misleads this Honorable Court. See Ex. 4, p. 196, to the statements of material facts of Defendant Rebarber's motion for summary judgment.

25. Defendant Rebarber argues that, according to Plaintiff Feliciano, AA operations increased in 23% since the SPA, in an effort to establish that Plaintiff Feliciano suffered no damages.  Nevertheless, the fact still is that by 23 December 2014, less than two weeks after the SPA, Plaintiff Feliciano had found that the airplanes needed substantial repairs which should

have been made before the SPA.  In addition, before the SPA, Defendant Rebarber represented in the financials documents from 2010 that sales were from $1,000,000 to $1,300,000 and the net income from low $100,000 up to $300,000.  Defendant Rebarber also represented to Plaintiff Feliciano that the cost of subcontracting charters was from less than $10,000 to up to $40,000 in 2014.  But, the reality when Plaintiff Feliciano took control was that AA had to incur in more than $110,000 in parts that were required to be changed before the SPA and the subcontracting charters went from $40,000 to 4 times more to $160,000  because AA did not have the pilots required for the operation and the equipment in the aircraft on the conditions required by the FAA, in other words the reality is very different from what Defendant Rebarber represented  and from what the aircraft logs and all the financial reports represented. Plaintiff Feliciano also found that 2 aircraft had been in the ground for more than six months and the other for more than a year. PMSF # 11.

26. Defendant Rebarber also argues that this Honorable Court lacks jurisdiction to entertain the matter because, according to the Puerto Rico General Law of Corporations (PRGLC), Plaintiff Feliciano, in spite of owning the controlling percent of 80% of the shares had to consult the decision to sue Defendant Rebarber with Defendant Rebarber, himself, because he owns 20% of the shares and is part of the Board of Directors.  It is basic corporate law that whoever has the majority of the shares of a corporation is entitled to make the decisions.  In addition, it makes no sense to have Plaintiff Feliciano consult with Defendant Rebarber the decision to sue Defendant Rebarber.  As President of the Board of Directors and owner of the majority of the shares, Plaintiff Feliciano had the authority to sue Defendant Rebarber, in representation of Plaintiff AA, and in his own individual capacity.  Nevertheless, Plaintiff Feliciano did notify Defendant Rebarber in writing of the claims for the maintenance issues that

10

predated the SPA before filing the complaint, but Defendant Rebarber denied the claims. PSMF # 6. A corporate resolution authorizing this lawsuit is attached.

27. All the requirements for a derivative action are met. The corporation is included as a party in the lawsuit, Plaintiff Feliciano is a stockholder, and before filing lawsuit Feliciano requested Defendant Rebarber to address his claims which Defendant Rebarber refused to do.

28. Finally, Defendant Rebarber also argues that the case should be dismissed because of Accord and Satisfaction. The check for $250,000 was not in accord and satisfaction. Defendant Feliciano has never waived his rights under the contract to collect from Defendant Rebarber the funds invested in reparations of issues that predated the SPA but were not recorded on the log books. AA needed to sell that airplane because it was not cost efficient for the type of operation it had (five aircraft were pistons and for short haul destinations but the aircraft sold was turbine and for long haul destinations) and the only way to be able to sell it was to pay said amount to Defendant Rebarber because as part of the SPA, the balance of $250,000 owed by Feliciano to Rebarber was guaranteed by a lien on said airplane. PSMF # 12.

**<u>Conclusion</u>**

29. There is a genuine issue as to whether, at the time of the purchase, the airplanes needed repairs and equipment replacements, which were not recorded in the maintenance and flight log books. Plaintiff and his expert claim that at the time of the purchase, the airplanes needed repairs, which were not recorded in the maintenance and flight log books, while Defendant Rebarber and his expert witnesses claim the opposite. This is obviously a controversy that the Jury will have to resolve.

WHEREFORE, the Plaintiffs request that the motion for summary judgment be denied.

Respectfully Submitted, this 1st day of March 2018.


This motion has been filed with the Clerk of the Court using the CM/ECF system which will notify all parties.

S/José R. Olmo-Rodríguez
José R. Olmo-Rodríguez
USDC 213405
El Centro I, suite 215, SJ, PR 00918
Tel. 7877583570/Fax. 7877640338