IN THE UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| LUIS A. FELICIANO-MUNOZ, AIR AMERICA, INC., Plaintiffs,<br><br>v.<br><br>FRED REBARBER-OCASIO Defendant. | CIVIL NO. 11-1827CC)<br><br><br>RE: BREACH OF CONTRACT |

PROPOSED PRETRIAL REPORT

TO THE HONORABLE COURT:

NOW COME the Parties, through the undersigned attorneys and submit their proposed pretrial report:

I.      **COUNSEL FOR THE PARTIES**

**Plaintiff:**

Plaintiffs Luis A. Feliciano-Muñoz and Air America, Inc. (AA) are represented by Jose R. Olmo-Rodríguez, Esq., El Centro I, Suite 215, San Juan, Puerto Rico 00918; Tel. 787-758-3570; email: jrolmo1@gmail.com.

**Defendant:**

Defendant Fred J. Rebarber is represented by Carlos A. Mercado-Rivera, Esq., PO Box 8086 Caguas, PR 00726-8086; Phone: 787-745-0628; Fax 787-961-9884 e mail: camercado@mercadoriveralaw.com

II.      **NATURE OF THE CASE**

**Plaintiff:**

This is an action for damages brought by the Plaintiffs against the Defendant for breach of contract. Under the Puerto Rico Civil Code (the "Code"), which governs Puerto Rico contract law, "[t]he contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order." P.R. Laws Ann. tit. 31 § 3372. The Defendant made fraudulent representations and warranties in the SPA (and verbally, prior to its execution) to ensure he could close a deal with Mr. Feliciano despite knowing that such representations and warranties were false in contravention of the Code and morals.

In accord with the Code, the SPA provides that the Defendant will indemnify Mr. Feliciano from and against all costs, expenses, among others, that he may suffer, directly or indirectly, due to the Defendant's breach of any of the representations and warranties made. Thus, the SPA provides for a remedy agreed upon by the parties, including the Defendant, for any breach of the SPA's representations and warranties. Similarly, the Code states that "[c]ontracts are perfected by mere consent, and from that time they are binding, not only regarding the fulfillment of what has been expressly stipulated, but also regarding all the consequences which, according to their character, are in accordance with good faith, use, and law." P.R. Laws Ann. tit. 31 § 3375. Therefore, the Defendant is responsible for the damages caused by his fraudulent representations and warranties, which were memorialized in the SPA.

Furthermore, the Defendant's actions constitute deceit in the formation of the contractual relationship (also known as "dolo" under the Code). The Code provides that dolo occurs when "by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made." P.R. Laws Ann. tit. 31 § 3408. To prove dolo, the plaintiff must establish "(1) the intent to defraud; (2) reliance on the fraudulent facts; (3) the false representations used to consummate the fraud; and (4) that the fraud was consummated by virtue of such representations." *P.R. Elec. Power Auth. v. Action Refund*, 472 F.Supp.2d 133, 138039 (D.P.R. 2006).

In this case, all elements required to prove dolo have been met. First, the Defendant knew of the aircrafts' inoperative and defective equipment, but he continued to conduct business afoul FAA regulations and then proceeded to sell his majority stake in the Corporation to Mr. Feliciano intentionally defrauding Mr. Feliciano. Second, Mr. Feliciano, having been denied the opportunity to have the Corporation's aircraft inspected, relied on the Defendant's representations and warranties to execute the SPA. Third, the fraudulent representations and warranties are contained in the SPA, which are contrary to the results of the investigations and inspections performed on the Corporation's aircraft after the SPA's execution. Finally, the SPA, which contained the deceitful representations and warranties, was executed between the parties. Ultimately, had the Defendant not represented and warranted that the Corporation conducted its business in compliance with applicable regulations, and without the possibility of performing due diligence (including aircraft inspections), Mr. Feliciano would have executed the SPA under different conditions (specifically, offering a lower purchase price for the Corporation). Thus, the elements of incidental dolo have been met ("Puerto Rico law distinguishes between two types of dolo: serious and incidental. Serious dolo 'causes, motivates, serves as the basis for and leads to the execution of the contract, in such a manner that without it, it would not have been executed.' *Colón Rivera v. Promo Motor Imps., Inc.*, 144 P.R. Dec. 659, 669 (1997) (certified translation). Incidental dolo, on the other hand, occurs when 'the contract would have been executed anyway, but not under the same conditions.' *Id.* 'In order that deceit may give rise to the nullity of a contract, it must be serious,' while '[i]ncidental deceit renders the party who employed it liable to indemnify for losses and damages only.'" P.R. Laws Ann. tit. 31 § 3409.)

Therefore, Plaintiffs request for Defendant to compensate them for the costs, expenses, losses, and others resulting from Defendant's breach of contract for fraudulent representations and warranties.

**Plaintiff:**

On April 27, 2017, Luis Feliciano Muñoz ("Mr. Feliciano", "Purchaser" or "the Plaintiff") and Air America, Inc. ("Air America", "the Corporation" or "Defendant"), collectively referred as "the plaintiffs", filed a First Amended Complaint against Fred Rebarber Ocasio ("Mr. Rebarber" or Seller"), alleging breach of contract.

Plaintiffs alleged the jurisdiction of the Court pursuant to 28 U.S.C. § 1332(a) (1) for being a dispute between citizens of different states given that Plaintiff Luis Feliciano Muñoz is a citizen of Puerto Rico; Air America, Inc., is a corporation organized pursuant to the General Corporations Act of Puerto Rico 14 L.P.R.A. § 3501. ("GCA of PR") and Defendant Rebarber is a resident of the state of Florida, U.S.A. The events that allegedly entitle the plaintiffs to a cause of action occurred in Puerto Rico and the claim exceeds seventy-five thousand dollars ($75,000.00)

Plaintiffs

The Plaintiffs allege that according to the Stock Purchase Agreement (SPA) executed between Plaintiffs and Defendant on December 17, 2014, Defendant should reimburse to Plaintiffs all costs, expenses, among others, that they suffered directly or indirectly, due to the Defendant's breach of representations and warranties made on the contract. As per the SPA, Plaintiff Feliciano acquired 80% of the stock and Defendant Rebarber maintained 20%.

