UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

FRED J. REBARBER-OCASIO,          )
                                  )
          Plaintiff,              )
                                  )
          v.                      )          No. 3:18-cv-01218-JAW
                                  )
LUIS FELICIANO-MUNOZ, et al.      )
                                  )
          Defendants.             )
_____ )
                                  )
LUIS FELICIANO-MUNOZ, et al.      )
                                  )
          Plaintiffs,             )
                                  )
          v.                      )          No. 3:16-cv-02719-JAW
                                  )
FRED J. REBARBER-OCASIO,          )
                                  )
          Defendant.              )

**ORDER DENYING MOTION FOR NEW TRIAL, AMENDED JUDGMENT,
OR REMITTITUR**

Counterclaim-defendant-Plaintiffs move this Court to vacate the judgment issued against them after a jury trial, to allow a new trial, or both. Counterclaim-defendant-Plaintiffs allege that the jury erred as the verdict is against the weight of the evidence and that the Court erred or abused its discretion in its management of the trial. In the alternative, Counterclaim-defendant-Plaintiffs seek remittitur for allegedly excessive damages. The Court denies the Counterclaim-defendant-Plaintiffs' motion in its entirety as it is non-meritorious.

**I.    BACKGROUND**

On July 1, 2022, at the end of a nine-day trial, a federal jury issued a verdict

in favor of Fred J. Rebarber-Ocasio and against Luis Feliciano-Muñoz, Christel Bengoa, and their conjugal partnership (Feliciano Defendants). This judgment granted $534,836.00 in damages to Mr. Rebarber for Mr. Feliciano's gross negligence in his management of Air America, Inc., found that Christel Bengoa and the Bengoa/Feliciano conjugal partnership had benefitted from Mr. Feliciano's actions and granted Mr. Rebarber $141,400.00 against Ms. Bengoa and the conjugal partnership, and denied Mr. Feliciano's breach of contract claim against Mr. Rebarber. *Jury Verdict* (ECF No. 270). The total verdict equaled $534,836.00 of which Mr. Feliciano is liable for the entire amount and of which Ms. Bengoa and the Bengoa/Feliciano conjugal partnership is liable for $141,400.00. *J.* (ECF No. 271).

On July 27, 2022, the Feliciano Defendants moved for a new trial or for a new judgment pursuant to Federal Rule of Civil Procedure 59. *Mot. under Rule 59 for New Trial and/or Am. J.* (ECF No. 279). On August 8, 2022, Mr. Rebarber responded. *Resp. in Opp'n to Defs.' Mot. under Rule 59 for New Trial and/or Am. J. (DN 279)* (ECF No. 281). In his opposition, Mr. Rebarber wrote:

> Throughout the motion, Defendants/Plaintiffs mention instances in which evidence was presented to the Jury yet fail to make a single specific reference to the specific place in the transcripts or Court record to support their arguments. For the reasons set forth herein, Mr. Rebarber respectfully requests this Honorable Court deny Defendants/Plaintiffs *Motion Under Rule 59 for New Trial and/or Amend Judgment* (ECF No. 279).

*Id.* at 2. Mr. Rebarber argued that the Feliciano Defendants' failure to provide a transcript was grounds for summary dismissal of their motion. *Id.* at 7.

The Feliciano Defendants responded by ordering a transcript and moving the

Court to allow them to support their Rule 59 motion with references to the trial transcript. *Mot. Regarding Trial Tr.* (ECF No. 282). Over Mr. Rebarber's objection, the Court granted the Feliciano Defendants' motion and ordered the Feliciano Defendants to file status reports every twenty-eight days regarding their progress in obtaining the transcript. *Order* (ECF No. 285); *Order* (ECF No. 287). The court reporter completed the final transcript of the nine-day trial on February 26, 2023. *See Order Denying Mot. for Order and Setting Br. Sch.* (ECF No. 341).

On March 27, 2023, Mr. Feliciano moved this court to amend the judgment against him and his fellow defendant-plaintiffs and to allow a new trial. *Mot. to Set Aside J. as to Christel Bengoa, Conjugal Partnership Feliciano-Bengoa, Air America Inc., Luis Feliciano, Mot. for New Trial* (ECF No. 358) (*Feliciano's Mot.*). On April 10, 2023, Mr. Rebarber responded in opposition. *Resp. to Mot. in Opp'n to Defs./Pls. Am.* (ECF No. 360) (*Rebarber's Opp'n*). A week later, on April 17, 2023, Mr. Feliciano replied. *Reply* (ECF No. 361) (*Feliciano's Reply*).

## II.   THE PARTIES' POSITIONS

### A.   Luis Feliciano-Munoz's Motion

The Feliciano Defendants base their motion for a new trial on claims that the verdict was against the weight of the evidence, that the damages were excessive, and that the trial was not fair. *See Feliciano's Mot.* at 2-28. Based on these alleged shortcomings and pursuant to Federal Rule of Civil Procedure 59, the Feliciano Defendants request that the Court vacate the jury verdict, hold a new trial, or both.

*Id.* at 2.  In the alternative, the Feliciano Defendants seek remittitur for excessive damages.  *Id.* at 27-28.

### 1.    The verdict was contrary to the weight of the evidence

The Feliciano Defendants argue that several pieces of evidence both individually and collectively demonstrate that a reasonable jury would have held Mr. Feliciano did not breach the contract, that Mr. Rebarber did breach the contract, and accordingly that Mr. Rebarber, not the Feliciano Defendants, owed damages.  *See Feliciano's Mot.* at 2-18.

First, the Feliciano Defendants argue that the "unchallenged evidence demonstrated that the same, or almost the same parts that Feliciano had to repair, or purchase new, had been found to be deficient by Luis Gonzalez, who was [Air America's] mechanic during Rebarber's management."  *Id.* at 2-3.  The Feliciano Defendants state that despite "Rebarber's awareness of these deficiencies and discrepancies" there was no "adequate disclosure to Feliciano prior to the significant stock purchase."  *Id.* at 3.  The Feliciano Defendants then point to the testimony of Luis González Acevedo and Frank Nieves, who both testified there was equipment that needed to be replaced or fixed.  *Id.* at 3-5.

Next, the Feliciano Defendants contend that Mr. Feliciano's "unrebutted testimony, as well as joint exhibit Number 2, the Stock Purchase Agreement of December 17, 2014, along with the pre-purchase list made by Witness González (Exhibit 1) and the list made by Nieves (Exhibit 3) were evidentiary demonstrations that any reasonable jury would have considered sufficient to prove Feliciano had a

4

right to reimbursement from Rebarber, for the expenses relating to parts and improvements that had to be made," *id.* at 6, and that Mr. Rebarber "was in breach of [that] obligation." *Id.* at 7.

The Feliciano Defendants then argue that Mr. Rebarber was unjustly enriched. *Id.* They assert that Mr. Feliciano's "unrebutted testimony summarized . . . a loss of $1.8 million." *Id.* They also point the Court to the "unchallenged testimony" by Mr. Feliciano's expert in aviation audits and operations, Luis Irizzary, "that the parts listed by González were the same, or almost the same, as the parts listed by Nieves and Fernandez." *Id.* at 8. Therefore, they contend, a verdict finding a breach of fiduciary duty on the part of Mr. Feliciano and a need for reimbursement to Mr. Rebarber "is contrary to justice [and] would result in unjust enrichment of Rebarber." *Id.* at 7.

The Feliciano Defendants then turn to the stock purchase agreement and point out that "Rebarber agreed to indemnify Feliciano from and against all costs, expenses, among others, that he may suffer, directly or indirectly, due to Rebarber's breach of any of the representations and warranties made." *Id.* at 8. Given that agreement, the Feliciano Defendants contend the "jury did not hold Rebarber accountable for any actions as Director of Operations or as a 'consultant' despite the testimony on the record." *Id.* at 9.

Next, the Feliciano Defendants assert that "[a] reasonable jury would have found Rebarber not in compliance with his accord to provide consultation" because Mr. Rebarber failed to communicate with Mr. Feliciano whenever he was called and

did not communicate with Mr. Feliciano whatsoever from March 2014 to November 2015. *Id.* at 10. Furthermore, the Feliciano Defendants allege Mr. Rebarber did not consult with him after he found out that one of the aircrafts, which would later be in another accident resulting in a passenger's death, had hit saltwater in an unreported incident under Rebarber's administration. *Id.*

Next, the Feliciano Defendants argue that "[a] reasonable jury would have understood force majeure striking the company's operations" after "the company was hit with the passing of Hurricanes Irma and Maria." *Id.* at 10-11.

The Feliciano Defendants once again point to "the testimony of Flight Instruction and Aviation Expert Luis Irizarry," who "concluded that the [Air American] records were not reliable" and "did not adequately follow[] reporting protocols." *Id.* at 14. "In addition," they claim, "Irizarry confirmed . . . that Rebarber instructed pilots and mechanics not to write down discrepancies on the log books, to avoid making repairs or purchasing new equipment." *Id.* at 15. In turn, the Feliciano Defendants argue, "[t]his evidence impeached Rebarber," therefore he "should have been deemed unreliable by any reasonable juror." *Id.*

The Feliciano Defendants' final piece of evidence that the verdict was contrary to the weight of the evidence is that an expert witness offered by Mr. Rebarber, Ismael Ortiz de Jesús, "acknowledged . . . there were record errors in the logbooks for the airplanes during Rebarber's administration of Air America." *Id.*

### 2. The Court erred, causing the trial to be unfair to Mr. Feliciano

The Feliciano Defendants argue that the Court committed multiple errors during the trial that caused the trial to be unfair to them. *See Feliciano's Mot.* at 11-13, 15-16, 17-18.

First, the Feliciano Defendants argue there was "structural error" because the jury was "exposed to extrinsic information which was inflammatory and unduly prejudicial," namely Mr. Feliciano's prior civil cases, "without there being adequate relevance, foundation or basis." *Id.* at 11.

Next, the Feliciano Defendants argue that "[i]n error and/or abuse of discretion, the Court allowed" the jury's "confusion" on the "applicable Law of Corporations in Puerto Rico, and the roles of Officers, Directors and Stockholders" to increase "by overruling Feliciano's objections in Rebarber's re-cross examination" to things which were "outside the scope of the direct and re-direct examinations." *Id.* Due to this, the Feliciano Defendants argue, "the jury actually got so confused that they rendered an unreasonable verdict determining breach of fiduciary duty, against Feliciano." *Id.* at 13.

The Feliciano Defendants then allege there was yet another "structural error in the case" because Expert Witness Dr. Ramon Cao's testimony and Exhibit FFF "essentially invaded" the jury's province and the jury "consumed a purported expert's response as to the ultimate question." *Feliciano's Mot.* at 15. To buttress this assertion, the Feliciano Defendants say the jury "based their damages award" of $534,836 on the "sum of what Cao testified was 20% of the goodwill value of Air

America ($209, 836) and the value of 20% of the stocks in Air America ($325,000), at the time of the 2014 80% stock purchase." *Id.* This indicates to the Feliciano Defendants that having Dr. Cao's report as "Defendant's Exhibit FFF, made the jury rely on the findings, conclusions, and assessments of this witness, instead of evaluating the evidence and reaching their own conclusions." *Id.* at 16.

The Feliciano Defendants also take issue with Mr. Rebarber's testimony. They first argue that "Rebarber's testimony should be afforded no weight as he lied on the stand on more than once occasion." *Id.* at 17. They then maintain "the jury was confused and misled by Rebarber's testimony," because Mr. Feliciano's fiduciary duty was "misconceived as relating to Air America, Inc.'s loans from Yellow Media and Feliciano." *Id.* at 18. The Feliciano Defendants then say that Mr. Rebarber "was allowed to define []gross negligence to the jury, in a way that was confusing the legal standards . . . leading the jury to confuse such with a claim for defamation." *Id.*

### 3. Mr. Feliciano was not grossly negligent

The Feliciano Defendants then argue, "Rebarber did not present evidence that Feliciano was grossly negligent and certainly did not overcome the presumption that Feliciano acted with a reasonable degree of care, in good faith and in the best interest of [Air America]." *Id.* at 21. Instead, "Rebarber would only refer to Economist Cao, and state conclusory statements, not factual, only to confuse the matter with the defamation claim." *Id.*

To rebut the idea that Mr. Feliciano was negligent, the Feliciano Defendants offer evidence to the contrary. This evidence includes portions of the testimony

8

offered by Mr. Feliciano, Christel Bengoa, Rafael Fernandez, and Frank Nieves.  *Id.* at 22-23.

The Feliciano Defendants then dispute the evidence put forth by Mr. Rebarber at trial: "The failure to conduct meetings of board of directors, or to consult Rebarber on any corporate matters did not cause any damages to Rebarber.  Rebarber cannot claim any such damages as he relinquished his decision power to Feliciano. . . . With 20% of the vote, Rebarber would never defeat Feliciano's 80% vote."  *Id.* at 24.

### 4.   No causal connection

The Feliciano Defendants argue that Mr. Rebarber "did not overcome the foreseeability standard [of proximate cause] as a matter of law, because it was impossible for Feliciano to foresee the passing of Hurricanes Irma and Maria and that one of the airplanes would suffer an accident due to pilot error."  *Id.* at 26.

### 5.   Comparative Negligence

Next, the Feliciano Defendants point out that Puerto Rico is a comparative negligence jurisdiction and argue "Rebarber is also liable for the loss of value of his 20% of [Air America's] stock and the verdict should be diminished by 70%."  *Id.* at 27. This, the Feliciano Defendants contend, is the case because: (1) "[t]he unchallenged evidence showed that Rebarber failed to correct the deficiencies on the airplanes in a timely and adequate manner which caused [Air America] to be overvalued and cause Feliciano and [Air America] to invest large amounts of money to maintain [Air America's] operations," and (2) "in 2014, right before selling 80% of [Air America's] stock to Feliciano, instead of making the needed repairs, Rebarber paid himself more

than $500,000 in dividends that should have been used to maintain the airplanes." *Id.*

### 6. Remittitur

The Feliciano Defendants argue that "[i]n the alternative, remittitur should be ordered, under Rule 59, because the jury's verdict exceed[ed] any rational appraisal or estimate of the damages that could be based on the evidence before the jury." *Id.* at 27-28. Specifically, they maintain that "[t]wenty percent of the value of the company at the time of the stock purchases is $325,000 [and t]here was evidence that the company assets were overvalued as the log books of the airplanes were unreliable and failed to disclose[] the real situation of the airplanes. Therefore, the value of 20% can never be greater than $325,000." *Id.* at 28. Consequently, the Feliciano Defendants submit, "[t]he rest of the damages claimed by Rebarber should be dismissed." *Id.*

### B. Fred Rebarber-Ocasio's Response

#### 1. The jury was correct in finding Mr. Rebarber does not owe Mr. Feliciano reimbursements

Mr. Rebarber argues that given myriad evidence offered by him at trial, the Feliciano Defendants' "argument[, namely] that the evidence did not support a finding that Mr. Rebarber was not responsible . . . is erroneous." *Rebarber's Opp'n* at 22.