Plaintiffs allege that upon taking control of the Corporation, Feliciano discovered that the airline was operating without complying with the Federal Aviation Administration (FAA) Regulations. They allege that key equipment of the six (6) airplanes bought, had deficiencies, failing to comply with the applicable Federal Aviation Administration's Regulations. They further allege that Mr. Feliciano had to ground all aircraft to perform repairs and continue business.

Plaintiffs allege that they had to incur in the following expenses:

$112,970.47 for repairs of the aircrafts

$160,905.60 for chartering other airlines for flying Air America's passengers

$9,580.44 for pending invoices incurred before the SPA's execution.

$237,216.65 for expenses incurred by Mr. Feliciano to keep the airline operational and for the unexpected decrease in the Corporation's assets which led to a significant devaluation of the Corporation's outstanding shares of which Mr. Feliciano is owner of 80%.

All amounts total a request for relief of $520,673.16.

In addition, Plaintiff seeks the payment of costs, attorney fees and interest.

## III.  THEORY OF THE PARTIES

### Plaintiff:

On or about August 2014, Mr. Feliciano contacted the Defendant to ask if he would be interested in selling Air America. The Defendant was receptive to Mr. Feliciano's inquiry and negotiations ensued. During the time between the start of negotiations and the execution of the Stock Purchase Agreement (the "SPA"), the Defendant provided the requested documentation about the Corporation. However, when Mr. Feliciano requested an inspection of Air America's fleet, which represented the main assets and main source of prospective income for the Corporation, the Defendant refused. Stating that the aircraft were in airworthy condition and in compliance with FAA regulations, the Defendant only allowed Mr. Feliciano to look at the aircraft and take photos, but Mr. Feliciano was not allowed to turn on the aircraft and certainly not to take any test flights. Furthermore, Mr. Feliciano was not allowed to communicate with Air America's employees during negotiations and not until twenty-four hours after the execution of the SPA.

Though the Defendant opposed Mr. Feliciano's request for aircraft inspection, he agreed to represent and warrant that the Corporation had all required licenses or other authority to operate and that the Corporation had conducted its business in compliance with such licenses. The SPA, Article II, Seller's Representations and Warranties, paragraph D (Operating Rights, Licenses and Permits) reads as follows:

> The Corporation has all operating authority, licenses, franchises, permits, certificates, consents, rights and privileges (collectively "Licenses") as are necessary or appropriate to the operation of its business as now conducted and as proposed to be conducted and which the failure to possess would have a material adverse effect on the assets, operations or financial condition of the Corporation. Such licenses are in full force and effect, no violations have been or are expected to have been recorded in respect of any such Licenses, and no proceeding is pending that could result in the revocation or limitation of any such Licenses. **The Corporation has conducted its business so as to comply in all material respects with all such Licenses**. (Emphasis added).

Furthermore, the Defendant agreed to indemnify Mr. Feliciano from and against all costs, expenses, among others, that he may suffer, directly or indirectly, due to the Defendant's breach of any of the representations and warranties made. The SPA, Article I, Sale and Purchase of Stocks, paragraph C, part (ii) (Other Deliveries) reads as follows:

> **Seller agrees to indemnify and save and hold harmless the Purchaser from and against all losses, claims, causes of action, obligations, suits, costs, damages, expenses** (including, without limitation, reasonable attorney's fees and disbursements) **and liabilities which the Purchaser…may suffer or incur or be compelled to or be subject to and which are caused by or arise directly or indirectly by reason of the breach of any representations and warranties of the Seller contained herein**. (Emphasis added).

Thus, Mr. Feliciano reasonably relied on the representations and warranties made by the Defendant resulting in significant financial damages to Mr. Feliciano and to Air America.

The Parties finally executed the SPA on December 17th, 2014. Per the SPA, Mr. Feliciano purchased from Defendant eighty percent (80%) of all the issued and outstanding common stock

Defendant owned in Air America while Defendant retained ownership of the remaining twenty percent (20%) of all the issued and outstanding common stock of the Corporation.

After taking control of the Corporation, Air America employees informed Mr. Feliciano that key equipment on six aircrafts had deficiencies, or were either broken or inoperative. Specifically, the condition of such aircrafts was not in compliance with applicable Federal Aviation Administration ("FAA") regulations, which placed the Corporation at risk for incurring in fines or penalties and possibly losing its operating licenses. Furthermore, Air America employees stated to Mr. Feliciano that the Defendant had instructed them over time to not record any instances of broken or inoperative equipment of the aircraft and that the FAA had found many instances of noncompliance in an audit performed in May 2014, which the Defendant did not disclose to Mr. Feliciano at any moment during negotiations. Therefore, the Defendant knowingly and fraudulently represented and warranted that the Corporation had conducted its business in compliance with required licenses or other authority and that the aircraft were in airworthy condition. To date, repairs amount to one hundred fifteen thousand one hundred and fifty-eight dollars with eighty-six cents ($120,361.49). The cost of repairs for each aircraft is provided below.

For aircraft N30PT (C421), the total cost of necessary repairs was twenty-five thousand five hundred and fifteen dollars with fifty cents ($25,215.50) to ensure its compliance with FAA regulations. To date, these repairs have been performed. In addition, as this aircraft has no commercial value for the company, Plaintiff requests that defendant Rebarber reimburse its appraisal value, $211,615.00.

For aircraft N2395Z (PA-23), the total cost of necessary repairs was six thousand three hundred and ninety dollars with fifty-seven cents ($6,390.57) to ensure its compliance with FAA regulations.  To date, these repairs have been performed.

For aircraft N62749 (PA-23), the total cost of necessary repairs was twenty-five thousand four hundred and seventy dollars with eighty-three cents ($22,551.99) to ensure its compliance with FAA regulations. To date, these repairs have been performed.

For aircraft N707TL (BE-90), the total cost of necessary repairs was twenty-two thousand six hundred and forty-two dollars with twenty-eight cents ($22,672.28) to ensure its compliance with FAA regulations.  To date, these repairs have been performed.