First, Mr. Rebarber takes issue with the Feliciano Defendants' reliance on the testimony of Mr. González and claims that "it can be gleaned from Mr. Luis González's testimony that in the months following April 2014, he has no personal

knowledge of the condition of Air America's aircraft, of Air America's operations, or anything regarding Air America and Mr. Rebarber." *Rebarber's Opp'n* at 10. To support this contention, Mr. Rebarber points to the fact that "Mr. Luis González was not an employee of Air America for months prior to the Stock Purchase Agreement execution, but was in fact fired prior to April 29, 2014, for not complying with instructions." *Id.* at 8. Mr. González testified that "he did not have contact with the company after being terminated and has no knowledge of the operations of the aircraft following his termination." *Id.* He similarly testified "he did not see the airplane books after April 2014 and has no knowledge of who conducted inspections . . . [or of] Air America's operations after he left the company." *Id.* In addition, Mr. Rebarber points to multiple admissions by Mr. González, which impact the weight his testimony should be given, including "that there are, in fact, a lot of items that may not be working properly but could be deferred by the Minimal Equipment List and the aircraft could still fly" and that "he has no evidence of any mechanic that was releasing aircraft for flight without correcting items first." *Id.* at 9.

Next, Mr. Rebarber tries to undermine the Feliciano Defendants' use of Mr. Nieves' testimony. Mr. Rebarber argues that despite the Feliciano Defendants' claims to the contrary, "Mr. Nieves' testimony proved that while he worked for Air America, there were FAA inspections that took place, and that the items the FAA took notice of and informed for correction were, in fact, corrected." *Id.* at 10. Mr. Rebarber then adds that "Mr. Nieves testified that during his time in Air America, there were no FAA violations by the company." *Id.* Moreover, Mr. Rebarber contends

11

that while the Feliciano Defendants attempt to use Mr. Nieves' testimony "to argue that a reasonable jury could find that the list of parts mentioned during his deposition is the same one that Mr. Luis González compiled," "that is a conclusory statement because the transcript of the deposition . . . does not indicate that to be the case." *Id.*

Mr. Rebarber then contends Mr. Feliciano's testimony "shows that he was aware of the conditions of Air America at the time of executing the Stock Purchase Agreement, and that there were no guarantees made by Mr. Rebarber as to the conditions of the aircraft or number of pilots." *Id.* at 13. He also maintains that Mr. Feliciano's testimony further shows "the aircraft continued to fly without problems following the Stock Purchase Agreement and that all flight and maintenance documents show the aircraft were compliant on December 17, 2014," the date of the sale. *Id.* To support this, Mr. Rebarber offers several admissions made by Mr. Feliciano during his testimony, which include having hired three consultants, having a legal advisor and at least two Airframe and Powerplant mechanics from Yellow Media Group who could have advised him, Mr. Rebarber having produced everything the consultants requested of him, and the "many conversations with Mr. Rebarber during which he explained Air America's operation to Mr. Feliciano" without making guarantees of the plane conditions or number of pilots. *Id.* at 11. Mr. Rebarber also notes "Mr. Feliciano admitted that there is nothing in the Stock Purchase Agreement that states Mr. Rebarber prevented him from inspecting the company, and [] that he has no written document stating that Rebarber did not allow him to inspect the aircraft of the company." *Id.* at 12.

Mr. Rebarber then asserts that "it is clear Mr. Irizarry's testimony was filled with speculative conclusions and incomplete resources to provide a reliable opinion." *Id.* at 15.  Therefore, Mr. Rebarber argues, Mr. Irizarry's testimony supports neither the Feliciano Defendants' argument that the logbooks were unreliable nor their argument that Mr. Rebarber encouraged documenting discrepancies.  *Id.*  In support, Mr. Rebarber notes that "Mr. Irizarry is not a mechanic," "he does not appear in the records of the schools he states he attended," "he admitted he had not interviewed the Chief Pilot on staff or the Director of Maintenance . . . nor had he interviewed Mr. Rebarber."  *Id.* at 14.  Mr. Rebarber then argues there are other flaws including that Mr. Irizarry's review "was limited only from 2013 onward" and "Defendants / Plaintiffs provided him with incomplete records for his review and thus, the scope of his evaluation was limited."  *Id.*  Moreover, Mr. Rebarber points out, "Mr. Irizarry admitted to speculating in his testimony."  *Id.*

On top of that, Mr. Rebarber adds the testimony of Ismael Ortiz to show that "while Air America's logbooks may have contained errors, those errors were in fact common and occur in small airlines like Air America. . .. Thus, it can be concluded that no fraudulent entries or ill-intent were present in Air America's logbooks, and Mr. Feliciano was not misled in his purchase with faulty records."  *Id.* at 18.

Next, Mr. Rebarber disputes the Feliciano Defendants' contention that Dr. Cao "was allowed to testify on the ultimate question that should have been in the jury's purview."  *Id.* at 18.  Rebuffing the point, Mr. Rebarber says "there is not a single objection on ultimate issue or ultimate question by Defendants / Plaintiffs that can

be found during the course of this testimony in the trial transcripts, and Defendants / Plaintiffs certainly did not point to one either." *Id.* at 19. Therefore, Mr. Rebarber argues, "this argument is meritless as the objection was not preserved." *Id.*

Next, Mr. Rebarber takes issue with the Feliciano Defendants' argument that "there is no evidentiary support of Ms. Christel Bengoa's or the Conjugal Partnership's actions causing damages." *Id.* at 19. Instead, Mr. Rebarber argues, "Ms. Bengoa was aware of everything that took place in this case, and having a Conjugal Partnership with Mr. Feliciano and being part owner of Air America, she and the conjugal partnership are both liable for all debts and obligations." *Id.* Since they "have not rebutted the presumption" of liability, Mr. Rebarber asserts they "should remain liable." *Id.*

Mr. Rebarber also defends his own credibility. First, he opines that "credibility is a question for the jury to decide." *Id.* at 20. Next, he argues that while the Feliciano Defendants allege that Mr. Rebarber was noncompliant as a consultant or with the Stock Purchase Agreement, his testimony demonstrates that is not the case. *Id.* at 20-22. Lastly, Mr. Rebarber argues "there was a relevance objection raised [about whether Mr. Rebarber was credible] and the Court ruled on the objection. Thus, the line of questioning [on his credibility] should not have been considered." *Id.* at 22.

### 2. The jury was correct in finding that Mr. Feliciano was grossly negligent

Mr. Rebarber then argues that "the jury was correct in finding Mr. Feliciano grossly negligent in his management of Air America. After Mr. Rebarber ran the company successfully for over fourteen years, Mr. Feliciano proceeded to run Air

America into the ground financially, running up a tally of unnecessary expenses, and affirmatively excluding Mr. Rebarber, also an owner of the company, from all financial and operational decisions." *Id.* at 30. To support this contention, Mr. Rebarber points to Mr. Feliciano's admission that "there were no corporate resolutions from Yellow Media to issue the loan to Air America," that those transactions were "neither consulted with nor communicated to Mr. Rebarber," and that "Air America is required to take loans from recognized financial institutions, which Yellow Media is most certainly not." *Id.* at 25. Additionally, Mr. Rebarber points to Mr. Feliciano's admissions that "he did not contact Rebarber to consult him after purchasing," that "they never held shareholder meetings," that Mr. Feliciano did not issue "a corporate resolution to sell one of Air America's aircraft outright," "that he paid for personal items with Air America's money," "that he sold a Hummer vehicle without issuing a Corporate resolution," and that "a pilot for the company had a fatal crash in which a passenger died, and there were falsified records found as well, all while under Mr. Feliciano's leadership." *Id.* at 25-26. Moreover, Mr. Rebarber adds, "Mr. Feliciano did not allow him to see the books once the deal was closed, keeping him out of the loop and never calling him, not even after the hurricane and despite Mr. Rebarber repeatedly requesting he do so." *Id.* at 27. Mr. Rebarber then builds on the argument, adding that Mr. Feliciano paid a "personal debt using an asset" that did not belong to him, deprived the corporation of $393,000, an action that "in itself is [] clear evidence of violation of his fiduciary duties, fraud and gross negligence." *Id.* at 28.

### 3. The jury was correct in finding a causal connection between Mr. Feliciano's acts and Mr. Rebarber's damages

Mr. Rebarber then argues the testimony "shows a clear causal connection between Mr. Feliciano's acts and Mr. Rebarber's damages." *Id.* at 30. In particular, Mr. Rebarber asserts "Mr. Feliciano chose not to consult anything with Mr. Rebarber. . . . His actions consisting of dubious financial dealings, combined with the loss of Air America's airline certificate as a result of his faulty management of the company, resulted in Air America's worthlessness, thus causing Mr. Rebarber's damages." *Id.*

### 4. The jury was correct in finding Mr. Rebarber not comparatively negligent

Mr. Rebarber attempts to quickly do away with the Feliciano Defendants' comparative negligence argument and claims: 1) the "cited testimony demonstrates the airplanes were being maintained adequately prior to the December 17, 2014 Stock Purchase Agreement," and 2) that their argument that the verdict should be diminished "should be disregarded for lack of support." *Id.* at 30.

### 5. Remittitur should not be granted

Mr. Rebarber argues the evidence shows the logbooks were up to date, "were not unreliable," and "errors in the logbooks were corrected soon after being recorded." *Id.* at 32-33.

Next, Mr. Rebarber attempts to distinguish the present case from *Wortley v. Camplin*, 333 F.3d 284 (1st Cir. 2003), which the Feliciano Defendants cite, by stating "*Wortley* consisted of a securities fraud violation in the state of Maine, versus the case between the instant parties, which consists of breach of contract . . . in Puerto Rico." *Id.* at 33. At bottom, Mr. Rebarber argues *Wortley* is irrelevant here "since there are

no allegations of Section 10b violations in this case.  Thus, the market value argument presented by Defendants / Plaintiffs to cap Mr. Rebarber's damages is flawed." *Id.* Adding on, Mr. Rebarber points out that the Feliciano Defendants cite "no Puerto Rico jurisprudence or law to support [his] damage cap argument." *Id.*

Mr. Rebarber then takes issue with the Feliciano Defendants' contention that he "is barred from claiming 'any part of the value of the airplanes, []or good will of the company as all of that was included in the valuation for the stock purchase.'" *Id.* at 34.  In response, Mr. Rebarber claims that the "argument regarding capping Mr. Rebarber's damages to only the value of his stock remains unsupported by the evidence and within their Rule 59 request, as they cite to no Puerto Rico precedent that allows for this." *Id.*

Mr. Rebarber concludes by asserting that Mr. Feliciano "had the opportunity to convince the jury in a fair trial, of the merits of this case, nevertheless none of the eight (8) jurors gave credit to his theory, based on the testimonies and the evidence admitted." *Id.*

### C.    Defendant-Plaintiffs' Reply

To begin, the Feliciano Defendants summarize their argument:

> A new trial is warranted because the verdict is against the weight of the evidence, the damages are excessive, and, the trial was not fair. . .. There is no doubt that a mistake has been committed by the jury.  A new trial should be granted because the verdict was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice.

*Feliciano's Reply* at 1 (internal citations omitted).

### 1.    Weight of the evidence

The Feliciano Defendants first respond to Mr. Rebarber's argument "that Gonzalez did not know anything about Air America's (AA) operations after he was fired a few months before the [stock purchase agreement]," by arguing this "assertion does not invalidate the fact that Gonzalez made a list of parts and equipment prior to the [stock purchase agreement] which contains essentially the same items as the list made by Nieves and Fernandez after the [stock purchase agreement], nor the fact that AA incurred in approximately $112,000 to repair and purchase said items." *Id.* at 2.

Next, they dispute Mr. Rebarber's contention that "Nieves did not testify that the list that he made corresponded to equipment that needed repairs or replacement before the [stock purchase agreement]." *Id.* Instead, the Feliciano Defendants argue that "Nieves testified that the list was precisely made, on December 17, 2014, three days after the [stock purchase agreement]." *Id.*

Then the Feliciano Defendants take issue with Mr. Rebarber insisting "that the [stock purchase agreement] constituted an 'as is' sale that did not guarantee the conditions of the airplanes," as well as with Mr. Rebarber saying that "Feliciano hired three financial consultants and an airplane valuation expert . . . that the airplanes were airworthy, and that Rebarber allowed Feliciano to conduct a full mechanical inspection before the [stock purchase agreement]." *Id.* Instead, the Feliciano Defendants argue, "Rebarber was impeached" because his "previous communications with Perdomo . . . demonstrated that he did not allow a full mechanical inspection of the airplanes." *Id.* at 3. Moreover, the Feliciano Defendants point out, the "contract

provides for reimbursement of all expenses that should have been made by AA during Rebarber's control. The [stock purchase agreement] makes no references to the FAA and reimbursement of those expenses." *Id.*

The Feliciano Defendants also dispute "that Irizarry's testimony about faulty recording is not reliable." *Id.* To this they respond that even if it were unreliable, "that argument does not invalidate the fact that the list prepared by Gonzalez prior to the [stock purchase agreement] contains essentially the same items as the list prepared by Nieves and Fernandez after the [stock purchase agreement]." *Id.*

Next, the Feliciano Defendants argue that Mr. Rebarber did hide things from Mr. Feliciano. For example, they claim, "Rebarber hid [an] FAA investigation from [him] because his FAA intervention took place only a few months before the [stock purchase agreement]. If Rebarber had disclosed this information to Feliciano, [he] would not have entered into the [stock purchase agreement] under the current terms." *Id.* at 3.

### 2. Gross Negligence

Turning to gross negligence, the Feliciano Defendants argue that "Rebarber failed to explain how the expenses needed to run the company adequately and the exclusion of Rebarber from the decisions amounted to gross negligence." *Id.* at 4. With respect to "excluding Rebarber from all financial and operational decisions," the Feliciano Defendants maintain that "Rebarber relinquished said rights in exchange for $1,300,000, when entering into the [stock purchase agreement] because he was no longer an officer of the corporation and as a member of AA's board of directors, he did

not have the majority vote." *Id.* Furthermore, the Feliciano Defendants contend they "had hired all the supervisory staff needed to run the airline, thus there was no need to consult Rebarber." *Id.*

The Feliciano Defendants also argue that the loans from Yellow Media and Mr. Feliciano to AA were not against the bylaws as they "do not state such a prohibition and [] do not contain a requirement for a corporate resolution for the president to direct the corporation." *Id.* at 5. Next, the Feliciano Defendants write that even if they did not communicate with Mr. Rebarber at all, "Rebarber fails to explain how that amounted to gross negligence that led to the closing of AA. Neither communicating corporate matters to Rebarber nor holding shareholder meetings would have stopped hurricanes Irma and Maria which are the main reason for the closing." *Id.* Moreover, "Defendants exhibit QQQ demonstrate that Feliciano allowed Rebarber access to corporate records." *Id.*

In addition, the Feliciano Defendants defend Mr. Feliciano's sale of an airplane to repay $250,000 he claims Mr. Rebarber owed him. First, they argue that "Rebarber authorized the sale and accepted the money without complaining and did not reimburse it to AA knowing it was AA's funds." *Id.* They continue, adding that "AA's bylaws do not require a corporate resolution to sell any asset." *Id.* The Feliciano Defendants reiterate there was no fraud committed in the sale of the plane and that by that point, Mr. Feliciano "had loaned more than $250,000 already to AA and therefore the amounts offset each other." *Id.* at 5-6. By the Feliciano Defendant's

estimation, "[t]his same reasoning applies to the $35,000 audio equipment and to the attorney and consultant fees for the [stock purchase agreement]." *Id.* at 6.