For aircraft N7049T (BN-2A), the total cost of necessary repairs was twenty-nine thousand thirty-nine dollars with sixty-eight cents ($31,039.68) to ensure its compliance with FAA regulations. To date, these repairs have been performed.

For aircraft N21WW (PA-23), the total cost of necessary repairs was six thousand one hundred dollars with no cents ($12,491.47) to ensure its compliance with FAA regulations. To date, these repairs have been performed.  Additional investment for necessary repairs is required to have all remaining aircraft in good operating condition and in compliance with applicable law and regulations.

Also, to keep the company operational, maintain sales and meet its obligations with customers, employees and vendors, the Corporation had to charter aircrafts from other companies between the months of December 2014 and October 2015 at a cost of one hundred sixty thousand nine hundred and five dollars with sixty cents ($160,616.00). Such expenses were a direct result of the Corporation's own aircraft not being operational and in compliance with applicable FAA regulations.

Furthermore, Defendant owes the Corporation the amount of nine thousand five hundred and eighty dollars with forty-four cents ($9,190.00) from pending invoices incurred before the SPA's execution. The SPA provides that all expenses incurred by the Defendant prior to the date of the SPA or that should have been incurred by the Defendant prior to such date would be Mr. Rebarber's responsibility. The SPA, Article IV, Seller's Indemnity, paragraph A, reads as follows:

> The Corporation and/or Seller [the Defendant] have satisfied 100% of any known accrued expenses and debt of the Corporation. Any unrecorded or undisclosed expenses and liabilities related with the operations of the Corporation prior to this date (the "Unrecorded Expenses") found by the Purchaser after the date hereof, shall be paid by Seller to the Corporation upon claim thereof by Purchaser or the Corporation supported by adequate evidence. If Seller fails to reimburse the Corporation, in addition to any rights available at law to collect the Unrecorded Expenses, Purchaser shall have the right to deduct or set-off the Unrecorded Expenses from face value of the Note. **All expenses incurred by the Corporation prior to the date hereof shall run on the account of the Seller**; and all expenses incurred by the Corporation after the date hereof will run on account of the Corporation. **In addition, any expenses incurred by the Corporation after the date hereof that should have been incurred by the Corporation prior to this date, will be on the account of the Seller and shall be considered Unrecorded Expenses**. (Emphasis added).

Undoubtedly, Mr. Feliciano has incurred in significant losses and expenses to maintain the Corporation operational and in compliance with FAA regulations. The expenses incurred for the aforementioned repairs and charters have resulted in an unexpected decrease in the Corporation's assets, which has resulted in a significant devaluation of the Corporation's outstanding shares of which Mr. Feliciano is a majority shareholder. Mr. Feliciano's reliance in the Defendant's fraudulent representations and warranties has resulted in costs and expenses that are currently estimated at about $493,264.00. In addition, Plaintiff seeks the payment of costs, attorney fees and interest.

**Defendant:**

Defendant adopts by reference all documents annexed to the Memorandum of Law in Support to the Summary Judgment and all uncontested material facts.

In essence, the complaint is based in the allegation that *Defendant is therefore liable for the damages caused to Plaintiff as a result of his breach of contract arising from his false representations and warranties regarding the Corporation's compliance with applicable FAA regulations.* Plaintiffs allege that for such breach of contract and false representations, they had to incur in the following expenses:

$112,970.47 for repairs of the aircrafts

$160,905.60 for chartering other airlines for flying Air America's passengers

$9,580.44 for pending invoices incurred before the SPA's execution.

$237,216.65 for expenses incurred by Mr. Feliciano to keep the airline operational and for the unexpected decrease in the Corporation's assets which led to a significant devaluation of the Corporation's outstanding shares of which Mr. Feliciano is owner of 80%.

All amounts total a request for relief of $520,673.16.

In addition, Plaintiff seeks the payment of costs, attorney fees and interest.

Said allegations are erroneous and does not have any base on reality according to the pertinent documents, specially, according to the Stock Purchase Agreement and as admitted by Plaintiff Feliciano himself both on his responses to request for admissions and to his testimony on his deposition.

Plaintiff alleges that he executed the buying, relaying on Defendant's representations and warranties regarding the Corporation's compliance with the FAA regulations.

First of all, it is important to state that Plaintiff Feliciano did not buy airplanes, he bought the majority of the shares of Air America, Inc. As part of Air America's assets, there were six airplanes operating under a FAR 135 airline business.

Defendant opposes to said allegation that the airline had been operational for years, with a valid certificate of operation issued by the FAA and with a perfect operating history. During the same year of the acquisition the FAA had conducted two comprehensive and exhaustive inspections with no significant findings. Furthermore, after Plaintiffs acquisition and controlling the operations, the airline

kept operating and the airplanes continued to fly without any grounding by the airline or the FAA. Thus, Plaintiffs allegations do not have any factual base.

Plaintiffs also allege that in order to make his decision to acquire the 80% of the Corporation, he relied on the information provided to him by Defendant. First of all, it is very unlikely that a seasoned businessperson with years of experience and previous possessing of airplanes, will rely only on the seller's representation. Obviously, that is not the way a prudent and reasonable buyer will conduct business and proceed. Nevertheless, the reality is that the airplanes were assessed, inspected and evaluated by three different professionals retained by Plaintiff Feliciano. Miguel Nicolás Moreda (of Porto Capital, CPA, Restructuring Startup, Tax Planning and CFO Services); Diego Perdomo (Perdomo Ferrer CPA's and Consultants); and a California based specialist in aviation and aircraft appraisals and acquisitions, Verlyn Wolfe (Wolfe Aviation, Aircraft Acquisition Sales and Service). Those three Feliciano's representatives participated actively in the process of evaluating all aspects needed by them on behalf of their client, Mr. Feliciano, and to advise him. As part of that process, all financial data was provided to them at their request; all information requested by them regarding the company and the airplanes was provided photographs were made available and each and every document, record or information requested by them, was provided by Mr. Rebarber. Mr. Feliciano admitted in his deposition, that he had previous experience of buying aircrafts for another of his business, went to Air America's facilities together with Mr. Moreda, inspected the aircrafts and took photographs of them from the outside and inside. Thus Mr. Feliciano's allegation of relying only on Defendant's representations and that Defendant made false claims are false.