The Feliciano Defendants also attempt to refute that "a passenger d[ying] during a crash that resulted from pilot error" indicates Mr. Feliciano was negligent, arguing he "was not the pilot and there was no evidence that the error resulted from [his] acts or omissions." *Id.* Similarly, they claim "there is no connection" between Mr. Feliciano and the allegations of his staff falsifying a training record. *Id.*

"In sum," the Feliciano Defendants insist, "neither individually, nor collectively, the arguments presented by Rebarber are sufficient to surpass the business judgment rule presumption and demonstrate that Feliciano was grossly negligent." *Id.*

The Feliciano Defendants reiterate that the "jury was misled to confuse the legal concept of fiduciary duty and gross negligence in the context of corporate law with concepts such as defamation and/or tax report errors . . . or a fax transmittal sheet error made by a secretary, not pertinent to the case."

Finally, the Feliciano Defendants repeat their claim that Dr. "Cao's testimony as to the ultimate question constitute[s] structural error which requires a new trial." *Id.* at 7. If the Court finds there was sufficient evidence to prove gross negligence, the Feliciano Defendants urge that "the judgment should only include the value of the 20% of [Rebarber's] stock which is the only property that he has in connection to AA" as "Rebarber cannot claim loss of goodwill on a corporation that does not have

his name and the jury could not award damages for loss of good will because no evidence of such damages was presented." *Id.*

## III.   LEGAL STANDARD

Under Rule 59, a trial court has discretion to grant a motion for a new trial in a jury-tried case "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." FED. R. CIV. P. 59(a). The First Circuit has limited this exercise of discretion, indicating that "[a] verdict may be set aside and new trial ordered when the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." *Colon-Millin v. Sears Roebuck De Puerto Rico, Inc.*, 455 F.3d 30, 35 (1st Cir. 2006) (quoting *Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir. 1996)); *accord Sánchez v. Foley*, 972 F.3d 1, 16 (1st Cir. 2020).  A Rule 59(a) motion for a new trial "may [also] invoke the discretion of the court insofar as it is bottomed on the claim that . . . the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940);  *accord Rivera Castillo v. Autokirey, Inc.*, 379 F.3d 4, 13 (1st Cir. 2004).  Similarly, the motion "may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co.*, 311 U.S. at 251.

"'A district court is free to independently weigh the evidence' when assessing whether to grant a motion for a new trial." *Sánchez*, 972 F.3d at 16 (quoting *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009)).  This is so because "[t]he decision to grant a new trial is squarely within the trial court's discretion." *Velazquez v. Figueroa-*

*Gomez*, 996 F.2d 425, 427 (1st Cir. 1993) (citing *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)).  Nonetheless, "[i]n general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *Blomquist v. Horned Dorset Primavera, Inc.*, 925 F.3d 541, 551 (1st Cir. 2019) (quoting *United States v. Garcia*, 978 F.2d 746, 748 (1st Cir. 1992)).  Instead, "a jury's verdict on the facts should only be overturned in the most compelling circumstances." *Velazquez*, 996 F.2d at 427 (quoting *Wells Real Estate. Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 811 (1st Cir. 1988)).

## IV.   DISCUSSION

### A.   An Overview

Having presided over this hard-fought, nine-day trial, the Court views this case as an ideal one for jury resolution and further views the jury verdict as entirely consistent with both the trial evidence and the law.  The central witnesses were Mr. Feliciano and Mr. Rebarber, both of whom are intelligent, capable men, and had more than their day in court.  Considering all the evidence, it is apparent that the jury found Mr. Rebarber more convincing than Mr. Feliciano and, apart from the fact that such credibility determinations are squarely within the aegis of a jury, the Court would affirm the verdict not simply because it is required to do so except in the most compelling circumstances—which are not present here, but also because the Court is convinced that the jury's assessment and verdict are manifestly correct.

### 1.   Luis Feliciano and the Purchase of Air America

Mr. Feliciano is an accomplished person with a decided knack for marketing. The son of a doctor, Mr. Feliciano spent the first years of his life in Spain, where his father studied medicine. *June 22, 2022 Trial Tr.* at 83:9-11 (ECF No. 306) (*Feliciano Test. June 22*). Subsequently, the family moved to Puerto Rico where Mr. Feliciano attended elementary, middle, and high school. *Id.* at 83:19-22. After high school, Mr. Feliciano spent seven years at the University of Puerto Rico, but did not earn his degree, *id.* at 83:25-84:3, and spent some time in the commonwealth of Massachusetts, studying marketing and finance. *Id.* at 84:2-3. Mr. Feliciano also worked as a floor salesman at a men's clothing store and as a receiver and sorter for UPS, but while in college, he developed his own company, called LAF, which focused on business promotion. *Id.* at 84:25-85:10. It was during this period in college that Mr. Feliciano discovered he has a talent for marketing and developed his own business, marketing to clubs and restaurants, filling them with customers on their off-days, and splitting the increased proceeds with the businesses. *Id.* at 85:11-21.

Then during his fourth or fifth year of college, Mr. Feliciano marketed what he described as "massive events." *Id.* at 85:22-24. He publicized events called "Mascomambo," huge social events in which everything sold for only $1.00. *Id.* at 85:23-86:5. These social events were held Island-wide and attracted as many as 7,000 people. *Id.* at 86:5-9. Mr. Feliciano then partnered with a company in Scottsdale, Arizona and put on an event called "The Great Rubber Duck Race." *Id.* at 86:21-87:5. Mr. Feliciano obtained a franchise for this event for all of Latin America, and for ten years held events throughout Central America and the Caribbean. *Id.* at 87:13-23.

24

Mr. Feliciano testified that he ran The Great Rubber Duck Race for non-profit foundations, such as the Muscular Dystrophy Foundation and a spina bifida center in Mayaguez. *Id.* at 87:24-88:13. Mr. Feliciano said that he worked with Wal-Mart on special events, and Wal-Mart would "give us the task and we would identify foundations and then run projects and use proceeds for them." *Id.* at 88:14-19.

In 1995, Mr. Feliciano became a partner in a business that involved so-called banner towing in which an airplane would tow a banner with an advertising message. *Id.* at 90:4-95:17. In 2001, Mr. Feliciano's company, LAF, bought the Puerto Rico banner towing operation, including two airplanes and specialized equipment. *Id.* at 95:21-97:5. The banner towing business continued until January 2014, when "the digital market came into outdoor advertising." *Id.* at 97:6-98:11. Mr. Feliciano acknowledged that he did not know how to fly an airplane and did not know how to fix one. *Id.* at 97:15-20. To address the operations part of the business, Mr. Feliciano hired a Chief Pilot, who "took care with all the operational parts, complying with all the regulations, which he knew in detail," *id.* at 97:10-13, and which Mr. Feliciano confessed he "didn't know." *Id.* at 97:14.

In 2001 through 2003, Mr. Feliciano and his wife, Ms. Bengoa, began a business called Yellow Media. *Id.* at 98:16-99:12. Mr. Feliciano named the business "Yellow Media" because he had taxi cabs, phone booths, and airplanes painted yellow. *Id.* at 98:22-100:7. Mr. Feliciano, whose nickname is Tito, testified that he became known as "Tito with the yellow plane." *Id.* at 98:23-00-12.

25

In 2014, when Air America came for sale, since Mr. Feliciano "had done pretty well in aviation," he "saw an opportunity, because American Eagle had left Puerto Rico" and he "believe[d he] had been somewhat successful in aviation" so he "could migrate to that." *Id.* at 100:11-14. Mr. Feliciano emphasized that "the news that American Eagle was leaving" created "a big hole in Puerto Rico," because the "rates for travel to the neighboring islands had gone up substantially because the volume had dropped." *Id.* at 103:12-22. Mr. Feliciano's plan was "to take Rebarber's company to a level to be able to compete in that market." *Id.* 103:24-25.

Mr. Feliciano had a vision that would allow him to transform the aircraft into "[f]lying works of art." *Id.* at 106:6-8. Mr. Feliciano explained that he had developed a concept he called "Taxi Gallery" in which his taxi cabs were "wrapped in flexible vinyl." *Id.* at 105:3-4. When wrapped in white vinyl, Puerto Rican artists would "use acrylic paints and then turn the vehicle into a work of art." *Id.* at 105:4-8. By doing so, Yellow Media's sales "multiplied fivefold." *Id.* at 105:1-2. At Air America, Mr. Feliciano planned to "invite artists to paint the aircraft with Caribbean cultural elements and, that way, we could budget very little for advertising, marketing and public relations." *Id.* at 105:23-106:5. "[W]ith just the investment of transforming the airplane into a work of art," Mr. Feliciano "believed that we were going to get headlines or be on the front pages of printed media in Puerto Rico, St. Thomas." *Id.* at 106:13-16. Mr. Feliciano did not mention his idea to Mr. Rebarber. *Id.* at 106:17-18.

On December 17, 2014, Mr. Feliciano entered into a purchase and sale agreement to buy eighty percent of the shares of Air America from Mr. Rebarber for $1,300,000. *Id.* at 110:11-111:9. Mr. Rebarber retained the remaining twenty percent of the stock and the corresponding ownership interest. *Id.* at 111:10-11. Mr. Feliciano paid $100,000 to Mr. Rebarber in November 2014 to demonstrate his intention to purchase Air America. *Id.* at 111:12-15. In December 2014, Mr. Feliciano paid Mr. Rebarber an additional $950,000, leaving $250,000 owed for the total purchase. *Id.* at 111:13-21.

### 2.    Fred J. Rebarber and Air America

Fred J. Rebarber made himself into a highly competent airline owner and operator. Natively very bright, detail-oriented, and business-savvy, Mr. Rebarber by dint of talent and hard work, personally built a small charter airline in Puerto Rico by learning about airplanes and the airline business from the ground up. Born in New York City, Mr. Rebarber moved between New York and Puerto Rico as he grew up. *June 28, 2023 Trial Tr.* at 102:19-103:1 (ECF No. 335) (*Rebarber Test. June 28, 2023*). At age thirteen, Mr. Rebaber returned to Puerto Rico with his mother and younger brother, and they lived in public housing. *Id.* at 103:2-10. Mr. Rebarber attended local schools and ultimately graduated from high school. *Id.* at 103:17-104:6.

While in high school, at age 16, Mr. Rebarber began working after school for a gasoline station that had a garage. *Id.* at 103:23-1. Mr. Rebarber was curious about cars and became fascinated by how things work, and as he began to learn about car

parts, his employer would send him to a local car parts store to pick up parts. *Id.* at 104:4-12. Mr. Rebarber got to know the owner of the car parts store, and, after a while, the owner offered him a parttime job, which Mr. Rebarber accepted. *Id.* at 104:15-19. Mr. Rebarber continued to work at this local auto parts store while attending college at the University of Puerto Rico in Carolina. *Id.* at 105:9-106:8.

As time went on, Mr. Rebarber was offered a job at a larger auto parts chain with 25 to 30 stores, called Garcia Motors, and he accepted. *Id.* at 106:6-18. This job led to another job with an auto parts wholesaler, and this new job came with sales commissions, leading Mr. Rebarber to make three times more in commissions than in salary. *Id.* at 106:19-107:5. At this point, Mr. Rebarber was twenty-two to twenty-three years old. *Id.* at 107:5.

After a couple of years, Mr. Rebarber had managed to save some money and contemplated starting his own business. *Id.* at 107:6-10. In 1984, with some money borrowed from his father and his own saved money, at age twenty-eight, Mr. Rebarber opened an auto parts store that exclusively stocked Japanese car parts. *Id.* at 107-11-17. The store did very well and within a couple of years, Mr. Rebarber opened a second store. *Id.* at 107:19-21.

On his way to his auto parts stores, Mr. Rebarber used to pass a sign that read: "Learn to Fly. Isla Grande Flying School." *Id.* at 107:22-108:1. One day, he turned around and went in the flying school to find out about learning to fly. *Id.* at 108:1-2. Mr. Rebarber took to flying the way he took to auto mechanics and found it "easy" and "fun." *Id.* at 108:8-9. At this point, he was thirty years old. *Id.* at 9-10. Mr.

Rebarber earned his pilot's license and found that "everything clicked" with flying; he found it simple and "just loved it." *Id.* at 109:13-22.

Mr. Rebarber found that aviation has "so many different steps." *Id.* at 110:4-5. From a private pilot's license, he obtained a high performance sign off, which allowed him to fly bigger airplanes with retractable gears. *Id.* at 110:5-11. Mr. Rebarber then stepped up a level and bought an airplane, a 300 horsepower Cessna 210. *Id.* at 110:12-13. Mr. Rebarber obtained his IFR[1] license and kept "constantly learning." *Id.* at 110:14-16. For less than a year, Mr. Rebarber worked as a pilot for a business in Florida that catered to people in need of dialysis, flying dialysis equipment to the patients, and while doing so, he became certified to operate a seaplane. *Id.* at 112:2-18.

While he was in Florida, Mr. Rebarber said that his auto parts business suffered because he was not there. As he was getting ready to leave his Florida job and return to Puerto Rico to attend to his auto parts business, the owner of the dialysis equipment delivery business told Mr. Rebarber that he was going into another business and suggested to Mr. Rebarber that he purchase the company's aircraft. *Id.* at 112:19-22. Mr. Rebarber explained that to operate a commercial airline, a business must obtain a certificate from the FAA. *Id.* at 111:1-10. The owner of the Florida business, Paradise Flights, had an FAA certificate, so when Mr. Rebarber purchased the shares of Paradise Flight, he also obtained an FAA

---

[1]      IFR stands for instrument flight restriction, a certification that allows a pilot to fly with instruments. *See June 24, 2022 Trial Tr.* at 104:12-14. An IFR license is an FAA certification. *See June 28, 2022 Trial Tr.* at 51:24-52:3 (ECF No. 335) (*Test. of Ortiz de Jesus*).

certificate.  *Id.* at 112:19-25.  Mr. Rebarber flew the plane to Puerto Rico and transferred the certificate to Puerto Rico.  *Id.* at 113:1-4.

At that point, Mr. Rebarber had an FAA certificate that allowed him to operate one plane with one pilot.  *Id.* at 113:7-11.  After performing extensive research and learning about the FAA certification process, he was successful in obtaining an FAA certification that allowed him to operate multiple pilots.  *Id.* at 113:21-23.  At the same time in 1994, he was working to improve his auto parts business, and when he was approached to sell his airline company with the certificates, he agreed to do so.  *Id.* at 113:23-114:8.  Mr. Rebarber was now operating only his auto parts business, but he began to regret having sold the airline, thinking that it had a lot of potential.  *Id.* at 114:9-11.  He began to look around for another airline to develop.  *Id.* at 114:18-19.