To the moment of the execution of the SPA, Air America company was in good standing, was operational, had all permissions and certificates and had never been subject to a violation a revocation of

its certificates or any interruption of its operations. Mr. Feliciano's allegations are not sustained by any evidence.

Furthermore, Feliciano knew that he was buying an "as is" operations, without any reservations or conditions. Feliciano issued two different letters of intent which were not accepted by the seller, until a third one, dated November 12, 2014, which was signed by both Feliciano and Rebarber, because it finally contained the satisfactory agreements for both parties. Subsequent to said Letter of Intent (LOI), a Stock Purchase Agreement (SPA) containing all the covenants, terms and conditions was subscribed on December 17, 2014. It is absolutely clear in those documents that there is no reference whatsoever to guarantee or condition of the airplanes or to the fitness or continuation of the operation after December 14, 2014. On the contrary, it was well clear, as customary, that the responsibilities of the Seller will cease after the taking over by the Buyer.

To Plaintiffs allegations that the airline was operating in violation of FAR's, the evidence contradicts said allegation. Contrary to Plaintiffs' allegation, Defendant Rebarber represented a truthful fact when guaranteed that the company was in compliance with the Federal Aviation Regulations and that the certificates were in full effect. As a matter of fact, during his deposition, Plaintiff Feliciano admitted that to his knowledge Air America's certificate had never been revoked. Plaintiff does not have any evidence on the contrary, making his allegation a futile and false one.

Plaintiff Feliciano also allege on his complaint that upon taking over of the company, he had to ground all aircrafts in order to repair them and operate legally. Such allegation is also false and is contrary to his testimony on deposition and to his answers to requests for admissions. First of all, contrary to his allegations, after December 17, 2014, the company kept operating and at least four airplanes were operational. It is false that the airplanes were grounded by Feliciano, by the FAA or by anyone else. A fifth aircraft was undergoing a routine inspection and started flying again on December

24, 2014, and only the sixth airplane was grounded for not having any business for it. As stated previously, the condition of this aircraft was well known to Feliciano, since he inspected it with one of his retained experts, Mr. Moreda, and took photos of the interior of it, showing absence of avionic equipment, lacking the passenger seats and having an inspection plate in the main cabin open. Obviously in a nonoperational condition.

In summary, it is incorrect that Mr. Feliciano grounded all aircrafts upon taking over the operation, since four were operating, a fifth one within a week. It is also incorrect that the company was operating without complying with the Federal Aviation Regulations. The airline went thru two different FAA base inspections in 2014 prior to the acquisition and they did not make any significant findings, but rather minor discrepancies that were timely corrected and no certificate action was ever commenced. The airline has never been violated or grounded by the FAA. The airline was flying with the required equipment to comply with the regulations, making the allegations in the complaint for damages not only speculative but frivolous and knowingly false.

Defendant Rebarber retained two different experts with extensive experience as FAA Aviation Safety Inspectors, (Mr. Rafael Gilestra and Mr. Ismael Ortiz), which concluded and confirm that by December 17, 2014, the airline had the aircrafts flying legally and were never subject to a grounding as alleged by Defendant. These two experts with decades of experience as Aviation Safety Inspectors with the FAA, also concluded that all expenditures in the aircrafts subsequent to December 17, 2014, were routine maintenance, normal unexpected repairs or voluntary adding of non-regulatory equipment, making again false the Plaintiffs' allegations.

Regarding Plaintiffs' allegations of having to interrupt operations and give their business to other airlines, causing to lose revenue, that is also false. Any interruption of the operations of the airline was due to the shortage of pilots to fly all the flights booked, because the airline, even though needed at least

two additional pilots, for over 7 months, was operating with only one full time pilot and another two-part timer. As expert Ortiz concludes in his expert report, he states that it is impossible to handle over of 400 flights for that period with only one full time pilot. *For the months of December 2014 until July, the only available full time Pilot with Air America, Inc. was Mr. José Rafael Fernández. He was qualified to fly all 3 models of aircraft operated. Mr. Yan Stephanie Cor acted as a part time pilot and only qualified to fly one model of aircraft, information provided by the carrier. Accordingly, only 2 pilots were available to fly 5 aircraft from the Air America, Inc. fleet. We found Mr. Fernández flying at least 2 different aircraft models on the same day.*

Also, on December 23, 2014, 6 days after the execution of the SPA, Mr. Feliciano wrote a communication to the Chief Pilot, stating that two additional pilots were needed, confirming that the reason for having to subcontract other airlines was because a known lack of pilots even though the aircrafts were operational.

The fitness (or lack of it) of Air America, from December 17, 2014, on, can only be attributed to the new management and not to any act or omission of Defendant Rebarber. On December 17, 2014, Plaintiff Feliciano took over an operation with four airplanes in conditions to fly, and a fifth one was flying within a week. Also, the condition of the only airplane undergoing maintenance was well known by Mr. Feliciano. He also knew the human resources working at that time and the need to hire more pilots. Mr. Feliciano's admissions corroborate the fact that he had the airplanes available, nevertheless, he did not hire the pilots to fly the commitments engaged, reason for having to use the services of other airlines. Being obvious that there was not any breach of contract by Defendant, and on the contrary, that the fitness of the airline after December 17, 2014 was entirely the consequence of Plaintiff's business decisions, the complaint should be dismissed.

## IV.    THE ADMITTED FACTS

### Plaintiff:

1.     On or about August 2014, Mr. Feliciano contacted the Defendant to ask if he would be interested in selling Air America. The Defendant was receptive to Mr. Feliciano's inquiry and negotiations ensued. During the time between the start of negotiations and the execution of the Stock Purchase Agreement (the "SPA"), the Defendant provided the requested documentation about the Corporation. However, when Mr. Feliciano requested an inspection of Air America's fleet, which represented the main assets and main source of prospective income for the Corporation, the Defendant refused. Stating that the aircraft were in airworthy condition and in compliance with FAA regulations, the Defendant only allowed Mr. Feliciano to look at the aircraft and take photos, but Mr. Feliciano was not allowed to turn on the aircraft and certainly not to take any test flights. Furthermore, Mr. Feliciano was not allowed to communicate with Air America's employees during negotiations and not until twenty-four hours after the execution of the SPA.