Mr. Rebarber explained that the FAA opens the door for new certificates whenever they need more money, *id.* at 114:21-115:2, and that "[t]he door opened."  *Id.* at 114:20.  Mr. Rebarber put in an application and undertook the "intense, long" FAA process to obtain another certification.  *Id.* at 115:3-5.  This process requires knowledge of the general operations manuals, the training manuals, and "a lot of work."  *Id.* at 115:3-7.  Mr. Rebarber described the FAA as extremely well-organized, and rule-bound, but since the FAA had written everything down, over the next three years he studied to learn the FAR, Federal Aviation Regulations.  *Id.* at 115:9-17.

In 2000, Mr. Rebarber started Air America.  *Id.* at 116:2.  But it took him ten years to work with the FAA and obtain the various agency authorities to run the

aviation business he had envisioned: "multi engine, municipal aircraft, municipal pilots all authorized, authority to fly at night." *Id.* at 116:2-5. Mr. Rebarber explained the FAA regulatory and inspection process, involving operations and maintenance, and he testified at length about his knowledge of the FAA regulations and the imperative that Air America comply with them. *Id.* at 116:10-122:4.

### 3.    Luis Feliciano and Fred Rebarber

The jury could well have found that there was an extreme contrast between the backgrounds of Mr. Feliciano and Mr. Rebarber in terms of their knowledge and understanding of the aviation business. Mr. Feliciano, though a capable person, had no background or experience in the aviation business and viewed the purchase of Air America as a marketing opportunity, whereas Mr. Rebarber had extensive experience literally from the ground up with all aspects of aviation from maintenance to piloting to FAA regulations. Mr. Rebarber gained his knowledge of how to run a small aviation business through years of accumulated knowledge in each facet of aviation. But Mr. Feliciano, who is not a pilot, not a maintenance person, and not an FAA regulatory specialist, had purchased a business that required all these skills.

A jury could have found, based on this contrast, that the problems Mr. Feliciano encountered after his purchase of Air America were problems of his own making. This is so because Mr. Feliciano purchased a business in a highly specialized area without any specialized knowledge. And when a fleet of airplanes turned out to be much more complicated than a fleet of taxi cabs and the business floundered, a

jury could reasonably have found that Mr. Feliciano looked for someone or something other than himself to blame.

## B.     The Jury Verdict Is Not Against the Clear Weight of the Evidence

The Feliciano Defendants offer a slew of reasons why they believe the jury's verdict is against the clear weight of the evidence. *See Pl.'s Mot.* at 2-22.

The First Circuit has made clear that "conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *Figueroa-Gomez*, 996 F.2d at 427. Therefore, the Court first addresses several arguments made by Mr. Feliciano that attempt to relitigate "conflicting testimony" and "questions as to the credibility of a witness." *Id.* As these arguments do not present sufficient grounds for granting a new trial, the Court rejects them.

The Feliciano Defendants' first argument is that the "unchallenged evidence demonstrated that the same, or almost the same parts that Feliciano had to repair, or purchase new, had been found to be deficient by Luis Gonzalez, who was AA's mechanic during Rebarber's management." *Feliciano's Mot.* at 2-4. Mr. Feliciano badly overstates his case. The evidence *was* challenged and readily falls under the categories of "conflicting testimony" and "questions as to the credibility of a witness." *Figueroa-Gomez*, 996 F.2d at 427.

To use one example, the Feliciano Defendants assert that Luis González Acevedo's testimony supports their argument that Mr. Rebarber did not properly maintain the fleet of airplanes and overvalued them, thereby misleading Mr. Feliciano. *See Feliciano's Mot.* at 3-4. Mr. Rebarber, in turn, argues that following

32

his firing in April of 2014, Mr. González had "no personal knowledge of the condition of Air America's aircraft, of Air America's operations, or anything regarding Air America and Mr. Rebarber." *Rebarber's Opp'n* at 10. Mr. Rebarber points to several admissions by Mr. González that limit "the weight his testimony should be given." *Id.* at 9. In his reply, the Feliciano Defendants argue that even if Mr. González was fired, that "does not invalidate the fact that [he] made a list of parts and equipment prior to the [stock purchase agreement] which contains essentially the same items as the list made by Nieves and Fernandez after the [stock purchase agreement]." *Feliciano's Reply* at 2.

At the core of this disagreement is a factual dispute about how much credibility the jury should have given to Mr. González. The first potential problem with Mr. González's testimony is that his knowledge was limited in time. Mr. González was employed by Air America from September 2, 2013, when it was owned by Mr. Rebarber, to April 2014, before it was owned by Mr. Feliciano. *June 21, 2022 Trial Tr.* (ECF No. 305) (*González Test. June 21, 2022*). The Stock Purchase Agreement was executed December 17, 2014. *See Joint Ex. II* at 1 (ECF No. 276) (*SPA*). Mr. Rebarber fired Mr. González "nine months before [Mr. Rebarber] sold Air America." *Rebarber Test, June 28, 2023* at 123:3-4. Thus, Mr. González was not employed at any time during Mr. Feliciano's ownership, and he admitted that after Mr. Rebarber terminated him, he did not have any contact with Air America. *González Test. June 21, 2021* at 128:14-17, 130:22-131:1.

Another potential problem with Mr. González's testimony is that on April 29, 2014, Mr. Rebarber fired him for failing to comply with his work guidelines. *Id.* at 113:13-21. Mr. González insisted during his testimony that, even though he was fired for not doing his job, he had in fact been "doing it excellently well" and he was not getting proper cooperation from others. *Id.* at 114:8-12. By contrast, Mr. Rebarber testified that he fired Mr. González because he had completed an AD note (Advisory Directive) by memory and "[y]ou don't do AD notes by recollection," "that's a no. That's a no-no. You don't do that." *Rebarber Test, June 28, 2023* at 122:7-123:7.

The Feliciano Defendants' argument that the jury was compelled to accept the testimony of Mr. González in these circumstances is simply untenable. A reasonable jury could well have completely discounted Mr. González's testimony because he not only never worked during Mr. Feliciano's ownership of Air America, but also because Mr. Rebarber fired him for asserted incompetence. A reasonable jury could have accepted Mr. González's testimony, but they were not required to do so.

As "trial judges do not sit as thirteenth jurors," the Court refuses to step in and override the jury's choice. *Rodríguez-Valentin v. Doctors' Ctr. Hosp. (Manati), Inc.*, 27 F.4th 14, 21 (1st Cir. 2022); *see also Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 537 (1st Cir. 2011) ("[O]ne may not argue that the verdict was against the weight of the evidence simply by citing to the evidence which was favorable to one's position. If evidence was offered to the contrary, the jury was free to accept or reject each party's evidence, and in most cases, a court is not warranted in overriding the jury's choice").

The Feliciano Defendants' arguments about Mr. Nieves', Mr. Irizzary's, Mr. Rebarber's, and Mr. Feliciano's testimony—and Mr. Rebarber's responses to those arguments—travel a similar road: they invite the Court to substitute its judgment for that of the jury on how these testimonies should have been weighed. *See Feliciano's Mot.* at 3-6 (arguing Mr. Nieves' testimony was "sufficient to prove Feliciano had a right to reimbursement from Rebarber"); *Rebarber's Opp'n* at 10 (offering multiple of Mr. Nieves' admissions to the contrary). *See also Feliciano's Mot.* at 6 (arguing Mr. Feliciano's "unrebutted testimony . . . were evidentiary demonstrations that any reasonable jury would have considered sufficient to prove Feliciano had a right to reimbursement from Rebarber"); *Rebarber's Opp'n* at 11-12 (offering Mr. Feliciano's admissions to argue the opposite). *See also Feliciano's Mot.* at 14-15 (arguing Mr. Irizzary's testimony impeached Mr. Rebarber); *Rebarber's Opp'n* at 13 ("Irizzary's testimony was filled with speculative conclusions and incomplete resources to provide a reliable opinion"). *See also Feliciano's Mot.* at 15 (arguing Mr. Ortiz's testimony demonstrated that errors in the logbooks misled Mr. Feliciano into the purchase); *Rebarber's Opp'n* at 14 (arguing the opposite). *See also Feliciano's Mot.* at 17 ("Rebarber's testimony should be afforded no weight as he lied on the stand on more than one occasion); *Rebarber's Opp'n* at 20-22 (arguing he was credible).

The First Circuit has made it clear that "conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *Figueroa-Gomez*, 996 F.2d at 427. Again, the Court declines to act as a thirteenth

juror and disrupt the judgment of a jury simply because the Feliciano Defendants dislike how the jury weighed the evidence. *See Rodríguez-Valentin*, 27 F.4th at 21.

Discounting the Feliciano Defendants' contention that the Court must accept their versions of the evidence, the Court turns to the remainder of the Feliciano Defendants' argument that the jury's verdict was contrary to the weight of the evidence.

The balance of the Feliciano Defendants' argument as to the weight of the evidence is tripartite. The first line of argument points to exhibits the Feliciano Defendants claim are sufficient to override the jury's determination. *Feliciano's Mot.* at 6-10. The second posits that a "reasonable jury would have understood force majeure striking the company's operations" after "the company was hit with the passing of Hurricanes Irma and Maria." *Id.* at 10-11. The third alleges the Court made multiple structural errors. *Id.* at 11, 13, 16, 18.

Regarding the first argument, the Feliciano Defendants point to the Stock Purchase Agreement of December 17, 2014, the pre-purchase list made by Mr. González, and the list made by Mr. Nieves to argue that Mr. Feliciano "had a right to reimbursement from Rebarber, for the expenses relating to parts and improvements that had to be made." *Id.* at 6. Specifically, the Feliciano Defendants argue that "[b]ased on Section C2 of the Agreement identified as Joint Exhibit 2, a reasonable jury would have found Rebarber was in breach of the obligation to reimburse." *Id.* at 7.

Section C(ii) of the agreement indicates that: "[a]ny unrecorded or undisclosed expenses and liabilities related with the operations of the Corporation prior to this date (the 'Unrecorded Expenses') found by the Purchaser after the date hereof, shall be paid by Seller to the Corporation upon claim thereof by Purchaser or the Corporation supported by adequate evidence." *SPA* at 2. The Feliciano Defendants highlight text in this section which reads: "All expenses incurred by the Corporation prior to the date hereof shall run on the account of the Seller. . . . In addition, any expenses incurred by the Corporation after the date hereof that should have been incurred by the Corporation prior to this date, will be on the account of the Seller and shall be considered Unrecorded Expenses." *Id.*; *see Feliciano's Mot.* at 8-9. The Feliciano Defendants also point to Article IV, paragraph A, of the stock purchase agreement, *Feliciano's Mot.* at 9, which reads as follows:

> Seller agrees to indemnify and save and hold harmless the Purchaser from and against all losses, claims, causes of action, obligations, suits, costs, damages, expenses . . . and liabilities which the Purchaser . . . may suffer or incur or be compelled to or be subject to and which are caused by or arise directly or indirectly by reason of the breach of any representations and warranties of the Seller contained herein.

*SPA* at 8. The Feliciano Defendants once again proffer an interpretation of Clause C(ii) that was rejected by the jury.

As the Feliciano Defendants describe it, the "genesis of this case" is Mr. Feliciano's "contractual claim against Rebarber for reimbursement of all expenses incurred by Feliciano for repairs or replacement of parts and equipment related to AA's airplanes that should have been conducted by Rebarber prior to Feliciano's purchase from Rebarber of 80% of AA's stock." *Feliciano's Mot.* at 2. But the Feliciano

37

Defendants' expansive interpretation of the SPA is not the only possible interpretation of Clause C(ii).  In fact, considering the context of the sale, namely a sale of stock, the Feliciano's interpretation is strained.

The contested clause appears in Article I of the SPA, addressing Sale and Purchase of Shares.  *SPA* at 1.  This Article delineates the Buyer's agreement to purchase and the Seller's agreement to sell shares in Air America.  Clause C within Article I addresses "Deliveries," such as delivery of the shares.  *Id.* at 2.  Within the "Deliveries" section of Article I, Clause C(ii) reads:

> The Corporation and/or Seller have satisfied 100% of any known accrued expenses and debt of the Corporation.  Any unrecorded or undisclosed expenses and liabilities related with the operations of the Corporation prior to this date (the "Unrecorded Expenses") found by the Purchaser after the date hereof, shall be paid by Seller to the Corporation upon claim thereof by Purchaser or the Corporation supported by adequate evidence.  If Seller fails to reimburse the Corporation, in addition to any rights available at law to collect the Unrecorded Expenses, Purchaser shall have the right to deduct or set-off the Unrecorded Expenses from face value of the Note.  All expenses incurred by the Corporation prior to the date hereof shall run on the account of the Seller; and all expenses incurred by the Corporation after the date hereof will run on the account of the Corporation.  In addition, any expenses incurred by the Corporation after the date hereof that should have been incurred by the Corporation prior to this date, will be on the account of the Seller and shall be considered Unrecorded Expenses.

*SPA* at 2.

From the Court's perspective, this Clause is no more than a delineation of the temporal liability of the Seller and the Buyer: before the sale, the expenses rest with Mr. Rebarber and after the sale, the expenses rest with the Feliciano Defendants. The clause first places the obligation to pay "known accrued expenses and debt of the Corporation" prior to sale on Mr. Rebarber.  The clause addresses so-called

"Unrecorded Expenses."  Thus, for example, if one of Air America's airplanes bought gas on an Air America account on December 16, 2014 and if it had not yet been recorded and paid by Mr. Rebarber, then Mr. Rebarber would have been responsible for this so-called "Unrecorded Expense" whenever it posted, but if one of its airplanes bought gas on December 18, 2014, the Feliciano Defendants would be responsible to make payment.

The Feliciano Defendants focus on the following language in Clause C(ii):

> In addition, any expenses incurred by the Corporation after the date hereof that should have been incurred by the Corporation prior to this date, will be on the account of the Seller and shall be considered "Unrecorded Expenses."

*SPA* at 2.  The apparent purpose of this clause is to prevent Mr. Rebarber from incurring expenses prior to sale, slow walking payment, not recording those expenses, and foisting them on the Feliciano Defendants after the sale.  Thus, if Air America had incurred a large bill for gasoline on December 10, 2014, hidden the bill, and then claimed that the Feliciano Defendants owed it, the Feliciano Defendants could set off their payments by deducting the pre-December 17, 2014 expense.

But the Feliciano Defendants interpret this clause as Mr. Rebarber's warranty of the condition of the airplanes at the moment of purchase, saying that if they discovered a repair to the aircraft—that in their view should have been made before December 17, 2014—they had a right to charge that post-December 17, 2014 expense against the amount the Feliciano Defendants owed Mr. Rebarber.  But the SPA makes plain that "there are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as set forth

39

specifically herein." *SPA* at 12.  The Court views the "genesis of the case" from the Feliciano Defendants' perspective to have been grounded on a dubious and faulty premise.