Though the Defendant opposed Mr. Feliciano's request for aircraft inspection, he agreed to represent and warrant that the Corporation had all required licenses or other authority to operate and that the Corporation had conducted its business in compliance with such licenses. The SPA, Article II, Seller's Representations and Warranties, paragraph D (Operating Rights, Licenses and Permits) reads as follows:

> The Corporation has all operating authority, licenses, franchises, permits, certificates, consents, rights and privileges (collectively "Licenses") as are necessary or appropriate to the operation of its business as now conducted and as proposed to be conducted and which the failure to possess would have a material adverse effect on the assets, operations or financial condition of the Corporation. Such licenses are in full force and effect, no violations have been or are expected to have been recorded in respect of any such Licenses, and no proceeding is pending that could result in the revocation or limitation of any such Licenses. **The**

**Corporation has conducted its business so as to comply in all material respects with all such Licenses**. (Emphasis added).

Furthermore, the Defendant agreed to indemnify Mr. Feliciano from and against all costs, expenses, among others, that he may suffer, directly or indirectly, due to the Defendant's breach of any of the representations and warranties made. The SPA, Article I, Sale and Purchase of Stocks, paragraph C, part (ii) (Other Deliveries) reads as follows:

> **Seller agrees to indemnify and save and hold harmless the Purchaser from and against all losses, claims, causes of action, obligations, suits, costs, damages, expenses** (including, without limitation, reasonable attorney's fees and disbursements) **and liabilities which the Purchaser…may suffer or incur or be compelled to or be subject to and which are caused by or arise directly or indirectly by reason of the breach of any representations and warranties of the Seller contained herein**. (Emphasis added).

Thus, Mr. Feliciano reasonably relied on the representations and warranties made by the Defendant resulting in significant financial damages to Mr. Feliciano and to Air America.

The Parties finally executed the SPA on December 17th, 2014. Per the SPA, Mr. Feliciano purchased from Defendant eighty percent (80%) of all the issued and outstanding common stock Defendant owned in Air America while Defendant retained ownership of the remaining twenty percent (20%) of all the issued and outstanding common stock of the Corporation.

Finally, the SPA provides that all expenses incurred by the Defendant prior to the date of the SPA or that should have been incurred by the Defendant prior to such date would be Mr. Rebarber's responsibility. The SPA, Article IV, Seller's Indemnity, paragraph A, reads as follows:

> The Corporation and/or Seller [the Defendant] have satisfied 100% of any known accrued expenses and debt of the Corporation. Any unrecorded or undisclosed expenses and liabilities related with the operations of the Corporation prior to this date (the "Unrecorded Expenses") found by the Purchaser after the date hereof, shall be paid by Seller to the Corporation upon claim thereof by Purchaser or the Corporation supported by adequate evidence. If Seller fails to reimburse the Corporation, in addition to any rights available at law to collect the Unrecorded Expenses, Purchaser shall have the right to deduct or set-off the Unrecorded

Expenses from face value of the Note. **All expenses incurred by the Corporation prior to the date hereof shall run on the account of the Seller**; and all expenses incurred by the Corporation after the date hereof will run on account of the Corporation**. In addition, any expenses incurred by the Corporation after the date hereof that should have been incurred by the Corporation prior to this date, will be on the account of the Seller and shall be considered Unrecorded Expenses**. (Emphasis added).

**Defendant:**

It is Defendant's understanding that there is no requirement under Local Rules to allege Admitted Facts.

## V.     PROPOSED UNCONTESTED FACTS

**Plaintiff:**

**Defendant:**

**Defendant's proposed uncontested facts:**

1.  By September 2014, Air America, Inc. was a corporation organized pursuant to the General Corporations Act of Puerto Rico, dedicated to providing airline services pursuant to Federal Aviation Regulations Part 135.

2.  By September 2014, Mr. Fred J. Rebarber was the owner of the shares of Air America, Inc., for said reason, Plaintiff Feliciano contacted him on September 30, 2014, with the purpose of buying the 100% of the shares from Defendant Rebarber.

3.  Plaintiff Luis Feliciano retained Mr. Manuel Nicolás Moreda, as consultant to assess him in the process of buying Air America, Inc.'s shares on or about September to December 2014.

4.  Mr. Manuel Nicolás Moreda is a CPA, and is the owner and or works for Porto Capital a company engaged in providing Restructuring, Startup, Tax Planning and CFO Services.

5. Plaintiff Luis Feliciano retained Mr. Diego Perdomo, as accounting and business consultant to assess him in the process of buying Air America, Inc.'s shares on or about September to December 2014.

6. Mr. Diego Perdomo is a CPA, and is the owner and or works for Perdomo Ferrer CPA's and Consultants.

7. Plaintiff Luis Feliciano retained Mr. Verlyn Wolfe as consultant to assess him in the process of buying Air America, Inc.'s shares on or about September to December 2014.

8. Mr. Verlyn Wolfe is an aviation consultant and is the owner and or works for Wolfe Aviation a company engaged in aircraft acquisition, sales and services.

9. On September 30, 2014, Mr. Luis Feliciano issued a first Letter of Intent to Mr. Fred Rebarber with the purpose of buying the 100% of the shares of Air America, Inc. for $1,500,000. Mr Rebarber did not sign the LOI.

10. On October 21, 2014, Mr. Rebarber directed an email to Mr. Moreda in which stated that he was not accepting the terms of the LOI, because the condition of the sale was "as is", and the LOI should not contain terms as "offer subject to" or "satisfaction to buyer".

11. On November 6, 2014, Mr. Luis Feliciano issued a second Letter of Intent to Mr. Fred Rebarber with the purpose of buying the 80% of the shares of Air America, Inc. for $1,300,000. Mr Rebarber did not sign the LOI.