But, even if the Court accepts the Feliciano Defendants' strained interpretation of the SPA, their motion for new trial still fails in the face of the adverse jury verdict.  In all of this, they seem to miss the crucial detail that in order to be indemnified of expenses incurred, they must provide "adequate evidence."  *See SPA* at 2.  To be clear, the Feliciano Defendants do provide arguably weighty evidence, in the form of these portions of the agreement and the lists created by Mr. González and Mr. Nieves.  Nonetheless, "one may not argue that the verdict was against the weight of the evidence simply by citing to the evidence which was favorable to one's position." *Berger v. Colon*, 215 F.3d 1311, 2000 WL 525945 at *1 (1st Cir. 2000).  In cases, like this one, where "evidence was offered to the contrary, the jury [is] free to accept or reject each party's evidence, and in most cases, a court is not warranted in overriding the jury's choice." *Id.*  Instead, "a jury's verdict on the facts should only be overturned in the most compelling circumstances." *Figueroa-Gomez*, 996 F.2d at 427.

These circumstances do not meet that very high threshold.  Here, a reasonable jury, based on trustworthy testimony presented at trial, could readily have found that Mr. Rebarber disclosed all necessary information to Mr. Feliciano, that Mr. Feliciano was aware of the conditions of the aircraft, that Mr. Feliciano and his consultants were able to inspect the aircraft, and that the aircraft flew well at the time of the

purchase and after the Agreement.  *See June 21, 2022 Trial Tr.* 128:14-24, 129:16-19; *June 23, 2022 Trial Tr.* at 63:8-25, 64:1-6, 72:14-17, 73:3-20, 75:8-10, 80:2-7, 81:5-25, 82:10-22, 99-102, 103:1-25, 114:17-18, 116:13-19, 119:18-120:3.

Once again, the heart of this inquiry is the weighing of the testimony offered by the parties' witnesses.  As there is ample evidence to support both parties' positions, the Court does not find that the jury's verdict for Mr. Rebarber is clearly against the weight of the evidence and therefore does not overturn the jury's verdict or award a new trial on this ground.

The Feliciano Defendants also argue that a reasonable jury "would have understood force majeure striking the company's operations" given Hurricanes Irma and Maria.  However, a reasonable jury, which after all consisted of residents of Puerto Rico who also endured Hurricanes Irma and Maria, could also consider Mr. Feliciano's actions before the hurricanes as relevant to, if not the outright cause of, the downfall of Air America.

Specifically, Mr. Rebarber offered evidence that Mr. Feliciano "never held shareholder meetings," "did not contact Rebarber to consult him," took a loan from a company other than a recognized financial institution, "paid for personal items with Air America's money," as well as that there were "falsified records" during Mr. Feliciano's leadership.  *See June 23, 2022 Trial Tr.* at 105-08 (ECF No. 324); *June 24, 2022 Trial Tr.* at 4-5, 38-41 (ECF No. 323); *June 29, 2022 Trial Tr.* at 33-35 (ECF No. 338).  Given all this evidence, the Court declines to upset the jury's verdict as it was not clearly contrary to the weight of the evidence.

### C.   Mr. Feliciano's Claims of Court Error are Unmeritorious

To support their request for a new trial or vacated judgment, the Feliciano Defendants also allege that the Court made multiple errors throughout the trial. All these allegations turn on whether the Court's evidentiary rulings were proper. *See Feliciano's Mot.* at 11, 13, 16. Such issues are properly raised in a motion for a new trial so the Court considers them. *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

Much like overturning a jury verdict because it is against the weight of the evidence, courts "do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Caldrello v. Mercedes Benz of North America, Inc.*, 488 F. Supp. 2d 129, 131 (D. Conn. 2007) (citing 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2803 (3d ed.); and *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)). Federal Rule of Civil Procedure 61 indicates that:

> [u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

FED. R. CIV. P. 61.

At times, the Feliciano Defendants allege "structural error." *Feliciano's Mot.* at 11 ("This was structural error, for it made the jury weigh[] character evidence against Feliciano, in an unduly prejudicial context"). Despite the allegations, they cite no authority for their claims of structural error arising from evidentiary rulings.

Regardless, the Feliciano Defendants' argument misses the mark.  In 1993, in *Brecht v. Abrahamson,* 507 U.S. 619 (1993), the United States Supreme Court discussed what it termed "structural error."  The *Brecht* Court described a spectrum of error, ranging from "[t]rial error," which is subject to a harmless error analysis, to "the other end of the spectrum of constitutional errors," which amount to "'structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless error' standards."  *Id.* at 629 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991)).  If a true structural error occurs, the Supreme Court requires "automatic reversal," because structural errors 'infect the entire trial process."  *Id.* at 629-30.

But as the First Circuit has pointed out, "[t]he Supreme Court has limited the definition of structural error to those errors that 'infect the entire trial process,'" *United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 47-48 (1st Cir. 2004) (quoting *Brecht,* 507 U.S. at 630), and has "classified an error as structural in only 'a very limited class of cases.'"  *Id.* at 48 (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)).  "Examples include denial of counsel, presence of a biased trial judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and offering a defective reasonable doubt instruction."  *Id.* (internal citations omitted).  Again, the Feliciano Defendants cite no authority for their contention that the Court's evidentiary rulings rise to the level of constitutional error and so infected the entire trial process to require automatic reversal.

The Court rejects the Feliciano Defendants' claim of structural error and instead reviews the trial transcript for substantial error, in line with the Rules of

Civil Procedure. *See* FED. R. CIV. P. 61. Put simply, the Court reviews first to see if there was in fact error, and if so, to determine whether the error was harmless or affected Mr. Feliciano's substantial rights. *See id.*

### 1. First Error Claim: The Jury Was Exposed to Extrinsic Information Which Was Inflammatory and Unduly Prejudicial

The Feliciano Defendants first direct the Court to the *June 23, 2022 Trial Tr.* at 60:2-18 (ECF No. 324). *Feliciano Mot.* at 11. The full context of the questioning begins on the prior page on cross-examination by Attorney Mercado:

**Q.** Good afternoon, Mr. Feliciano. In your testimony yesterday, we heard about your biography, your different activities as a businessman; is that correct?

**A.** Yes.

**Q.** We heard about your different projects that you experienced, your experience in aviation and, obviously, how you ended up with this company here, [Air] America and your business with Mr. Rebarber.
    One of the projects that you mentioned was the - -

**The Court:** I'm sorry, I don't think that either I or the Court Reporter can hear you, Mr. Mercado.

**Q.** One of the projects was called Rubber Ducky and mentioned there was also one in Wal-Mart. Isn't it true there was some differences that ended up in a claim from you against Wal-Mart. That is a yes or no.

**A.** Yes.

**Q.** Also you said that some of the projects that you had involved Isla Grande Flying School, correct?

**A.** Correct.

**Q.** Isn't it true that you ended up suing Isla Grande Flying School in case number KAC 20090870.

    Mr. Feliciano, you also mentioned your experience in how you got into the business of towing banners, the airplane that tows banner to make advertising by the beaches mostly. You said that one of the was a

guy from audit wide and fell in love with Puerto Rico and stayed here. That was Marcelo, right?

**A.** Yes.

*June 23, 2022 Trial Tr.* at 59:13-60:18.

At this point, Mr. Olmo objected and asked to approach the bench, which the

Court allowed.  The following colloquy ensued:

> **Mr. Olmo-Rodriguez:** Marcelo is mentioned in a lawsuit where I was the lawyer for Feliciano and he was the lawyer for the other party.  That lawsuit ended up in a confidential agreement; therefore, I believe he should not be discussing that matter here because we wouldn't be able to go into it about it.

> **Mr. Mercado:**  I'm not discussing about it.  I am just saying because he mentioned those projects.  I'm not going to say anything confidential.

> **The Court:**  I assume it was filed in Federal Court and if I were to look it up on the docket, there would be a docket entry on it.

> **Mr. Olmo-Rodriguez:** Yes.   The thing is that the agreement was confidential, that we cannot go into that.

> **The Court:** Wait a minute.

> I think he has a right to ask whether or not he sued because that's a matter of public record and that's as far as you are going to go, am I correct?

> **Mr. Mercado:** That as far, yes.

> **The Court:** Thank you.

*Id.* at 60:19-61:17.

Attorney Mercado finished his questioning on this topic:

**Q.**  I will repeat the question again.

> Isn't it true that Marcelo Ramos, that he was working with banners, the same Marcelo sued for damages and breach of cont[r]act in case 05-1960 in this Federal Court?

45

**A.** Correct.

*Id.* at 61:20-24.

As for questions about lawsuits with Wal-Mart and Isla Grande Flying School, Mr. Feliciano never objected at trial, and a "defendant who does not object to admission of evidence during trial waives objection and cannot raise it for the first time in [a] motion for new trial." *Brown v. Crown Equip. Co.*, 460 F. Supp. 2d 188, 197 (D. Me. 2006) (quoting *Maeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006)).

Even though Mr. Feliciano now claims that the Court erroneously allowed the admission of character evidence when it allowed testimony about Mr. Feliciano's lawsuit involving Marcelo Ramos, Mr. Feliciano did not object at trial on that basis. Mr. Feliciano's sole trial objection was that the lawsuit was controlled by a confidentiality agreement and should not be admitted. When the Court asked whether the fact of the lawsuit was a matter of public record, Attorney Olmo-Rodriguez conceded that it was. Because Attorney Olmo-Rodriguez limited his trial objection to confidentiality and because he acknowledged that the fact of the lawsuit was public, the Court's ruling was necessarily correct. Moreover, on redirect examination, the Court allowed Mr. Feliciano, over objection, to explain each of the lawsuits and the results, which he described as favorable to himself. *June 24, 2022 Trial Tr.* at 111:7-114:13 (ECF No. 323) (*June 24, 2023 Trial Tr.*).

Under Federal Rule of Evidence 103(a)(1), error may not be predicated upon a ruling that admits or excludes evidence "unless a substantial right of the party is

affected and . . . a timely objection or motion to strike appears on the record." As Mr. Feliciano objected only to the Ramos lawsuit, the Court turns to whether the reference to the lawsuit between Mr. Ramos and Mr. Feliciano affects "a substantial right" of Mr. Feliciano. Clearly it does not. During direct examination, Mr. Feliciano had touted his success in the business world and his altruism by describing raising money through Wal-Mart and other business for charitable causes. The fact that he became involved in litigation with Wal-Mart and other companies tends to undercut the impression of business benevolence that his direct testimony had created.

If Mr. Feliciano had objected to this testimony as improper character evidence under Federal Rule of Evidence 404, the Court could have addressed that objection at the time and considered whether to give a limiting instruction. But because Mr. Feliciano never objected on that basis during trial, because the brief testimony was otherwise relevant, and because Mr. Feliciano was allowed to rebut any negative inference, the Court rejects his claim of error.

> ### 2. Second Error Claim: The Court Allowed the Jury to be Confused on the Applicable Law by Overruling Mr. Feliciano's Objections during Mr. Rebarber's Re-Cross Examination
>
> #### a. Alleged Improper Re-cross-Examination of Luis Feliciano

Next, the Feliciano Defendants assert that "[i]n error and/or abuse of discretion, the Court allowed" the jury's "confusion" on the "applicable Law of Corporations in Puerto Rico, and the roles of Officers, Directors and Stockholders" to increase "by overruling Feliciano's objections in Rebarber's re-cross examination" to

things which were "outside the scope of the direct and re-direct examinations." *Feliciano's Mot.* at 11. Due to this, they argue, "the jury actually got so confused that they rendered an unreasonable verdict determining breach of fiduciary duty, against Feliciano." *Id.* at 13.

In their motion, the Feliciano Defendants point to an exchange with the Court during Attorney Mercado's cross-examination of Mr. Feliciano as a basis for error. *Feliciano Mot.* at 11-12. Specifically, they claim that the Court erred because it allowed Attorney Mercado to question Mr. Feliciano on matters beyond the scope of direct examination. *Id.* at 11 ("First, the court, despite timely objections, allowed the continuation of the questioning in re-cross examination outside of the re-direct examination").

This objection is frivolous. One of the issues before the jury was the condition of the airplanes when Mr. Rebarber sold Air America to Mr. Feliciano. On redirect examination of Mr. Feliciano, Attorney Olmo-Rodriguez asked Mr. Feliciano about an appraisal of the Air America aircraft by Verlyn Wolfe, an appraisal expert, hired by Mr. Feliciano before the sale. Attorney Olmo-Rodriguez explained Mr. Feliciano's position in his opening statement:

> When Feliciano purchased the company, he hired an appraisal, an appraiser, and that person made an appraisal of the airplanes based on those logbooks of the planes that did not contain all the real information about the planes because Rebarber did not allow people to write on the logbooks.

> So the logbooks did not reflect the reality of the planes, therefore when Feliciano purchased his appraisal expert viewed those logbooks that appeared that the planes were in good condition and that's how Feliciano acquired the company.

*Trial Tr. June 21, 2022* at 28:21-29:5 (ECF No. 305).

As stated by Attorney Olmo-Rodriguez, whether Mr. Wolfe's aircraft appraisals were accurate and whether they had been based on accurate information supplied by Mr. Rebarber were factual issues before the jury critical to the positions of the parties. On cross-examination on Friday, June 24, 2022, for example, Attorney Mercado questioned Mr. Feliciano about Mr. Wolfe's appraisals, and Mr. Feliciano conceded that Mr. Rebarber had not made the plane appraisals; Mr. Wolfe had. *June 24, 2022 Trial Tr.* at 29:10-21. But Mr. Feliciano responded that Mr. Wolfe's appraisal was only as good as the records that Mr. Rebarber provided. *Id.* 29:10-30:4 ("Because he let himself be guided by some documents that were incorrect of inaccurate").

On redirect examination of Mr. Feliciano on Friday, June 24, 2022, Mr. Olmo-Rodriguez asked Mr. Feliciano about Mr. Wolfe's aircraft appraisals, and Mr. Feliciano repeated that Mr. Wolfe's appraisals were based on information contained in Air America's airplane logbooks and Mr. Wolfe's market values assumed their accuracy:

> **Q.** Okay. Okay. So this is Mr. Wolfe saying that the current market values, by him, the values that he did assume that each aircraft has complete logbooks and records since new. If logbooks are missing, there would be a deduction in value. Is that what it says?
>
> **A.** That is correct.
>
> **Q.** What did you understand that to mean?
>
> **A.** That some of the items on the value has attachments, that that would be incorrect, the values would be less.

**Q.** It says appraisals were generated using your spreadsheets and pictures.

**A.** Correct.

**Q.** Are those the ones Rebarber provided to you?

**A.** That is correct.  Rebarber provided them and I sent the pictures.

**Q.** Now, it says the present market values are all assume and if not, they will value less.

**A.** That is correct, they will value less.

*Id.* at 117:4-21.  Consistent with Attorney Olmo-Rodriguez's opening statement, Mr. Feliciano testified that the Wolfe appraisals were incorrect because they were based on inaccurate information supplied by Mr. Rebarber.