12. On November 12, 2014, Mr. Luis Feliciano issued a third Letter of Intent to Mr. Fred Rebarber with the purpose of buying the 80% of the shares of Air America, Inc. for $1,300,000. In this third LOI there were no references to conditions such as "offer subject to" or "satisfaction to buyer". There was no reference as to the conditions of the aircrafts or to guarantee the operation of the airline or as to the keeping employees or pilots. Mr. Rebarber signed this LOI.

13. On December 17, 2014 a Stock Purchase Agreement (SPA) was signed by Mr. Luis Feliciano and Mr. Rebarber. The document contained the terms, agreements and covenants of the parties.

14. In the SPA, there are no references to conditions such as "offer subject to" or "satisfaction to buyer". There is no reference as to the conditions of the aircrafts or to guarantee the operation of the airline or as to the keeping employees or pilots.

15. The terms and conditions of the SPA agreement were basically that defendant Rebarber will sell 80% of the shares, maintaining 20% for himself. The selling price was agreed in $1,300,000. The payment schedule was as follows: $100,000 were previously paid on November 12, 2014, as a deposit upon acceptance of the offer; $950,000 were paid at the signing of the agreement on December 17, 2014, and a final payment of $250,000 twelve (12) months after signing of the agreement.

16. The SPA contained a clause stating that a lien was going to be established upon aircraft Beechcraft King Air E-90, to secure the final payment of $250,000.

17. The SPA contained a clause sating that it shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico.

18. The SPA contained a clause under the Sellers representations and warrantees' section, stating that the licenses of the Corporation were in full force and effect, no violations have been or expect to be recorded and that the business was being operated in compliance to such licenses.

19. Plaintiff Feliciano took photographs with Mr. Moreda of the company's aircrafts.

20. Plaintiff Feliciano took two photographs of the inside of the Cessna N30PT aircraft.

21. On December 17, 2014, Plaintiff Feliciano and Defendant Rebarber signed a Unanimous Written Consent of the Shareholders of Air America, Inc.

22. The Unanimous Written Consent of the Shareholders of Air America, Inc. contained a clause stating that the Corporation shall be managed by the stockholders acting as directors of the Corporation.

23. As part of the LOI signed on November 12, 2014, Mr. Rebarber Ocasio remained available to be consulted by the hour for at least one year.

24. On December 17, 2014, Plaintiff Feliciano and Defendant Rebarber signed an Amended and Restated Certificate of Incorporation of Air America, Inc.

25. On December 17, 2014, on the Amended and Restated Certificate of Incorporation of Air America, Inc., the purpose of the Corporation was modified *to provide air transportation services for passengers and cargo, on chárter or scheduled basis, to and fron San Juan, Puerto Ricoto and from destinations in the Caribbean, and any other comercial lawful business purpose or purposes that a corporation organized under the laws of the Commonwealth of Puerto Rico may be permitted to undertake.*

26. On November 16, 2015, Plaintiff Feliciano sent a letter to Mr. Rebarber informing that he was exercising his right to set off an indemnity claim against Rebarber in the amount of $250,000 and requesting an additional amount of $25,395.46. He alleged a breach of contract because, upon taking control of the business they discovered that the key equipment on six aircrafts were broken or inoperative and in order to render the airplanes airworthy, they he had to ground the aircrafts and expenditures due to necessary repairs.

27. On November 24,2015, Rebarber replied with a letter stating that Mr. Feliciano had to pay the money he owed and that the condition of the aircrafts was in compliance with the FAR's, and that Feliciano's intention was to delay the payment of the $250,000 owed.

28. On June 22, 2017, a deposition was taken upon Plaintiff Luis Feliciano.

29. On June 22, 2017 Feliciano's deposition he stated under oath that the answers to the response to the request for admissions were true and correct.

30. On May 3, 2017, Plaintiff Feliciano submitted his answers to the document identified as Plaintiffs' Response to Defendant's Request for Admission. (From now on "R of A")

31. On December 23, 2014, Plaintiff Feliciano sent an email communication to the chief pilot Rafael Fernández, acknowledging the need to hire minimum, at least two more pilots.

32. On December 2, 2015, Plaintiff sent an email to Defendant Rebarber telling him that he will receive the $250,000 in exchange of the release of the lien on the E90 aircraft.

33. On December 03, 2015, Plaintiff paid via deposit to the bank account the remaining $250,000 owed to Defendant.

34. Plaintiff Feliciano admitted under oath that No Service Difficulty Reports were submitted to the Federal Aviation Administration during 2015 in accordance with FAR 135.415.

35.  Plaintiff Feliciano admitted under oath that No Mechanical Interruption Summary Reports were submitted to the Federal Aviation Administration during 2015 in accordance with FAR 135.417.

36. The aircrafts owned by Air America as of December 17, 2014, were the following:

| YEAR | PLATE | MODEL | S/N |
|------|-------|-------|-----|
| 1978 | N62749 | PA23-250 | 27-7654198 |
| 1978 | N2395Z | PA23-250 | 27-7954107 |
| 1975 | N21WW | PA23-250 | 27-7554066 |
| 1971 | N7049T | BN-2A-21 | 643 |
| 1976 | N30PT | 421C | 0157 |
| 1976 | N707TL | E09 | LW-173 |

37. Plaintiff Feliciano admitted under oath that Defendant Rebarber submitted to him, the spreadsheets containing the information of the aircrafts requested by Verlyn Wolfe.

38. Plaintiff Feliciano admitted under oath that he status of the propeller governor on aircraft N30PT appears on the spreadsheet sent to Mr. Verlyn Wolfe.

39. Plaintiff Feliciano admitted under oath that aircraft N707TL flight and maintenance document reflects that after December 28, 2014, that the aircraft continued to fly without discrepancies until on December 28, 2014, when a generator light illuminated which was corrected the same day.

40. Plaintiff Feliciano admitted under oath that aircraft N21WW flight and maintenance document reflects that the aircraft continued to fly without discrepancies from December 17, 2014 to January 7, 2015 when a light in cockpit was noted as inoperative.

41. Plaintiff Feliciano admitted under oath that the light illuminated in the panel of aircraft N21WW on January 7, 2015, was fixed on January 9, 2015 and the aircraft was without any noted until January 21, 2015, when a scheduled maintenance was performed.