Clearly then, the accuracy of Air America's logbooks was a central factual issue in the case.  In addition to Mr. Feliciano's testimony, Luis Irizarry, Mr. Feliciano's aviation expert, testified that Air America's logbooks were inaccurate.  *June 27, 2022 Trial Test.* at 91:22-24 (Mr. Irizarry testified that Air America's logbooks "are not reliable at all").  Mr. Rebarber and his expert vigorously challenged the claim that Air America's logbooks were inaccurate.  Ismael Ortiz de Jesus, Mr. Rebarber's aviation expert and former safety inspector for the FAA, explained that by regulation, both the pilot and the mechanic bear responsibility to make sure an aircraft's logbooks are accurate.  *June 28, 2022 Trial Tr.* at 40:18-22.  Furthermore, Mr. Irizarry testified that the FAA performed base inspections for Air America and reviewed its records to determine their accuracy.  *Id.* at 43:22-44:3.  Mr. Rebarber testified repeatedly about the significance of the logbooks in terms of aircraft safety

and FAA oversight, at one point describing the allegations as "crazy" because "you can't fly an airplane when you have a discrepancy list." *June 28, 2023 Trial Test.* at 130:23-131:8.

Moreover, on recross-examination, Attorney Mercado questioned Mr. Feliciano about his claim that Mr. Wolfe's aircraft appraisals were based on faulty information. Attorney Mercado pointed out that Mr. Wolfe had told Mr. Feliciano that he had checked the FAA registry and that "all the airplanes were airworthy." *June 24, 2022 Trial Tr.* at 12:13-18. Mr. Feliciano agreed, but he added that this was "according to the records. According to the records." *Id.* Mr. Feliciano asserted that under his interpretation of the SPA, Mr. Rebarber was responsible for paying for "more than 1,000 parts" in the purchased aircraft. *Id.* at 12:19-22.

When Attorney Mercado asked Mr. Feliciano to explain how the parts he claimed were Mr. Rebarber's responsibility were not reflected in the aircraft logbooks, Attorney Olmo-Rodriguez objected on the ground that these questions went beyond the scope of his redirect examination. *Id.* at 13:3-5. The Court overruled his objection. *Id.* When Attorney Mercado probed further on whether the logbooks reflected the contested parts, Attorney Olmo-Rodriguez again objected as beyond the scope of redirect examination, *id.* at 13:22-23, and the Court again overruled his objection. *Id.* at 13:24. Attorney Mercado asked Mr. Feliciano whether the planes would have had to have been grounded if the logbooks had indicated defective parts. *Id.* at 15:23-23. Attorney Olmo-Rodriguez objected a third time on the ground that the questioning was beyond the scope of redirect examination. *Id.* at 15:25-16:1. The Court overruled

him for a third time and reminded Attorney Olmo-Rodriguez that it, not he, controlled examination.  *Id.* at 16:2-3.

Later on during cross-examination, having reviewed the logbooks, Mr. Feliciano was able to identify only four inaccurate entries in the logbooks out of the forty or "more than 1,000 parts":

> **Q.** Okay, so your testimony is that, out of 40 items in the books, there are four items, and they are April 2015 on 62749, April 2015 on 49 Tango, March 2015 on 985 Zulu, and 30PT on July 2016.
>
> **A.** That's what I found.

*Id.* at 39:21-25.  A reasonable jury could have found that Attorney Mercado's cross-examination of Mr. Feliciano badly undercut Mr. Feliciano's credibility because he had alleged that the logbook contained numerous inaccuracies, but when pressed on cross-examination, he was only able to identify four.

The Court views as baseless Mr. Feliciano's objection to the Court's control of examination under Federal Rule of Evidence 611.   Attorney Olmo-Rodriguez questioned Mr. Feliciano closely on redirect examination about whether the information Mr. Rebarber had given Mr. Wolfe for his appraisals had been accurate, and in the Court's view, Mr. Mercado had the perfect right on recross-examination to question Mr. Feliciano about the fact that the FAA had declared the airplanes airworthy and that the logbooks had not revealed any of the problems that Mr. Feliciano had repeatedly asserted.  The Court firmly rejects Mr. Feliciano's claim of error.

> ### b.   Alleged Improper Impeachment of Luis Feliciano About a Clerical Error

In their motion, the Feliciano Defendants argue:

> Second, it was improper impeachment of Feliciano, to allow numerous and continuous questions regarding a clerical error in a fax transmittal sheet, not contained in the substantive documents of the corporation, which led the jury to be confused as to the Board of Directors of the Corporation, particularly the role of the secretary.

*Feliciano Mot.* at 12 (citing *June 27, 2023 Trial Tr.* at 27:2-29:25). The Feliciano Defendants claim that the Court "recognized the predicament," and pointed out that the Court said that the jury was going to be "miserably confused about this." *Id.* at 13 (citing *June 27, 2023 Trial Tr.* at 33:24-34:19).

### i.    The Secretary's Mistake

One of the issues in this case was Mr. Rebarber's contention that Mr. Feliciano had been self-dealing from Air America, benefitting himself personally to the detriment of Mr. Rebarber, who remained a twenty percent minority shareholder after the sale. To support his contention, Mr. Rebarber presented evidence that after he bought the company, Mr. Feliciano was not sufficiently careful with Air America's corporate form, specifically an apparent mistake Air America made during Mr. Feliciano's ownership in its filings with the Puerto Rico Secretary of State.

Under the terms of the PSA, Mr. Feliciano held the offices of president, secretary, and treasurer of Air America. *June 27, 2023 Trial Tr.* at 40:15-18. During Attorney Mercado's initial cross-examination of Mr. Feliciano, it turned out that on a series of documents Air America transmitted to the Puerto Rico Secretary of State for the years 2014 to 2018, Brenda Gullien, Mr. Feliciano's secretary, incorrectly listed herself as the corporation's Secretary. *June 24, 2022 Trial Tr.* at 44:1-47:14.

Attorney Mercado challenged Mr. Feliciano about this repetitive mistake, and Mr. Feliciano responded (1) that it was "a silly error," *id.* at 46:14-16, and (2) that Attorney Mercado was making "a fuss" of it. *Id.* at 47:8-9.   Attorney Olmo-Rodriguez did not object to any of this cross-examination. *Id.* at 44:1-47:14.

By the time Attorney Olmo-Rodriguez objected, Attorney Mercado had moved to a different topic: whether Mr. Feliciano had properly accounted for Mr. Rebarber's continued role as a shareholder. *Id.* at 47:15-48:25.   On this point, Attorney Mercado questioned Mr. Feliciano about whether the shareholders of Air America were acting as the directors of the corporation. *Id.* at 48:22-25.   During this questioning, Attorney Olmo-Rodriguez objected to the line of questioning on the ground that Attorney Mercado was conflating the roles of shareholder and director.   *Id.* at 47:19-21 ("Objection, Your Honor.   The question makes reference to two different things.   He is (mixing) two concepts, Your Honor").   The Court allowed Mr. Feliciano to answer the question if he could.   *Id.* at 47:22.   Mr. Feliciano rejected Attorney Mercado's implication, contending instead that he was the "sole director." *Id.* at 48:22-25.

Attorney Mercado raised the question of secretarial error again on recross-examination.   *June 27, 2022 Trial Tr.* at 26:25-31:4.   This time, Mr. Feliciano responded variously that (1) it was Ms. Guillien's mistake, (2) it was Mr. Rebarber's CPA's mistake, (3) it was Mr. Feliciano's mistake, and (4) it was an insignificant detail. *Id.* at 26:25-29:25.   At this point, Attorney Mercado asked for tax reports from 2014 through 2018 to be admitted, but as Attorney Olmo-Rodriguez had not seen these documents, the Court took a recess and allowed the lawyers to review the

documents. *Id.* at 30:1-31:4. Up to this point, Attorney Olmo-Rodriguez had not objected to any of this recross examination.

Upon return from recess, the Court admonished Attorney Mercado that he had gone "substantially beyond the confines of redirect" and Attorney Mercado responded that he only had "three more questions and that's it." *Id.* at 31:6-17. After this, Attorney Olmo-Rodriguez objected for the first time to this recross examination on the grounds that it exceeded redirect. *Id.* at 31:21-23. Attorney Olmo-Rodriguez also objected on the ground that Joint Exhibit 3, a Consent of Shareholders of Air America, signed by both Mr. Rebarber and Mr. Feliciano, stated that Mr. Feliciano would be the sole Director and Treasurer, and that Attorney Mercado was "misleading the jury." *Id.* at 31:24-32:4.

In response to Attorney Olmo-Rodriguez's second objection, namely the asserted conflation of the roles of stockholder and director, the Court observed that the SPA provided that shareholders acting as directors would control the corporation and if there was a separate agreement to a different effect, it would be a jury issue as to whether there was a conflict between the agreements, and which of the two controlled. *Id.* at 32:5-33:2. Attorney Olmo-Rodriguez agreed that Joint Exhibit 3 did not eclipse the SPA, and so the Court asked Attorney Olmo-Rodriguez what he wanted the Court to do. *Id.* at 33:3-5. Attorney Olmo-Rodriguez responded:

> I would like you to allow me a redirect to clear this up, or not allow Mr. Mercado to continue and strike the remarks from those questions.

*Id.* at 33:6-8. The Court granted Attorney Olmo-Rodriguez's request for further redirect examination:

> I think you have [a tension] between the Stock Purchase Agreement and this unanimous written consent. I will allow you to clear it up if you wish to do so.

*Id.* at 33:9-11. Attorney Mercado responded that Mr. Feliciano had testified that listing Ms. Guillien as the secretary was a "silly error" but it was a sworn statement. *Id.* at 33:22-23. The Court informed Attorney Mercado that he had "made that point." *Id.* at 33:24.

The Court turned to the apparent conflict between the roles of shareholder and director as set forth in the SPA and the unanimous consent, and said that the tension did not necessarily mean that Mr. Rebarber, who was still a shareholder, had relinquished his rights as a shareholder to act as a director of Air America for all purposes, but the Court warned counsel that the jury was going to be "miserably confused about this." *Id.* at 33:24-34:17. The Court allowed Attorney Mercado to "[a]sk your two or three more questions," *id.* at 34:18-19, but Attorney Mercado elected not to pursue this line of questioning. *Id.* at 35:15-38:9. As the Court promised, it allowed Attorney Olmo-Rodriguez to engage in further redirect examination, and Attorney Olmo-Rodriguez asked Mr. Feliciano about the unanimous written consent of the shareholders and whether the document confirmed that, as of the date of the purchase, he and Mr. Rebarber had agreed that he would be president, secretary, and treasurer. *Id.* at 40:6-19.

### ii.    Merits of the Secretarial Mistake Issue

With this detailed background, the Court rejects Mr. Feliciano's badly conflated claim of error. First, contrary to his implication, Attorney Olmo-Rodriguez

made no contemporaneous objection to Attorney Mercado's questioning of Mr. Feliciano about the secretarial mistake. Second, when Attorney Mercado questioned Mr. Feliciano again during recross-examination on the secretarial error, Mr. Olmo-Rodriguez, once again, made no contemporaneous objection.

Third, when Attorney Olmo-Rodriguez objected to Attorney Mercado's questions about the roles of shareholder and director, he requested that the Court grant him relief in one of multiple alternatives: allow him to clarify the matter on further redirect examination, deny Attorney Mercado the right to ask any further questions on the topic, or strike the testimony. Contrary to Attorney Olmo-Rodriguez's current argument, the Court granted Attorney Olmo-Rodriguez one of the forms of relief he requested and allowed him to question Mr. Feliciano on further redirect examination.

Fourth, it was the Court, not Attorney Olmo-Rodriguez, who intervened concerning improper recross-examination by Attorney Mercado, and the Court restricted Attorney Mercado from further questioning. Fifth, after the Court's admonition, presumably based in part on the Court's discouragement, Attorney Mercado did not further pursue this line of questioning, thus satisfying Attorney Olmo-Rodriguez's second form of requested relief. The Court was not required on pain of new trial to grant all three forms of Attorney Olmo-Rodriguez's requested relief.

Sixth, Attorney Mercado's recross-examination brought out Mr. Feliciano's obstinacy, blame-shifting, and obfuscation, all of which went to his credibility before the jury.

Seventh, Attorney Olmo-Rodriguez mischaracterizes the Court's comment about jury confusion. The Court's comment about the jury being miserably confused was not about the secretarial error but about the roles of shareholder and director in a closed corporation, which it allowed Attorney Olmo-Rodriguez to clarify on further redirect examination.

In short, this entire issue is a manufactured controversy, amounts to a sideshow, and is not grounds for vacating the judgment or for a new trial. Mr. Feliciano has failed to demonstrate that the Court committed any error at all, much less structural error or error meriting a new trial. *See Nieves-Villanueva*, 133 F.3d at 102.

### 3. Third Error Claim: Dr. Cao's Expert Witness Testimony and Exhibit Invaded the Jury's Province

The Feliciano Defendants allege there was yet another "structural error in the case" because the admission of expert witness Ramon Cao's testimony and Exhibit FFF "essentially invaded" the jury's province, and the jury "consumed a purported expert's response as to the ultimate question which they were supposed to find through the judicial process instead." *Feliciano's Mot.* at 15. To buttress this assertion, they point out that the jury "based their damages award" of $534,836 on the "sum of what Cao testified was 20% of the goodwill value of Air America ($209,836) and the value of 20% of the stocks in Air America ($325,000), at the time

of the 2014 80% stock purchase." *Id.* This suggests to the Feliciano Defendants that having Dr. Cao's report as "Defendant's Exhibit FFF, made the jury rely on the findings, conclusions, and assessments of this witness, instead of evaluating the evidence and reaching their own conclusions." *Id.* at 16.

Mr. Rebarber responds by arguing that "there is not a single objection on [the] ultimate issue question by Defendants/ Plaintiffs that can be found during the course of this testimony in the trial transcripts. . . . Thus, this argument is meritless as the objection was not preserved." *Id.* at 19.

In their argument, the Feliciano Defendants cite no rule of evidence, no statute, and no caselaw. The Court "has no obligation to supply what counsel failed to provide." *PR Recovery & Dev. JV, LLC v. Lopez-Lopez*, No. 22-1205 (ADC), 2023 U.S. Dist. LEXIS 54722, at *7 (D.P.R. Mar. 29, 2023). "Undeveloped arguments not supported by legal authorities are deemed waived and/or abandoned." *United States v. Pérez-Velázquez*, 488 F. Supp. 2d 82, 87 (D.P.R. 2007) (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). The Court could deem his argument waived.

However, as the Feliciano Defendants' contention is readily resolved against them on the merits, the Court will also discuss the merits of the issue. Their challenge must be under Federal Rule of Evidence 704, which deals with witness opinions on the ultimate issue. Contrary to their argument, Rule 704 states that "[a]n opinion is <u>not</u> objectionable just because it embraces an ultimate issue." FED. R. EVID. 704(a) (emphasis supplied). The sole exception is that in "*a criminal case*, an expert witness must not state an opinion about whether the defendant did or did

not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone."  FED. R. EVID. 704(b) (emphasis supplied).