42. Plaintiff Feliciano admitted under oath that aircraft N21WW continued flying after January 9, without any discrepancies being noted until its January 20, 2015, when the scheduled maintenance was performed.

43. Plaintiff Feliciano admitted under oath that aircraft N62749 flight and maintenance document reflects that since December 17, 2014 the aircraft continued to fly without discrepancies noted until its scheduled maintenance on January 4, 2014.

44. Plaintiff Feliciano admitted under oath that aircraft N2395Z was flying from December 17, 2014 until January 8, 2015, when a discrepancy regarding the cabin door was noted, even though the aircraft was only flown for training purposes and not for passengers.

45.  Plaintiff Feliciano admitted under oath that aircraft N7049T flight and maintenance document reflects that after December 17, 2014 the aircraft continued to fly until December 29, 2014, when a magnet was noted as inoperative.

46. Plaintiff Feliciano admitted under oath that aircraft N7049T continued to fly after a scheduled inspection on December 29, 2014 until February 10, 2015, when the right generator light reflected an over voltage.

47. Plaintiff Feliciano admitted under oath that aircraft N30PT was subject to an annual inspection on July 25, 2015

48. Plaintiff Feliciano admitted under oath that as of December 14, 2014, all flight and maintenance documents of the aircraft mentioned in the complaint reflect that these were in compliance with FAA regulations.

49. Plaintiff Feliciano admitted under oath that as of December 14, 2014, there were no entries in the flight and maintenance documents of the aircraft mentioned in the complaint such as would ground any of them, other than those undergoing scheduled inspections or routine maintenance.

50. Plaintiff Feliciano asked consultant Diego Perdomo to do due diligence.

51. Plaintiff Feliciano had previous experience buying and owning airplanes.

52. Plaintiff Feliciano admitted in his deposition that he provided Mr. Verlyn Wolfe the list of the serial number of the aircrafts.

53. Plaintiff Feliciano admitted in his deposition that Defendant Rebarber provided him with a list of all the avionics and all of the equipment of the aircrafts.

54. Plaintiff Feliciano admitted in his deposition that he provided Mr. Verlyn Wolfe the list of the serial number of the aircrafts.

55. Plaintiff Feliciano admitted that Mr. Moreda or Mr. Perdomo advised him to walk away from the business deal, but he continued.

56. Plaintiff Feliciano admitted in his deposition that the Seller (Defendant Rebarber) did not guarantee the condition of the aircraft[s].

57. Plaintiff Feliciano admitted in his deposition that the Seller (Defendant Rebarber) did not guarantee that the airplanes would not break down at any time after Feliciano bought the airline.

58. Plaintiff Feliciano admitted in his deposition that the Seller (Defendant Rebarber) did not guarantee that he had enough pilots to operate the airline.

59. Plaintiff Feliciano admitted in his deposition that nobody prevented him from inspecting the aircrafts while he was taking photographs.

60. Plaintiff Feliciano admitted under oath that the aircraft's flight and maintenance documents reflect that after December 24, 2014 and up to December 2015, N2395Z, N21WW, N62749, N707TL and N7049T all have had consecutive 50-hour, 100 hour and annual inspections.

61. Plaintiff Feliciano admitted under oath that prior to filing the case at caption, Air America, Inc. did not obtain a Resolution authorizing it to file said matter.

62. Plaintiff Feliciano admitted that Fred Rebarber is the registered Agent for Service of Air America, Inc.

63. Plaintiff Feliciano admitted under oath that on February11, 2016, El Nuevo Día republished an article originated 90 days previously where Plaintiff Feliciano is quoted as stating that Air America's flight capacity had increased by 23 percent since his acquisition of the company 13 months hence.

64. Plaintiff Feliciano admitted under oath that on February 22, 2016 there appeared in the Air American Caribbean blog, the following statement: "According to Feliciano Air America has experienced an increase of 23% in operations since they acquired the company in December 2014."

65. Plaintiff Feliciano admitted under oath that the reason to contract other charter operators such as Air Flamenco on December 27 2014, on January 2 2015 and on March 14 2015; Air Margarita on February 7 2015, on February 14, 2015 and on March 14, 2015; Air Paradise on February 14, 2015 and February 22 2015; Charter flights on February 14 2015 and March 8 2015, was because on those dates Air America did not have pilot available.

## VI.    THE ULTIMATE FACTS WHICH WILL BE DISPUTED

### Plaintiff:

1. Whether the Defendant made false representations to the Plaintiffs.

2. Whether the Defendant failed to conduct necessary repairs and equipment installation that predated the stock purchase agreement.

3. The amount of damages.

### Defendant:

1. Whether Plaintiffs filed a frivolous action.

2. Whether Defendant should be imposed the penalty of costs attorney's fees and punitive damages for filing a cause of action without any merits.