"Rule 704 permits expert testimony that tackles the ultimate issue of a case . . .. The ultimate issue that Rule 704 refers to, does not, however permit expert testimony that proffers legal conclusions."  *Cotto-Vazquez v. United States*, No. CV 16-2807 (SCC), 2021 U.S. Dist. LEXIS 48474, at *59 (D.P.R. Mar. 11, 2021) (citing FED. R. EVID. 704; and *Nieves-Villanueva*, 133 F.3d at 99-100).  The narrow issue, then, is whether Dr. Cao's testimony merely speaks to the ultimate issue or crosses the line into legal conclusions.

During his testimony, Dr. Cao explained that "[Mr. Rebarber] says that he suffered some financial damages from the sale of Air America.  Then I was asked to evaluate *not from a legal point of view, I do not do legal opinions*, and to quantify [the damages]."  *June 27, 2022 Trial Tr.* at 81:17-20 (emphasis supplied).  Dr. Cao explained his methodology in creating the report, *id.* at 82:6-23, before recounting what assumptions underpinned his findings.  *Id.* at 83:4-85:6.  Dr. Cao used his technical knowledge of corporate financial documents to help the jury determine the appropriate damages.  *See, e.g., id.* at 87:3-17; *id.* at 88:7-13, 18-24; *see generally id.* at 87-99.

Mr. Feliciano points to no testimony where Dr. Cao proffers a legal conclusion on any legal questions and the Court's review of the entirety of Dr. Cao's testimony produces none.  The Court concludes that Dr. Cao appropriately testified in

accordance with Federal Rule of Evidence 704 to the ultimate issue without offering any legal conclusions and that accordingly there was no error in allowing his testimony.

###### 4.     Fourth Error Claim: There is no Evidentiary Basis for a Damage Award against Christel Bengoa or the Conjugal Partnership

In the fourth claim of error, the Feliciano Defendants blankly assert:

> Without there being any support in evidence, the jurors also unreasonably awarded damages attributable to Christel Bengoa and the Bengoa/Feliciano Conjugal Partnership in the amount of $141,400.00. Such amount was never supported by the evidence during trial.  No reasonable jury would have awarded such an amount against such parties in this case, as the number was random, not resulting from any summation or subtraction from any amounts testified to or presented into evidence.  No reasonable jury would have rendered such an award as to these defendants and for this, the judgment should be set aside and relief granted to prevent an injustice.

*Feliciano Mot.* at 16.

Again, in their argument, the Feliciano Defendants cite no rule of evidence, no statute, and no caselaw.  They do not even cite any part of the voluminous record, requested trial transcripts, or several exhibits.  The Feliciano Defendants' argument consists solely of plainly declaratory sentences, as if by stating a proposition, they have proven it.

However, the law requires more.  Once again, the Court "has no obligation to supply what counsel failed to provide."  *Lopez-Lopez*, 2023 U.S. Dist. LEXIS 54722, at *7.  "Undeveloped arguments not supported by legal authorities are deemed waived and/or abandoned."  *Pérez-Veláquez*, 488 F. Supp. 2d at 87.  The Court also

could deem his argument waived. Nonetheless, in excess of caution, the Court reaches the merits.

"Article 1308 of the Civil Code of Puerto Rico provides that the conjugal partnership shall be liable for 'all debts and obligations contracted during the marriage.'" *F.D.I.C. v. Monterrey, Inc.*, 847 F. Supp. 997, 1004 (D.P.R. 1994), *aff'd* 45 F.3d 423 (1st Cir. 1995) (quoting P.R. Laws, tit. 31, § 3661 (1990)). The "burden of proof rests initially on the spouse who denies [her] liability or that of the marital community." *Id.* at 1004-05 (quoting *WRC Props., Inc. v. Santana*, 116 D.P.R. 1, 27 (1985)). However, the burden "may be easily inverted." *Id.* (quoting *WRC Props.*, 116 D.P.R. at 27). Even so, "[a] mere denial that the conjugal partnership benefitted from the spouse's dealings is not sufficient to rebut the presumption delineated by Article 1308." *Kodak Ams., Ltd. v. Caribbean Photo & Imaging Co.*, 242 F. Supp. 2d 117, 120 (D.P.R. 2002).

During her trial testimony, Ms. Bengoa confirmed that she does not have a prenuptial agreement with Mr. Feliciano. *July 28, 2023 Trial Tr.* at 62:14-15. Ms. Bengoa also confirmed that she is a part-owner of both Air America and Yellow Media. *Id.* at 62:16-20. There was evidence in the record that Mr. Feliciano had the title to four aircraft owned by Air America that were transferred to Yellow Media, a company owned by both Mr. Feliciano and Ms. Bengoa. *June 24, 2022 Trial Tr.* at 40:1-6, 14-18. This evidence is sufficient to create the presumption that Ms. Bengoa is liable as a conjugal partner to Mr. Feliciano for the amount of the jury award, and Ms. Bengoa has asserted no evidence in this record, nor outside of it, to rebut the

marital community presumption.   The Court, therefore, denies the Feliciano Defendants' objections to the jury award against Ms. Bengoa and the conjugal partnership.

> **5.    Fifth Error Claim: The Court allowed Mr. Rebarber to Confuse the Jury on the Correct Legal Standard for Gross Negligence**

The Feliciano Defendants contend that Mr. Rebarber "was allowed to define []gross negligence to the jury, in a way that was confusing the legal standards . . . leading the jury to confuse such with a claim for defamation." *Feliciano's Mot.* at 18. To support this contention, they point to the following interchange during Mr. Rebarber's testimony:

> **Q.** That's regarding the airline, but regarding the corporation.  What is gross negligence?   Why are you alleging gross negligence of Mr. Feliciano?
>
> **A.** So, we signed the Stock Purchase Agreement and we also signed the Unanimous Consent of the Shareholders.   So this is a corporate document on how he is going to proceed as president and the duties that he was supposed to do.
>
> He didn't do anything.  Everything here that he signed and I signed on that day, from not changing me from Agent of Service of the corporation to his name, to loans, getting loans that were unauthorized, by using me as a manager of a corporation with a lame excuse that I was untrustworthy.
>
> You look at everything that he has done is just careless, bad faith.  I mean, any problems that he would have found is not acceptable that he didn't call me personally and say, "hey, what do you think about this?" I now know if you look at the proposal letter where he said he has the monies to invest, he has the Human Resources to turn my company into a regional airline, and what he did to that effect, and he did to all the corporate duties that he was supposed to do is evident that he had it all planned.

He took two months, two months after he took control of the companies, he took months to pay his personal debts, invoices that weren't even invoiced to Air America. It was invoiced to him, the lawyers' fees. His due diligence agents, he paid from Air America. A $35,000 home theater for his personal use he paid from Air America. In his deposition, he said again, "Oh, it was a mistake." These and many more. Not paying back the $250,000 that he paid me by selling a corporate seat. At least, he should have returned that money to the corporation, but no, he never did.

That's all grossly negligent . . . .

*June 30, 2023 Trial Tr.* at 21:17-22:15.

The Feliciano Defendants take this question out of context. This question followed an unobjected-to line of questioning where Mr. Rebarber was asked to describe the factual basis for his various claims against the Feliciano Defendants. *See id.* at 16:13-16 ("Mr. Rebarber, you are claiming in your suit against Mr. Feliciano, obviously his wife in the conjugal partnership, illegally benefited from the company. Why so? Why is that?"); *id.* at 16:20-21 ("You are also claiming that Mr. Feliciano was grossly negligent in managing the corporation. Why is that?"). Mr. Rebarber answered each of these questions with his view of the evidence, not with legal pronouncements. Following these questions, Attorney Mercado asked Mr. Rebarber why he was making a gross negligence claim about the way Mr. Feliciano had handled Air America as a corporation, not for a legal definition of gross negligence.

Notably, Mr. Olmo-Rodriguez failed to object to this question and response. "It is a basic tenet of our law that in order to preserve an evidentiary issue for review, the party opposing the admission of the evidence must make a timely objection."

*United States v. Merserve*, 271 F.3d 314, 324 (1st Cir. 2001) (citing FED. R. EVID. 103(a)(1)).  Where a party failed to properly preserve an objection, a "court may take notice of a plain error affecting a substantial right."  FED. R. EVID. 103(d).  "[P]lain error 'entails a quadripartite showing: (1) that there was error; (2) that it was plain; (3) that the error affected substantial rights; and (4) that the error affected the fairness, integrity, or public reputation of judicial proceedings.'"  *Meserve*, 271 F.3d at 321-22 (quoting *United States v. Eirby*, 262 F.3d 31, 36 (1st Cir. 2001)).

Applying these principles, the Court easily concludes that there was no error, much less plain error.  As the context of the question makes clear, Mr. Rebarber was being asked why he was claiming that Mr. Feliciano had been grossly negligent.  This is much like a contention interrogatory, where the party is asked to set forth the facts supporting its contentions.  *See Mass. Elektron N. Am., Inc. v. Applied Chemistries, Inc.*, 2019 U.S. Dist. LEXIS 225266, at *9 (D. Mass. July 26, 2019) ("Contention interrogatories are a proper means to establish the factual and legal bases for the adverse party's claims").  Allowing this commonly accepted convention did not affect the Feliciano Defendants substantial rights.  Nor did it affect the fairness, integrity, or public reputation of judicial proceedings. Mr. Rebarber was asked to explain to the jury the factual basis for his gross negligence claim against Mr. Feliciano.  There is nothing at all improper about the question.

Furthermore, Mr. Rebarber's response did not allude to or define a legal term.  *See June 30, 2022 Trial Tr.* at 21:17-23:21 (ECF No. 339).  To the contrary, in his testimony, Mr. Rebarber described his perception of the facts and his motivation for

filing suit.  *See id.*  Instead, in line with this line of questioning, Attorney Mercado asked Mr. Rebarber to describe the factual basis for his claim that Mr. Feliciano was grossly negligent in his handling of the corporation: "That's regarding the airline, but regarding the corporation.  What is gross negligence?  Why are you alleging gross negligence of Mr. Feliciano?"  It appears that Attorney Mercado made a slip of the tongue when he asked, "What is gross negligence?"  He immediately clarified his question: "Why are you alleging gross negligence of Mr. Feliciano?"  The Feliciano Defendants have seized upon Attorney Mercado's slip of the tongue, which he immediately corrected, as a ground for a new trial.  If Mr. Rebarber had answered the question by instructing the jury on the law, it would be one thing.  But Mr. Rebarber's response was to the clarified question and did not touch on the legal definition of gross negligence.

Even if Mr. Feliciano were correct that Mr. Rebarber's testimony led the jury to confuse legal standards (which the Court does not conclude), the Court's jury instructions[2] clearly defined gross negligence for the jury in writing prior to their

---

[2]    The relevant jury instructions read:

**REBARBER'S BREACH OF FIDUCIARY DUTY CLAIM AGAINST FELICIANO**

Mr. Rebarber has asserted that Mr. Feliciano breached fiduciary duties under Puerto Rico law and in doing so, caused him damages.  Mr. Rebarber must prove each element of his claim by a preponderance of the evidence.
. . .
To overcome this presumption, Mr. Rebarber must establish that Mr. Feliciano's conduct was grossly negligent.  Gross negligence consists of a complete lack of care or so small a degree of diligence that justifies the belief that the defendant acted with complete indifference for the interest and welfare of the other party.

deliberations and instructed them to follow that standard.[3]  *See Nieves-Villanueva*, 133 F.3d at 102 ("In a civil case, the party asserting error bears the burden of demonstrating that the error was harmful, i.e., that it affected that party's substantial rights. In determining whether an error affected a party's substantial right[s], the central question is whether this court can say with fair assurance . . . that the judgment was not substantially swayed by the error") (internal citations omitted).

Indeed, the Court adopted virtually verbatim Mr. Feliciano's proposed definition of gross negligence under Puerto Rico law.  *Compare Pl.'s Proposed Jury instructions* at 2 (ECF No. 202) ("As used in Puerto Rico, gross negligence consists of complete lack of care or so small a degree of diligence that justifies the belief that the defendant acted with complete indifference for the interest and welfare of the other party"), *with Jury Instructions*, *July 1, 2023 Trial Tr.* at 115:21-24 ("Gross negligence consists of a complete lack of care or so small degree of diligence that justifies the belief that the defendant acted with complete indifference for the interest and welfare of any other party").

---

[3]      The relevant jury instructions on their general duty reads as follows:

**General Rules Concerning Jury Duties**
It is your duty as jurors to follow the law as stated in the instructions of the Court, and to apply these rules of law to the facts as you find them from the evidence in the case.
You are not to single out one instruction alone as stating the law but must consider the instructions as a whole.
Neither are you to be concerned with the wisdom of any rule of law stated by the Court.  Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than that given in the instructions of the Court; just as it would be a violation of your duty, as judges of the facts, to base a verdict upon anything but the evidence in the case.

Again, the Court rejects the Feliciano Defendants' claim of error. The contention line of questions posed to Mr. Rebarber were proper, Mr. Rebarber's response referred exclusively to facts, not law, and the Court clearly instructed the jury as to the proper legal standard for gross negligence. Therefore, the Feliciano Defendants' fifth claim of error is unavailing.

**D.   The Jury's Finding that Mr. Feliciano Was Grossly Negligent Was Not Against the Clear Weight of the Evidence**

The parties agree that Article 4.03 of Puerto Rico's General Corporation Law, 14 LPRA sec. 3563 (2011), is at the core of the dispute about Mr. Feliciano's alleged gross negligence. Article 4.03 outlines, in relevant part, that: "Directors and officers shall be obliged to devote to the affairs of the corporation and to the exercise of their duties the *attention and care* which in a similar position and under analogous circumstances a *responsible and competent director* or officer would execute in applying his/her *business judgment in good faith*." *Id.* (emphasis supplied).