## VII.    LIST OF EXHIBITS AND TRANSLATION OF SAME

### Plaintiff:

1.   Luis Irizarry's expert witness report.

2.   Email communication dated December 2014 re maintenance.

3.   Rebarber's accounts payables to AA.

4.   Profit loss reports for 2014-2016.

5.   Charter flights schedules and invoices.

6.   Bank statements with copies of checks made for repairs and equipment.

**Defendant:**

1.   Certificate of Incorporation of Air America, Inc.

2.   Certificate of Air America, Inc. as an FAA Air Carrier.

3.   Letter of Intent (LOI) dated September 30, 2014.

4.   Deposition taken to Mr. Luis Feliciano on June 22, 2017.

5.   Mr. Manuel Nicolás Moreda's business profile.

6.   Perdomo Ferrer, LLC's business profile.

7.   Wolfe Aviation's business profile.

8.   Fred Rebarber's October 21, 2014, email to Manuel Moreda.

9.   Letter of Intent (LOI) dated November 6, 2014.

10.   Letter of Intent (LOI) dated November 12, 2014.

11.   Stock Purchase Agreement (SPA) of December 17, 2014.

12.   Photograph of aircraft 421C, N30PT left side cabin.

13.   Photograph of aircraft 421C, N30PTcenter of cabin.

14.   Unanimous Written Consent of the Shareholders of Air America, Inc.

15.   Amended and Restated Certificate of Incorporation of Air America, Inc.

16.   Luis Feliciano's letter to Fred Rebarber dated November 16, 2014.

17.    Letter from Fred Rebarber to Luis Feliciano dated November 24, 2014.

18.    Plaintiff's Response to Defendant's Request for Admissions

19.    Email from Luis Feliciano to Rafael Fernández dated December 23, 2014.

20.    Email from Luis Feliciano to Fred Rebabrber dated December 2, 2015.

21.    Fred Rebarber's bank account statement reflecting $250,000 deposit.

22.    Expert Witness Rafael Gilestra's C/V.

23.    Expert Witness Ismael Ortiz's C/V.

24.    Rafael Gilestra's Expert Witness Report.

25.    Ismael Ortiz's Expert Witness Report.

26.    Defendant reserves the right to use any and each piece of evidence intende to use by Plaintiff.

27.    Defendant alleges that the pieces of evidence not previously announced or not submitted during the discovery process could be objected as surprise.


## VIII.  <u>DEPOSITIONS</u>

### <u>Defendant:</u>

Defendant took a deposition upon Plaintiff Luis Feliciano on June 22, 2017 continuing on June 23, 2017. The transcript of the deposition will be used by Defendant for all purposes permitted under the Federal Rules of Civil Procedures and the Federal Rules of Evidence.


## IX.   <u>PROPOSED VOIR DIRE AND JURY INSTRUCTIONS</u>

### <u>Defendant:</u>

Will be submitted on Court's due date.


**X.**   **TECHNICAL WORDS**


**XI.**   **WITNESSES**


**Plaintiff:**


1. Mr. Luis Feliciano: Mr. Feliciano will explain the facts narrated in Section II and III above, and will explain the business decisions that required repairing and making the airplanes compliant with applicable regulations. He will also testify as to the debt by Rebarber.

**Defendant:**


1. Mr. Fred Rebarber will testify of the nature of the business and operations of Air America since its creation. Will testify of the conversations and written communications between the parties until the execution of the SPA on December 17, 2014. Will testify of the contents of the communications until the final agreement contained in the SPA. Will testify of the condition of the airplanes and the operations details. Will further testify of the communications with Air America, from December 17, 2014 on. Mr. Rebarber will testify of his full compliance with the terms of the SPA on his behalf. Additionally, Mr. Rebarber will oppose or raise any defense to any allegation or testimony of Plaintiffs' witnesses.


2. Mr. Rafael Fernández. Mr. Fernández is an airline pilot which held the position of Chief Pilot foro ver two years with Air America. He will testify of the way the operations were conducted

before December 17, 2014 and after that date. He will testify as to the conditions of the aircrafts before during his tenure. As Chief Pilot. He will also testify as the instructions given by Mr. Feliciano regarding the operations.

3.  Defendant reserves the right to call to testify any and such witness called by Plaintiffs.

## XII.   EXPERT WITNESSES

**Plaintiff:**

1.  Mr. Luis A. Irizarry Porrata:  Mr. Irizarry will provide opinions about the deficiencies found in the airplanes, which required the repairs listed in the complaint. Mr. Irizarry's qualifications and report were included in the Plaintiffs' Initial Disclosures filed on December 21, 2016.

2.  Mr. Diego L. Perdomo: Mr. Perdomo will provide opinions about the economic damages caused to Air America and its shareholders as a result of Defendant's false representations in the SPA. Mr. Perdomo's qualifications (curriculum vitae) are included and his report will be provided as soon as it is available.

**Defendant:**

1.     Mr. Rafael Gilestra. Mr. Gilestra is a retired Federal Aviation Administration safety inspector. He retired on March 2005. He will testify on his qualifications and experience contained in his curriculum vitae. He will testify of the contents of his expert witness report, specially, he will express his opinion on the conditions of the aircrafts owned by Air America

as evidenced by his inspection of the aircraft records and the airplanes and to his conclusions that the allegations of the complaint do not have any merits.

2.      Mr. Ismael Ortiz is a retired Federal Aviation Administration safety inspector. He retired on December 31, 2010. He will testify on his qualifications and experience contained in his curriculum vitae. He will testify of the contents of his expert witness report, specially, he will express his opinion on the conditions of the aircrafts owned by Air America and that the operation conducted by Plaintiffs lacked personnel to conduct the operations needed. He will also testify of his conclusions that the allegations of the complaint do not have any merits.

3.      Defendant objects the utilization of Mr. Luis Irizarry. Mr. Irizarry does not meet the standards required by Daubert doctrine. Additionally, Mr. Irizarry's conclusions on his report are just speculations and not based on any reliable technique or investigation.

4.      Defendant object the utilization of Mr. Diego L. Perdomo for not meeting the Daubert's standards.

5.      Defendant reserves the right to use any expert witness called to testify by Plaintiff for all permitted purpose in law.

**XIII.  ITEMIZED STATEMENT OF SPECIAL DAMAGES**

1.

**XIV.  ESTIMATED LENGTH OF TRIAL**

Plaintiff estimates the length of the presentation of his evidence in four days.

Defendant estimates 2 days
.

## XV.   <u>RESERVATIONS AND PENDING MATTERS</u>

<u>Defendant:</u>

On January 16, 2018, Defendant filed a Motion for Summary Judgment. To this date, the motion has not

been resolved. Defendant respectfully requests that said motion should be adjudicated before trial, given

that there is enough factual evidence and matters of law to dismiss the case without the need of the

parties and the Court to engage in the preparation for trial.

Respectfully submitted, this 30th day of August 2018.

**S/Jose R. Olmo-Rodríguez**
**José R. Olmo-Rodríguez**
**USDC # 213405**
El Centro I, Suite 215
San Juan, Puerto Rico 00918
Tel.758-3570
jrolmo1@gmail.com


*S/Carlos A. Mercado Rivera*
CARLOS A. MERCADO RIVERA
USDC-PR NO. 211904

**MERCADO-RIVERA LAW OFFICES**
P.O. BOX 8086
CAGUAS, PR 00726-8086
Tel: 787-745-0628
Fax: 787-961-9883
Email: camercado@mercadoriveralw.com