The parties disagree, however, on the outer contours of a director's obligations. On the one hand, the Feliciano Defendants emphasize the business judgement rule and argue it is for Mr. Rebarber to rebut the "presumption that in making a business decision, directors acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Feliciano's Mot.* at 19. Further, the Feliciano Defendants argue that "in Puerto Rico, gross negligence consists of complete lack of care or so small a degree of diligence that justifies the belief that the defendant acted with complete indifference." *Id.* at 20. Therefore, they contend, gross negligence is a "difficult threshold to reach," *id.*, and Mr. Rebarber

failed to meet this burden because he "did not present evidence that Feliciano was grossly negligent and certainly did not overcome the presumption that Feliciano acted with a reasonable degree of care, in good faith and in the best interests of AA." *Id.* at 21. The Feliciano Defendants claim that Mr. Rebarber "would only refer to Economist Cao, and state conclusory statements, not factual, only to confuse the matter with a defamation claim." *Id.*

In response, Mr. Rebarber situates the obligation of directors in a broader context by pointing to Article 2.03 of the Corporations Law, 14 LPRA § 3523 (2011). *Rebarber's Opp'n* at 23-24. Article 2.03 outlines that "[t]he authority and powers conferred on . . . directors and officers shall be enjoyed and shall be exercised . . . for the benefit of the corporation's shareholders and for the prudent management of the corporation, their business and affairs, as well as for the promotion of their objectives [and] purposes." 14 LPRA § 3523 (2011). This greater context, Mr. Rebarber contends, "sets forth the specific obligation to carry out [the corporation's] tasks in a capable and responsible manner, but always in accordance with the interests of the entity." *Rebarber's Opp'n* at 24. "Naturally," he continues, "failure to observe these duties . . . could generate personal responsibility." *Id.*

Mr. Rebarber next counters the Feliciano Defendants' claim that no factual evidence was provided; he points to Mr. Feliciano's admissions that both the Yellow Media loan to Air America and the transfer of four aircraft from Air America to Yellow Media were completed without a corporate resolution, consultation, or communication with Mr. Rebarber, that Mr. Feliciano never held shareholder

69

meetings, and that Mr. Feliciano bought personal items with Air America's money. *Id.* at 25-26 (citing *June 24, 2022 Trial Tr.* at 37-40 (ECF No. 323); *June 23, 2022 Trial Tr.* at 105-108 (ECF No. 324)). Mr. Rebarber also refers to his own testimony, during which he stated that "Mr. Feliciano did not allow him to see the books once the deal was closed, keeping him out of the loop and never calling him, not even after the hurricanes and despite Mr. Rebarber repeatedly requesting he do so" and that Mr. Feliciano paid a personal debt to Mr. Rebarber using the proceeds of the sale of one of Air America's aircraft. *Id.* at 27-28 (citing *June 29, 2022 Trial Tr.* at 63, 68 (ECF No. 338); *June 23, 2022 Trial Tr.* at 40, 53 (ECF No. 324)).

After weighing the evidence presented, the jury found Mr. Feliciano was grossly negligent. In fact, as earlier noted, the jury did so using the same definition of gross negligence Mr. Feliciano proposed to the Court at trial and now cites in his post-trial motion. *Compare Feliciano's Mot.* at 20 ("As used in Puerto Rico, gross negligence consists of complete lack of care or so small a degree of diligence that justifies the belief that the defendant acted with complete indifference"), *with Jury Instructions*, *July 1, 2023 Trial Tr.* at 115:21-24 ("Gross negligence consists of a complete lack of care or so small degree of diligence that justifies the belief that the defendant acted with complete indifference for the interest and welfare of any other party"). As the jury finding of gross negligence is not contrary to the weight of the evidence, the Court declines to upset it.

The Court's independent assessment of the evidence is entirely consistent with the jury verdict. Even under Mr. Feliciano's narrower reading of the obligations of a

director, he failed to meet them.  The evidence demonstrates that Mr. Feliciano used the assets of Air America improperly for personal gain and ignored the best interests of his minority shareholder by purchasing personal items and paying off personal debts.  These acts, among others, are palpably inconsistent with Mr. Feliciano's obligations under Puerto Rico law to act in the best interest of all the shareholders as a director.

As Mr. Rebarber presented evidence that supports the jury's finding that Mr. Feliciano was grossly negligent and did not act with a reasonable degree of care, in good faith, or in the best interests of Air America, the Court holds the jury's determination was not against the clear weight of the evidence.  Thus, the Court denies the Feliciano Defendants' motion to vacate judgment or for a new trial on this issue.

### E.   The Jury's Finding That There Was a Causal Connection Between Mr. Feliciano's Actions and Mr. Rebarber's Damages Was Not Against the Weight of the Evidence

The Feliciano Defendants also argue that the jury was incorrect in its finding that Mr. Feliciano's negligence was linked to Air America's demise.  *Feliciano's Mot.* at 25.  This is so, they claim, because the causal nexus "cannot be satisfied unless the plaintiff proves that the injury was reasonably foreseeable and thus, could have been avoided had the defendant acted with due care."  *Id.* at 25-26 (citing *Grajales-Romero v. Am. Airlines, Inc.*, 194 F.3d 288, 296 (1st Cir. 1999); and *Woods-Leber v. Hyatt Hotels of P.R., Inc.*, 124 F.3d 47, 50-51 (1st Cir. 1997)).  By the Feliciano Defendants' estimation, "Rebarber did not overcome the foreseeability standard . . . because it was

impossible for Feliciano to foresee the passing of Hurricanes Irma and Maria and that one of the airplanes would suffer an accident due to pilot error." *Id.* at 26.

Mr. Rebarber takes no issue with the legal standard put forth by the Feliciano Defendants. Instead, he argues that a "review of the testimony . . . shows a clear causal connection between Mr. Feliciano's acts and Mr. Rebarber's damages." *Rebarber's Opp'n* at 30. Mr. Rebarber characterizes Mr. Feliciano's "dubious financial dealings, combined with the loss of Air America's airline certificate as a result of his faulty management" as the catalysts leading to Air America's worthlessness and ultimately the damages Mr. Rebarber faced. *Id.*

At trial, the jury weighed the evidence before it and found Mr. Feliciano's actions and inactions caused Mr. Rebarber's damages. That finding is consistent with and not against the clear weight of the evidence as a reasonable jury could find that Mr. Feliciano undermined the financial security of Air America long before Hurricanes Irma and Maria, through his comingling of personal and business funds. *See, e.g.*, *June 24, 2022 Trial Tr.* at 5:19-25, 36:7-25, 37:1-14, 38:1-23, 39:1-9; *June 23, 2022 Trial Tr.* at 105:18-22, 106:10-25, 107:1-25, 108:15-24, 113:8-12; *June 29, 2022 Trial Tr.* at 57:16-25, 58:1-2, 63:1-7, 68:1-9, 108:14-25, 110:1-11.

As Mr. Rebarber presented sufficient evidence to support the jury's finding that Mr. Feliciano's negligence was the cause of Mr. Rebarber's damages, the Court holds the jury's determination was not against the clear weight of the evidence. Thus, the Court denies the Feliciano Defendants' motion to vacate judgment or for a new trial on this issue.

**F.   The Jury's Finding that Mr. Rebarber Was Not Comparatively Negligent Was Not Against the Weight of the Evidence**

The Feliciano Defendants also maintain that "[t]he unchallenged evidence shows that Rebarber failed to correct the deficiencies on the airplanes in a timely and adequate manner which caused AA to be overvalued and caused Feliciano and AA to invest large amounts of money to maintain AA's operations." *Feliciano's Mot.* at 27. They further argue that "instead of making the needed repairs, Rebarber paid himself more than $500,000 in dividends that should have been used to maintain the airplanes in adequate condition.  Therefore, Rebarber is also liable for the loss of value of his 20% of AA's stock." *Id.*

Mr. Rebarber asserts that the "already cited testimony demonstrates the airplanes were being maintained adequately prior to the December 17, 2014 Stock Purchase Agreement." *Rebarber's Opp'n* at 31.  Therefore, he contends, the Feliciano Defendants' "argument should be disregarded for lack of support." *Id.*

The Feliciano Defendants' comparative negligence claim once again falls on precept that juries are the best judges of conflicting testimony.  The testimony they offer suggests Mr. Rebarber did not correct the deficiencies on the airplanes in a timely and adequate matter.  Mr. Rebarber's more persuasive testimony and evidence prove precisely the opposite.

As the First Circuit has made clear that "conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial," *Figueroa-Gomez*, 996 F.2d at 427, the Court refuses to act as a thirteenth juror and

73

disrupt the judgment of a jury of Mr. Feliciano's peers. *See Rodríguez-Valentín*, 27 F.4th at 21; *see also Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 537 (1st Cir. 2011) ("[O]ne may not argue that the verdict was against the weight of the evidence simply by citing to the evidence which was favorable to one's position. If evidence was offered to the contrary, the jury was free to accept or reject each party's evidence, and in most cases, a court is not warranted in overriding the jury's choice"). The Court denies the Feliciano Defendants' motion for a vacated judgment or a new trial on this ground because Mr. Rebarber offered sufficient evidence so that the jury's verdict is not clearly against the weight of the evidence.

### G.    Remittitur is Not Appropriate

Having decided that the Feliciano Defendants are not entitled to vacating the judgment or to a new trial, the Court turns to their alternative argument: that remittitur should be ordered under Rule 59 "because the jury's verdict exceeds any rational appraisal or estimate of the damages that could be based on the evidence." *Feliciano's Mot.* at 28 (citing *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 13 (1st Cir. 20009)).

"The standard of review of damage awards places an enormous burden on the party challenging the award." *Figueroa-Gomez*, 996 F.2d at 428. "A party seeking remittitur 'bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit to stand.'" *Sánchez v. Foley*, 972 F.3d 1, 17 (1st Cir. 2020) (quoting *Currier v. United Techs. Corp.*, 393 F.3d 246, 256 (1st Cir. 2004).

"In reviewing an award of damages, the district court is obliged to review the evidence in the light most favorable to the prevailing party," in this case Mr. Rebarber. *Wortley v. Camplin*, 333 F.3d 284, 297 (1st Cir. 2005); *accord E. Mountain Platform Tennis, Inc. v. Sherwin–Williams Co.*, 40 F.3d 492, 502 (1st Cir.1994). Courts will not "upset a jury's damage award unless it '*exceeds any rational appraisal or estimate of the damages that could be based on the evidence before the jury.*'" *Sánchez*, 972 F.3d at 17 (emphasis supplied) (quoting *Smith v. Kmart Corp.*, 177 F.3d 19, 29 (1st Cir. 1999)). The rationale is that "[t]ranslating legal damage into money damages is a matter peculiarly within a jury's ken," *Smith v. Kmart Corp.*, 177 F.3d 19, 30 (1st Cir. 1999), therefore courts "rarely will override the jury's judgment on the appropriate amount of damages to be awarded." *Brown v. Freedman Baking Co.*, 810 F.2d 6, 11 (1st Cir. 1987). *Accord Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 428 (1st Cir. 1993). In reviewing the evidence, the Court keeps in mind that the "paramount focus in this analysis is the evidence presented at trial." *Gutierrez Rodriguez v. Cartagena*, 882 F.2d 553, 579 (1st Cir. 1989).

A review of the evidence presented at trial shows the jury award for damages has a "substantial basis in the evidence." *Tejada Bautista v. Fuentes Agostini*, 258 F. Supp. 2d 18, 22 (D.P.R. 2003). While the Feliciano Defendants argue that "[t]here was evidence that the company assets were overvalued as the log books of the airplanes were unreliable and failed to disclose the real situation of the airplanes," *Feliciano's Mot.* at 28, Mr. Rebarber retorts that "the logbooks were not unreliable" as "maintenance was kept accordingly and errors in the logbooks were corrected soon

after being recorded." *Rebarber's Opp'n* at 32-33.  As this issue of weighing conflicting testimony was decided by the jury, the Court does not reweigh it.  Instead, the Court points out as it did above that there is a substantial basis in the evidence to support the conclusion that both the valuation of the company at the time of the Agreement signing and the damages award are accurate.  *See, e.g.*, *June 28, 2022 Trial Tr.* at 82:5-99:13 (ECF No. 335); *June 22, 2022 Trial Tr.* at 10:1-23, 11:11-19, 74:17-20, 74:25-75:1 (ECF No. 306); *June 23, 2022 Trial Tr.* at 744:13-25, 75:8-10, 81:5-9, 81:21-25, 82:10-15, 99-102, 114:17-18, 119:18-22, 120:1-3 (ECF No. 324).

The Feliciano Defendants also urge that the "rest of the damages claimed by Rebarber should be dismissed [because] Rebarber cannot claim any part of the value of the airplanes, nor good will of the company as all of that was included in the valuation for the stock purchase and is therefore included in the value of 20% of the stock." *Feliciano's Mot.* at 28.  Similarly, they contend that "Rebarber cannot claim damages to his morale or reputation as he can only claim the value of his stock." *Id.*

In response, Mr. Rebarber points out that the Feliciano Defendants cite "no specific language in the [stock purchase agreement] that imposes such a limitation," and contends that this argument "is unsupported and should not be considered." *Rebarber's Opp'n* at 34.

In reply, the Feliciano Defendants further develop their claim, saying "Rebarber cannot claim loss of goodwill on a corporation that does not have his name and the jury could not award damages for loss of goodwill because no evidence of such

76

damages was presented . . . The name Air America is property of AA, therefore if it lost any goodwill, only AA can claim it from Feliciano." *Feliciano's Reply* at 7.

Mr. Rebarber accurately points out that the Feliciano Defendants cite "no specific language in the [stock purchase agreement] that imposes such a limitation" in the calculation of damages. *Rebarber's Opp'n* at 34. Adding on, Mr. Rebarber points out that they cite "no Puerto Rico jurisprudence or law to support [his] damage cap argument." *Id.* The Feliciano Defendants do cite *Wortley v. Camplin*, 333 F.3d 284, 297 (1st Cir. 2003), for the proposition that "Rebarber can only be awarded the market value of the stock." *Feliciano's Mot.* at 28.

But as Mr. Rebarber points out, *Wortley* is readily distinguishable from the present case. *See Rebarber's Opp'n* at 33. The *Wortley* court was addressing the fair market value limitation of damages in the context of an alleged violation of §10b of the Securities Exchange Act of 1934. *See Wortley*, 333 F.3d at 296 ("When there has ben a violation of Section 10-b, the ordinary measure of damages is for a defrauded seller to recover the difference between what the seller received for the shares and the fair market value of the shares at the time of the sale").

Mr. Feliciano points the Court to no precedent that suggests this fair market value limitation applies to buyers as well as sellers, much less cases outside of the §10b context. The Court is independently aware of none. Absent sufficient authority to ground Mr. Feliciano's basis for remittitur, the Court declines to engage with this argument. *See Cardona Román v. Univ. of P.R.*, No. CV 10-1363(DRD), 2012 WL 13170522, at *7 (D.P.R. Feb. 14, 2012) (declining to tackle conclusory and

unsupported arguments); *Rios-Pineiro v. United States*, 2010 U.S. Dist. LEXIS 159459, \*10 (D.P.R. March 31, 2010) (same).

As the award has a substantial basis in evidence, the amount awarded to Mr. Rebarber by the jury is not "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit to stand." *Sánchez*, 972 F.3d at 17. The Feliciano Defendants cite no precedent to support their argument to the contrary. Therefore, the Court will not upset the jury's damages award and denies the Feliciano Defendants' motion for remittitur on the grounds of excessive damages.

## V.  CONCLUSION

The Court DISMISSES as moot Plaintiffs'/Counterclaim Defendants' Motion under Rule 59 for New Trial (ECF No. 279) and DENIES Plaintiffs'/Counterclaim Defendants' Motion to Set Aside Judgment as to Christel Bengoa, Conjugal Partnership Feliciano-Bengoa, Air America Inc., Luis Feliciano-Munoz, and their Motion for New Trial (ECF No. 358).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of December, 2023